KELLUM, Judge.
In March 2005, an Etowah County grand jury returned an indictment against the appellant, Michael Wayne Reynolds, charging him with five counts of capital murder in connection with the deaths of Charles James Martin III, Melinda Martin, and the Martins’ eight-year-old daughter, Savannah Martin. The murders were made capital because: (1) two or more persons were killed by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Code of Alabama 1975 (count I of the indictment); (2) the murder of Charles Martin III was committed during the course of a first-degree robbery, see § 13A-5-40(a)(2), Code of Alabama 1975 (count II of the indictment); (3) the murder of Melinda Martin was committed during the course of a first-degree robbery, see § 13A-5-40(a)(2), Code of Alabama 1975 (count III of the indictment); (4) Savannah Martin was less than 14 years of age when she was murdered, see § 13A-5-40(a)(15), Code of Alabama 1975 (count IV of the indictment); and (5) the murder of Savannah Martin was committed during the course of a first-degree robbery, see § 13A-5-40(a)(2), Code of Alabama 1975 (count V of the indictment).
Following a trial by jury, Reynolds was convicted of all five counts of capital murder, as charged in the indictment. The jury recommended, by a vote of 12-0, that Reynolds be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Reynolds to death for the five capital-murder convictions.
Reynolds filed a timely motion for new trial, which was denied by operation of law.[1] This appeal followed.

*74
Facts of the Crimes

The State presented evidence that in the early morning hours of Sunday, May 25, 2003, Charles Martin III, his wife, Melinda, and their 8-year-old daughter, Savannah, were stabbed to death in their house. Their bodies were doused with gasoline and set on fire. The crimes were discovered later that morning by Melinda’s father, Jerry Veal. Melinda Martin’s purse and a cordless telephone were missing from the house.
Adrian Marcella “Marcie” West, who was Michael Reynolds’s girlfriend at the time of the murders, testified at trial. She and Reynolds lived with Reynolds’s father, Harold Reynolds, at the time of the crimes. West testified that on Saturday, May 24, 2003, Michael Reynolds installed a car stereo for Donald Harvey, who was also known as “Dino,” in exchange for some cocaine. West and Reynolds used the cocaine; they also used crack cocaine several more times throughout that day and night.
West testified that later that night or early on Sunday morning, she drove Michael Reynolds to the Martins’ house in a vehicle that was owned by Harold Reynolds’s girlfriend, Sandra Roberts. West said that Michael Reynolds and Charles Martin were good friends. Reynolds told West that they were going to the Martins’ house “to get some money,” and she assumed he meant that he was going to rob Charles Martin.
When they arrived at the Martin residence, West parked the vehicle in the driveway, and Michael Reynolds got out. Reynolds told West to wait in the car. West said that Reynolds was not wearing any shoes, and that he was carrying a scabbard containing a dagger-style knife. She had seen the knife before at Harold Reynolds’s residence. West testified that she was not alarmed that Reynolds had the knife with him because, she said, Reynolds sometimes traded various items for drugs or money.
Reynolds went to the carport door and knocked. Charles Martin opened the door and waved at West, and then Martin and Reynolds went into the house.
While West was waiting in the car, she heard Melinda Martin scream. West got out of the car and ran into the house. She saw Charles Martin lying on the kitchen floor and she heard Melinda Martin screaming in the back of the house. West went to the bedroom, where she saw Melinda Martin bent over next to the bed as Michael Reynolds stabbed her. Savannah Martin was on the bed.
West testified that she got between Reynolds and Melinda and tried to stop him from stabbing her. Reynolds accidentally stabbed West through the arm when she tried to intervene. West testified that Reynolds yelled at her and asked her what she was doing there. He told West to get the telephone and Melinda Martin’s purse and to go wait in the car. Reynolds handed her two knives — the knife that he had taken into the house, and a steak knife that West had not seen before.
West grabbed the telephone and Melinda Martin’s purse, and took the knives and left the bedroom. When she left the room, Melinda Martin was “slouched over” at the end of the bed, and Savannah Martin was standing on the bed. West testified that she felt faint, so she leaned up against the wall in the hallway. She again felt faint when she crossed over Charles Martin’s body in the kitchen, so she leaned against the kitchen counter. West left the house and went to the car.
West opened the front passenger door and placed the items in the floorboard and then crawled to the driver’s side of the *75 vehicle — the driver’s door was damaged and did not open.
West testified that Reynolds came to the car and told West not to leave, and then he grabbed the larger knife and went back into the house. Reynolds apparently returned to the car a second time and again told West not to leave. West testified that she was afraid, so she did not leave or call for help. At that time, West did not realize that she had been stabbed.
West testified that when Reynolds returned to the car for the third time, he got in the vehicle and told her that she had been stabbed and that he should drive. West said that she did not allow Reynolds to drive because she feared that he was going to take her somewhere and kill her. West could see the orange glow of a fire in the house.
She drove back to Harold Reynolds’s residence. When they arrived at Reynolds’s house, Michael Reynolds told West to give her clothes to him and to take a shower. West stated that she saw Reynolds looking through Melinda Martin’s purse. While West was taking a shower, Reynolds took a cloth and cleaned Sandra Roberts’s car. After West showered, Reynolds bandaged her arm, using a first-aid kit they had in their bedroom. Reynolds told West that there was no blood in the car.
Sandra Roberts testified that she was asleep in Harold Reynolds’s bed when West and Michael Reynolds arrived back at the house. She testified that around 3:00 or 4:00 a.m. she was awakened when Reynolds placed her car keys on the night stand beside the bed. West and Reynolds then went to their bedroom. Roberts noticed that West was walking with her arms folded.
Roberts got out of the bed and went into the kitchen and sat down at the kitchen table. A short time later, Michael Reynolds entered the kitchen and gave Roberts some money and told her to go buy some drugs. Roberts left and purchased some crack cocaine. West said that while Roberts was gone, Michael Reynolds took a shower and that is when she noticed blood on Reynolds’s legs.
When Roberts returned to the house, she and Michael Reynolds divided the crack cocaine. Roberts used her portion of the drugs while she was seated at the kitchen table, but Michael Reynolds took his and West’s share of the crack to his bedroom.
Roberts testified that a short time later, Michael Reynolds reentered the kitchen and propositioned her for sex, but she refused. Roberts said that Michael Reynolds wanted more drugs but, according to him, he could not get West to give him more money. Reynolds asked Roberts to talk to West. Roberts agreed.
When Roberts entered the bedroom, West was in the bed with the covers pulled up to her neck, staring at the ceiling. Roberts testified that West was acting strangely and that she was unable to engage West in any conversation. Roberts decided to leave and go to her house. As she was driving, she noticed a cordless telephone without the base on the backseat of her car. Roberts had never seen that telephone before.
West and Michael Reynolds woke around 9:00 or 9:80 on that morning. West noticed that the eyeglasses Michael Reynolds had been wearing the night before were broken. When she pointed this out to Reynolds, he told her that the missing eyeglass piece would melt in the fire. West testified that Reynolds told her that the knives were under the truck and that their clothes and Melinda Martin’s purse were in a white bag.
*76 Around 10:00 a.ra. on Sunday May 25, Jerry Veal, Melinda Martin’s father, drove by Charles and Melinda Martin’s residence located on Tidmore Bend Road in Etowah County. Veal became concerned when he saw Melinda’s vehicle parked in the driveway because Melinda regularly attended church services on Sunday mornings. Veal telephoned Melinda on his cell phone, but no one answered.
Veal drove back to the Martin residence and parked his vehicle in the driveway. He got out and went to the carport door and knocked. When no one came to the door, Veal opened the carport door and found the kitchen in disarray — furniture had been moved around, the window treatments were partially torn down, and there was blood everywhere. Veal saw his son-in-law lying on the kitchen floor in a pool of blood.
Veal returned to his car and told his wife, and she telephoned 911. While Jerry Veal was talking on the cell phone with the 911 dispatcher, he saw James Mulkey, a retired Gadsden police officer, drive by the house. Veal was acquainted with Mulkey, so he stopped Mulkey and told him what he had seen.
Mulkey instructed Veal to remain outside, and Mulkey went to the carport door. When Mulkey opened the carport door, he saw Charles Martin, who appeared to be dead, lying on the kitchen floor. Mulkey did not enter the residence at that time because he could detect the strong odor of gasoline and gunpowder.
When the paramedics arrived, Mulkey and the paramedics entered the residence; they determined that Charles Martin was dead. Mulkey and the paramedics proceeded down the hallway to determine if anyone was in need of medical assistance. They discovered the bodies of Melinda Martin and Savannah Martin in a bedroom. The bedroom was in disarray and there was blood everywhere.
The smell of gasoline was overpowering, so Mulkey opened the back door to the residence, and then he and the paramedics left through the back door of the house, being careful not to disturb the scene.
Investigators arrived and processed the scene. During the investigation, a bloody partial footprint and a blood drop were discovered on the steps outside the carport door. Charles Martin was found lying on the floor in a pool of blood with a cigarette by his mouth. There were three bloody shoe prints on the kitchen floor. The kitchen chairs were knocked over, the kitchen blinds had been ripped or slashed, and there was blood spattered everywhere. A gasoline can was sitting on the floor beside Charles Martin’s body, and exploded bottle rockets were scattered throughout the kitchen and into the living room.
A utensil drawer in the kitchen was open, and there were blood droplets under the drawer. There were two sandwiches on a Styrofoam plate on the kitchen counter by the stove, and one of the burners of the kitchen stove was lit. Investigators observed a spoon with gray material in it and a syringe located on the counter beside the stove. A basket of prescription drugs was also on the counter.
Blood droplets were found on the hallway wall opposite the door to the bedroom where the bodies of Melinda and Savannah were discovered.
Melinda Martin was found lying on the floor on the right side of the foot of the bed. She had slits in her clothing that were consistent with stab wounds. She was also wearing a back brace. A walking cane was found near her body. A telephone cord extended from the wall by the headboard of the bed to Melinda Martin’s *77 body, but no telephone was attached to the cord.
Savannah Martin was lying on her back on the bed. She had been stabbed multiple times and had a prominent stab wound through her neck. A bloody hand print was discovered near Savannah’s body on the fitted sheet; however, due to the soft surface, there was no ridge detail to the print.
An investigator collected the wet, bloody comforter and bed linens and put them in a large paper bag in order to transport the bedding to the forensic laboratory for further testing. When the bedding was un-packaged and put up to dry later that day, a television remote and a temple piece to a pair of eyeglasses fell out of the bedding. Law-enforcement personnel were informed about the eyeglass piece.
An autopsy of the victims confirmed that Melinda Martin died as a result of 24 stab wounds to her body. Charles Martin died as a result of 11 stab wounds to his body. Savannah Martin died as a result of 5 stab wounds to her body. All the victims had chemical burns to their bodies, and Chuck Martin also had thermal burns on his body. None of the stab wounds to the victims was immediately fatal.
West testified that as she and Reynolds were walking to a nearby convenience store later that same Sunday morning, Reynolds asked West if he had made the headlines, and he inquired whether West had seen Charles Martin’s face. Later that day, the police arrested Michael Reynolds on an unrelated matter.
That same afternoon, West saw Donald Harvey drive into the alley behind Reynolds’s residence. West got into Harvey’s car, and he asked her if Reynolds had anything to do with what happened to Charles Martin. West nodded in the affirmative. Although the evidence was conflicting regarding whose idea it was, West and Harvey agreed that they should get rid of the evidence from the crime scene.
Harvey and West went to a gasoline service station and purchased some gasoline and drove to an area near Tuscaloosa Avenue. West threw the telephone base into the woods, and then Harvey doused the bag containing their clothes and the purse with gasoline and set the items on fire. West and Harvey threw the knives into the Coosa River from a pier at a boat launch located at Gadsden State Junior College.
On the day the murders were discovered and in the days that followed, the police questioned several persons regarding their potential involvement in the murders and robbery, including Charles Martin’s nephew, Chad Martin, and John Langley, who lived in the same neighborhood as the Martin family. The police ultimately ruled these individuals out as suspects.[2]
A few days after the discovery of the crimes, West talked with her former employer, who was an attorney, and told him what had happened. The attorney contacted the district attorney’s office, and as a result, West subsequently gave the police a statement regarding the crimes.
Based on the information provided by West, the Gadsden police located and photographed the burn pile where West said the clothes and purse had been burned, and the police also recovered the telephone base in the woods a short distance from the burn pile. The phone base, the cordless phone found in Roberts’s car, and the telephone cord lying across the floor in the room where the bodies of Melinda and *78 Savannah Martin were found were all Uni-den brand products.
Gadsden police conducted a search of Harold Reynolds’s residence. In the bedroom shared by Michael Reynolds and West, the police discovered a pair of prescription tinted eyeglasses. The glasses were broken — the temple piece was missing, and one of the lenses was lying beside the glasses. The glasses were consistent with the prescription lenses and frames sold to Reynolds by a professional optician. The temple piece recovered from the bedding at the Martin house matched the temple piece still attached to the frame found at the Reynolds residence. A first-aid kit was also discovered in the bedroom.
A scuba diver with the Etowah County Rescue Squad recovered an oriental-style scabbard from the Coosa River in the area where the knives had been discarded by West and Harvey. Sandra Roberts testified that the scabbard appeared to be the same scabbard she had previously seen at Reynolds’s residence. West also testified that the scabbard was the one that she and Harvey had disposed of in the Coosa River.
Photographs of Michael Reynolds’s hands taken by the Gadsden police after his arrest showed bruising and flaking skin. West testified the bruising and flaking was not present at the time of the murders.
A forensic examination of the interior of Roberts’s car did not indicate the presence of any blood. Forensic testing of the DNA extracted from the swab of the blood drop from the outside steps and the hallway at the Martin residence matched the DNA obtained from Adrian West. There was a mixture of DNA on the blood swabbed from the handle of the gasoline can. The primary contributor of that DNA was determined to be Savannah Martin, but neither Michael Reynolds nor Melinda Martin could be excluded as a contributor of the DNA. There was also a mixture of DNA from a swab of blood obtained from the lens of Michael Reynolds’s glasses — Melinda Martin’s DNA was the primary component of that DNA mixture. The bloody footprint on the outside door-step matched a known ink print of Michael Reynolds’s footprint.
The shoe prints in the kitchen did not match any of the known samples submitted for comparison purposes, and a blood swab from the outside door frame did not match any of the known DNA samples.
Michael Reynolds testified in his defense. He testified that he met Charles Martin in May 2002 and that he and Charles became good friends. Reynolds testified that Martin was one of the people authorized to take Reynolds’s son home from school. Reynolds and his son even lived with Charles Martin for several months, at Martin’s mother’s residence.
Reynolds said that he saw Martin several times a week up until the time Reynolds was arrested for a different offense. Reynolds testified that he had seen Melinda Martin a couple of times, but that he had never seen Savannah Martin. He testified that the last time he saw Martin alive was two or three weeks before the Martins were killed.
Reynolds testified that at the time of the incident, he and Adrian West were living with his father at his father’s residence. Reynolds said that on the morning of Saturday May 24, 2003, his “boss” came by the residence and paid his father and him for a painting job they had completed the day before. Later that morning, Donald Harvey came to the Reynolds residence and asked Michael Reynolds to install a car radio for him. Reynolds said that he installed the radio, and Harvey gave him a gram of cocaine in return.
*79 Reynolds said that between 9:00 and 10:00 p.m., Sandra Roberts came to the residence. Reynolds and West shared the last of their drugs with Roberts. Reynolds testified that he gave Roberts some money to get some more drugs. Reynolds explained that he had money to purchase the drugs because in addition to the money that he had received that morning for completing the painting job, West also had $500 that Reynolds’s father had given her to hold in case Reynolds needed to post bond — he testified that there was an outstanding warrant for his arrest at that time.
Reynolds testified that Sandra Roberts left and went to buy more drugs. When she returned with the drugs, Reynolds, Roberts, and West used all of those drugs. Reynolds testified that some time later, Adrian West and Sandra Roberts left together in Sandra’s car to go get more drugs. Reynolds testified that he instructed West to go with Roberts because he thought Roberts had cheated them out of drugs on the previous transaction.
Reynolds testified that after Roberts and West had been gone for a couple of hours, he changed into a pair of shorts and a T-shirt, went to bed, and fell asleep. His father was passed out; he was intoxicated.
Reynolds said that some time later, Adrian West woke him and told him that she was hurt. Reynolds got out of bed to attend to West. When Reynolds asked her how she was hurt, she told him that she had been stabbed. Reynolds then asked West how she had been stabbed, and she responded that “Chuck was dead and she ... got stabbed trying to stop them from stabbing Chuck’s wife.” (Vol. XI, R. 1567.) Reynolds testified that West did not tell him who she was with at the time of the stabbings.
Reynolds stated that he was concerned about her arm, so he bandaged it using a first-aid kit he had in the bedroom. He said that the wound was not bleeding very much but that it looked bad. After bandaging her arm, Reynolds instructed West to accompany him outside the house so that he could talk to her without fear of his father overhearing.
Reynolds testified that when they got outside, he continued to question her about what happened, but West did not want to talk about it. Reynolds said that West was very worried, so he told her to get Sandra Roberts’s car keys and she did.
Reynolds said that they left in Roberts’s car, and that West drove because Reynolds’s license had been revoked. Reynolds was still dressed in the clothes he had on when he went to sleep, and, although he put on his glasses, he did not put on any shoes.
They went to the Martin residence. He said that when they got to the residence, West slowed down in order to pull in the driveway; however, Reynolds said that because the lights were on in the house, he instructed her to keep driving. West drove to a nearby gas station, turned around, and then drove back to the Martin residence.
When they got to the Martin residence, West asked Reynolds what he wanted her to do. He testified that he again instructed her to “just drive.” (Vol. XI, R. 1571.) West began to drive back to Reynolds’s residence. Reynolds testified that as they were traveling, West told him that she was scared, and she asked him what they were going to do. Reynolds said that as they neared his father’s residence, he “just knew [he] had to do something,” so he instructed West to again drive to the Martin residence. (Vol. XI, R. 1571.)
Reynolds testified that when they arrived at the Martin residence that time, West drove the car into the driveway. *80 The carport light was on. Reynolds got out of the car and told West to remain in the car. As Reynolds approached the carport door, he saw that the door was cracked open. Reynolds pushed the door open and saw Charles Martin lying on the floor. Reynolds said there was blood all around Martin so, he said, he knew at that point that West had told him the truth.
He testified that he did not telephone the police; instead, he went inside, stepped over Charles Martin’s body, and went to the Martins’ bedroom. He explained that he went to that bedroom because West told him she had been hurt “trying to stop them from stabbing Chuck’s wife.” (Vol. XI, R. 1573.) Reynolds said that although the television was on in the bedroom, the bedroom lights were not on, so he did not see Melinda Martin’s body when he first went into the room. Reynolds said that he tripped over Melinda Martin, who was lying in the floor between the bed and the doorway. When he tripped, his glasses fell off onto the bed, and he caught himself on the bed. Reynolds testified that he grabbed his glasses from the bed and stood up and that is when he saw Melinda Martin, who appeared to be dead. Reynolds testified that he never saw Savannah Martin.
Reynolds said that he went back through the house and outside, stepping back over Charles Martin in the process. He gave West his glasses and told her to hold them. Reynolds then asked West to tell him everything that she had touched so that he could wipe it off, but West could not recall everything she had touched. Reynolds testified that he went back into the house, intent on wiping the surfaces off. Reynolds said that everything in the house was such a mess that he did not know where to start. He said that at that point, he looked and saw that one of the burners on the stove was lit, so he decided to burn the house down. Reynolds testified that he got the gasoline can that was located beside the porch steps, and doused the rooms with gasoline.
Reynolds said that when he got back to the kitchen, he got a napkin and lit it from the burner, and threw it on the gasoline trail. Reynolds then left the house and got in the car and told West to leave. As West drove back toward Harold Reynolds’s residence, she asked Reynolds what was going to happen and he told her “[N]othing, I caught the place on fire.” (Vol. XI, R. 1576.)
Reynolds testified that when they got back to Harold Reynolds’s residence, they parked Sandra’s car and went into the house. As they walked by his father’s bedroom, Sandra Roberts asked them if they had “anything,” meaning drugs. Reynolds told her they did not, and then he and West went to the bedroom they shared. Reynolds testified that at that point, he told West to give him some money and West gave him $20. He gave that money to Sandra Roberts and told her to go get some more drugs. He testified that he wanted to get Roberts out of the house. Reynolds said that he and West went into the bathroom, and he cleaned and rew-rapped the injury on West’s arm. In a few minutes, Roberts returned with more drugs.
When Roberts returned with the drugs, Reynolds went into the kitchen and he and Roberts took some of the drugs. Reynolds prepared a syringe of the drugs for West and took it into their bedroom; however, West refused the drugs, saying she just wanted to go to sleep. Reynolds offered the drugs to Roberts, and when she declined to take the drugs, Reynolds used them. He then went back to sleep.
Reynolds testified that later that morning while he and West were walking home from the convenience store, he again tried *81 to question West about what had happened the night before. Reynolds said that West was acting strangely and that she told him that she did not want to think about it. He testified that at that point, he did not want to think about it either.
Reynolds said that shortly after they arrived back at his father’s residence, the police arrived and arrested him and that he had been incarcerated since that time.
After both sides had rested and the circuit court had instructed the jury on the law applicable to Reynolds’s case, the jury returned a verdict finding Reynolds guilty of five counts of capital murder, as charged in the indictment.
During the penalty phase of Reynolds’s trial, the State resubmitted all the evidence it had introduced during the guilt phase. Apparently, for strategic reasons, defense counsel stipulated to the presence of the aggravating factor that the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses. See § 13A-5-49(8), Ala.Code 1975. With regard to the statutory mitigating factors, the State agreed that Reynolds had no significant history of prior criminal activity.[3] See § 18A-5-51(l), Ala. Code 1975.
Reynolds presented several witnesses who testified to the neglect and abuse Reynolds witnessed and endured from his father and mother during his developing years and who testified that Reynolds was introduced to drugs and crime at an early age. Reynolds also presented evidence indicating that he had overcome many of the hardships that he endured as a child and that he managed to create a fairly stable professional and social life until he began using the drug crystal methamphetamine.
After both sides had rested and the circuit court had instructed the jury on the law applicable to the penalty phase proceeding, the jury returned a verdict, by a vote of 12-0, sentencing Reynolds to death. The circuit court accepted the jury’s recommendation and sentenced Reynolds to death for the five capital-murder convictions.

Standard of Review

In every ease in which the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
As this Court stated in Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies *82 only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Although Reynolds’s failure to object at trial will not preclude this Court from reviewing an issue, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

Guiltr-Phase Issues

I.
Reynolds maintains that the circuit court “improperly ordered [him] to wear a stun belt throughout his trial.” Specifically, Reynolds argues that the “trial court’s decision improperly and needlessly deprived [him] of his rights to due process, a fair trial, and to participate in his own defense.” (Reynolds’s brief, Issue VII, at 69-71.)
Reynolds did not object to the use of the stun belt. Accordingly, we will review his claim for plain error only. Rule 45A, Ala. R.App.P.
The record does not indicate who ordered Reynolds to wear the stun belt— whether it was required by the Court or by the sheriffs department. However, there is no evidence indicating that the belt interfered with Reynolds’s right to confer with his counsel or that the jury was even aware that Reynolds was wearing a stun belt. We have reviewed the record and, as we did in Belisle v. State, 11 So.3d 256 (Ala.Crim.App.2007), aff'd, 11 So.3d 323 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009), we find no plain error. Rule 45A, Ala.R.App.P.
II.
Reynolds argues that the circuit court committed a number of errors during the jury-selection process. (Reynolds’s brief, Issue XX, at pp. 108-10.) These will be addressed individually below.
A.
Reynolds contends, in a one-sentence argument, that the circuit court “erroneously excused at least 150 of the summoned jurors outside the presence of the parties, in violation of [his] Sixth Amendment right to be present and to a fair trial by an impartial jury.” (Reynolds’s brief, at 108.)
The record indicates that when the veni-re was first assembled, during the circuit court’s general instructions regarding the proceedings, the court stated:
“But here is kind of the way it works: We sent out four hundred jury summons. You will look around. There are not four hundred people in this room. Of those four hundred, about one hundred and fifty of them have already been excused....”
(Vol. V, R. 327.) The court then continued with its general introduction to the proceedings.
Reynolds did not object to the circuit court’s excusing the potential jurors outside his or his counsel’s presence. Accordingly, we review this assertion for plain error only. Rule 45A, Ala.R.App.P.
*83 “Section 12-16-74, Ala.Code 1975, specifically gives a trial court the right to excuse potential jurors outside the presence of the parties and their counsel. No error, much less plain error, occurred here.”
Dorsey v. State, 881 So.2d 460, 482 (Ala.Crim.App.2001), aff'd in part, rev’d in part on unrelated ground, 881 So.2d 538 (Ala.2003). Reynolds has not presented any specific instance in which the circuit court supposedly exceeded its discretion in excusing the potential jurors outside the presence of the parties, and we find no error, plain or otherwise.
B.
Reynolds alleges, in a one-paragraph argument, that the circuit court erred to reversal because, he claims, the Court “directed that all self-employed persons, individuals over the age of 80, and full-time students would be automatically removed from the jury venire.” (Reynolds’s brief, at 108.) (Emphasis added.)
Reynolds did not object on this ground at trial. In fact, defense counsel indicated that they were satisfied with the proceeding. (Vol. V, R. 401.) Accordingly, we review this contention for plain error only. Rule 45A, Ala.R.App.P.
Section 12-16-63, Ala.Code 1975, provides, in relevant part:
“(a) The court, upon the request of a prospective juror pursuant to this section, shall determine on the basis of information provided during an interview with the prospective juror or based on other competent evidence whether the prospective juror should be excused from jury service.
“(b) A person who is not disqualified for jury service may apply to be excused from jury service by the court only upon a showing of undue or extreme physical or financial hardship, a mental or physical condition that incapacitates the person, or public necessity....
“(1) ....
“(2) For purposes of this article, undue or extreme physical or financial hardship is limited to any of the following circumstances in which an individual would:
“(a) Be required to abandon a person under his or her personal care or supervision due to the impossibility of obtaining an appropriate substitute caregiver during the period of participation in the jury pool or on the jury.
“(b) Incur costs that would have a substantial adverse impact on the payment of the individual’s necessary daily living expenses or on those for whom he or she provides the principal means of support.
“(c) Suffer physical hardship that would result in illness or disease.
“(3) Undue or extreme physical or financial hardship does not exist solely based on the fact that a prospective juror will be required to be absent from his or her place of employment.”
The record indicates that during the jury assembly, the court informed the prospective jurors that there were generally four reasons that the court would accept in order to excuse a prospective juror from service: (1) a verifiable medical condition that precluded the prospective juror from serving; (2) persons who were over the age of 80 years; (3) full-time students; and (4) self-employed persons. (Vol. V, R. 329-30.) After the general qualification of the prospective jurors, the circuit court interviewed the prospective jurors who sought to be excused. (Vol. V, R. 362-402.) Of the 48 jurors who were interviewed in this process, the circuit court granted 21 of the requests to be excused. (Vol. V. R. 362-402.) Those 21 jurors *84 were excused for reasons encompassed in § 12-16-63, Ala.Code 1975.
The circuit court did not abuse its discretion, and we find no error, plain or otherwise, in this regard. See Turner v. State, 924 So.2d 737, 752-53 (Ala.Crim.App.2002); Boyd v. State, 715 So.2d 825, 843 (Ala.Crim.App.1997).
C.
In a one-sentence argument, Reynolds contends that the circuit court'erred to reversal in removing 10 veniremembers based on the veniremembers’ opposition to the death penalty.
First we note that Reynolds objected to the circuit court’s granting of the State’s challenges for cause for only 2 of the 10 prospective jurors, Z.B. (Vol. 6, 533) and F.G. (Vol. VI, R. 600.)[4] Thus, we will review Reynolds’s allegations regarding the remainder of the challenges for plain error only. Rule 45A, Ala.RApp.P.
We have reviewed the voir dire conducted by the circuit court of each of the 10 prospective jurors:
1. Z.B. — (Vol. VI, R. 487, 492, 512-15.)
2. F.G. — (Vol. VI, R. 550, 554-55, 600.)
3. N.M. — (Vol. VI, R. 638; Vol. VII, 664, 692.)
4. S.O. — (Vol. VI, R. 640; Vol. VII, 664, 689-91.)
5. J.M. — (Vol. VI, R. 639, Vol. VII, 683-84.)
6. J.R. — (Vol. VI, R. 640, Vol. VII, R. 685.)
7. J.M. — (Vol. VII, R. 705-07.)
8. M.W. — (Vol. VII, R. 765-67.)
9. O.H. — (Vol. VII, R. 768-69.)
10. E.F.T. — (Vol. VII, R. 772-73.)
Because of these jurors’ opposition to the death penalty, we find no error in the circuit court’s granting of the challenges for cause with regard to the 10 prospective jurors. See Bryant v. State, 951 So.2d 732, 737-39 (Ala.Crim.App.2003), for a thorough discussion of the pertinent law regarding appellate review of a trial court’s granting of a challenge for cause.
D.
In a related vein, Reynolds argues that the “pre-trial death qualification violated [his] constitutional right to an impartial guilty-phase jury.” (Reynolds’s brief, at 109.) As best we can determine, Reynolds did not object on this basis at trial, and we find no plain error. This Court has previously addressed and rejected this assertion. See Dotch v. State, 67 So.3d 936 (Ala.Crim.App.2010.)
E.
Reynolds asserts that the circuit court erred in refusing his request to sequester the jury. (Reynolds’s brief, at 109.)
“ ‘Even in a capital case there is no requirement that a court sequester the jurors during the trial. The decision to grant or deny a motion to sequester the jury during trial is within the sound discretion of the trial court. See Centobie v. State, 861 So.2d 1111 (Ala.Crim.App.2001).’ Belisle v. State, 11 So.3d 256, 279 (Ala.Crim.App.2007). See also Brown v. State, 11 So.3d 866, 885 (Ala.Crim.App.2007) (holding that there is no requirement that the jury be sequestered).”
Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009.)
In support of his assertion, Reynolds alleges that “there is a substantial likelihood that [he] was prejudiced by the jury’s exposure to highly prejudicial matters.” *85 (Reynolds’s brief, at 109-10.) However, Reynolds does not specify what those “highly prejudicial matters” were, or how he was purportedly prejudiced by them.
“What [Reynolds] has presented to this Court is only bare allegations of prejudice that, he says, resulted from the trial court’s failure to sequester the jury; he offers no concrete factual basis to support these claims. We will not base error on speculation and conjecture. In deciding to allow the jury to separate, the trial court in this case did so with great caution, providing adequate instructions to the jury. Therefore, we conclude that the trial court did not abuse its discretion when it permitted the jury to separate.”
Broadnax v. State, 825 So.2d 134, 155-56 (Ala.Crim.App.2000).
F.
Finally, Reynolds argues, in effect, a violation of the cumulative-error rule. Specifically, he maintains that “[individually or collectively, the aforementioned errors of the trial court denied [him] his right to a fair trial by a fair and impartial jury-” (Reynolds’s brief, at 110.) The Alabama Supreme Court has set forth the cumulative-error rule as follows: “[Wjhile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.” Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala.R.App.P.). As previously discussed, we found no error, plain or otherwise, with regard to Reynolds’s allegations of error in Parts II-A through II-E. Likewise, after applying the cumulative-error standard set out in Ex parte Woods, supra, to Reynolds’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence indicating that the cumulative effect of any of the aforementioned nonreversible errors in this case affected Reynolds’s substantial rights at trial.
III.
Reynolds, who is Caucasian, asserts that because the State used its peremptory strikes to remove 9 of the 14 African-American jury veniremembers, the circuit court erred in concluding that there were no violations of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Because Reynolds did not make a Bat-son objection at trial, we review this claim under the plain-error standard. In the circuit court’s written sentencing order, the court specifically found:
“A jury was struck and sworn in this case, consisting of seven (7) females and five (5) males. One of the male jurors was black, and all of the remaining jurors were white. There were no Batson challenges made by either side and no Batson violations occurred in the selection of the jury.”
(Vol. II, C. 320, 327, 334, 341, 348.)[5]
Reynolds now argues that “[g]iven the unquestionable evidence of discrimination in this case, the trial court’s failure to find a prima facie case of discrimination and to require the prosecutor to state reasons for his strikes was erroneous.” (Reynolds’s brief, at 106-07.) Reynolds does not speci *86 fy what that “unquestionable evidence” was, and it is not evident to this Court.
With regard to Batson claims:
“ ‘ “ ‘For plain error to exist in the Batson context, the record must raise an inference that the state [or the defendant] engaged in “purposeful discrimination” in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).’ ” ’
“Smith v. State, 756 So.2d 892, 915 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.2000) (quoting Rieber v. State, 663 So.2d 985, 991 (Ala.Crim.App.1994), quoting in turn other cases).”
Ex parte Walker, 972 So.2d 737, 742 (Ala.2007), cert. denied, 552 U.S. 1077, 128 5.Ct. 806, 169 L.Ed.2d 608 (2007).
The only ground Reynolds offers in support of his allegation is that the State used 9 of its 14 strikes to remove African-American veniremembers. “Alabama courts have repeatedly held that numbers alone are not sufficient to establish a pri-ma face ease of discrimination.” Vanpelt v. State, 74 So.3d 32, 53 (Ala.Crim.App.2009). We have thoroughly reviewed the record before this Court and find no inference of purposeful discrimination by the State.[6] Thus, there is no plain error in this regard.
IV.
Reynolds contends that the circuit court erred in denying his written motion to remove his lead counsel. Specifically, he maintains that he and his lead counsel had an “irreconcilable conflict that caused a breakdown in their communication and impaired [lead counsel’s] preparation for [his] defense.” (Reynolds’s brief, Issue VIII, at 71-75.)
The record reflects that after the voir dire of the veniremembers, Reynolds presented the circuit court with a handwritten motion to remove his lead counsel. The motion was read into the record. (Vol. VII, R. 789-91.) In the motion, Reynolds asserted that he was entitled the removal of his lead counsel because, he claimed: (1) lead counsel did not believe that he was innocent; (2) lead counsel withheld information from him; (3) lead counsel did not file a motion that Reynolds had requested counsel to file; (4) lead counsel did not object to a motion that Reynolds had requested that his previous co-defense counsel not file; and, (5) lead counsel disclosed vital information about his case to the State. (Vol. VII, 790-91.) Reynolds concluded by asking the circuit court to remove his lead counsel and to replace lead counsel with another appointed attorney. Reynolds also requested that the trial be continued in order to give that newly appointed cocounsel adequate time to prepare. (Vol. VII, R. 771.)
*87 The State responded that lead defense counsel had worked tirelessly with the co-defense counsel. The State indicated that it had no objection to lead counsel’s being removed, provided that the trial proceed with Reynolds being represented by his two remaining appointed defense counsel. The prosecutor also emphatically denied that Reynolds’s lead counsel had disclosed any confidential information to the State.
When the circuit court gave lead defense counsel an opportunity to reply, counsel stated that the claims in Reynolds’s motion were so vague that counsel could not adequately respond. (Vol. VII, R. 793.) Thereafter, the circuit court noted:
“THE COURT: Well, treating this as a motion by the defendant and from what I have observed in the case, you have done everything that you need to do or could possibly do, and you have adamantly championed your client’s position. You have filed appropriate motions. You have argued motions to the Court. I find no shortcomings in your skills as an attorney. You have practiced before me on many, many occasions. And I have seen nothing inappropriate on your behalf in this case so far. So this would be denied.”
(Vol. VII, R. 793.)
However, before making a final ruling, the circuit court gave Reynolds an opportunity to argue his motion before the court. Reynolds argued:
“Sunday October 14th, [lead defense counsel] came to see me here in the jail. He had information on a motion that he had in his possession that we had a hearing on, and I asked [lead defense counsel] why he didn’t show that motion in Court that day. He said he didn’t know.
“[Lead defense counsel] has made several comments about him not believing in my innocence. He made a comment to me on the 14th again when he came to see me that I found not appropriate. [Lead defense counsel] said he — I asked him how many cases he has handled as a defense on a capital cases, murder cases. And he said he has handled quite a few and has always been on the losing end except when he was a prosecutor and [he] had a good little laugh about that.
“The motion in this — [lead defense counsel] also knew that this Court has took my case off another judge’s docket. .... I didn’t have any idea about this until [lead defense counsel] revealed this in a hearing and after we had done set a court date. I asked for a change of venue at the beginning for [lead defense counsel] to put a motion in at the beginning of this case. He has failed to do so.
“My rights were violated — I explained this to [lead defense counsel] by [the district attorney] when they were questioning me on this before I was ever charged on this. My constitutional rights were violated. [Lead defense counsel] doesn’t even think this is an issue, that the constitutional rights were within reason. I feel it does. Nothing else, Your Honor.”
(Vol. VII, R. 794-95.)
The court asked Reynolds whether he had an issue with proceeding with the trial while being represented by his two other appointed counsel. Reynolds indicated that he would not be satisfied with that option because, he argued, the other two counsel had not prepared to represent him on the entire case, those counsel had not had sufficient time to prepare to try the case without the assistance of lead counsel, and neither of the cocoun-sel had ever tried a capital case. (Vol. VII, R. -797-98.) The circuit court denied Reynolds’s motion to remove lead counsel.
*88 “ ‘ “An indigent defendant who cannot afford to retain an attorney has an absolute right to have counsel appointed by the Court in all criminal proceedings in which representation by counsel is constitutionally required. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Strickland v. State, 280 Ala. 31, 189 So.2d 771 (1965); U.S. Const, amend. V and XIV; Art. I, Ala. Const.1901, § 6; Ala.Code 1975, § 15-12-21; Ala. R.Crim. P. 6.1. While an indigent defendant may have the right to be represented by counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. Briggs v. State, 549 So.2d 155 (Ala.Cr.App.1989). The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant. Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The Sixth Amendment does not guarantee a defendant a meaningful relationship, rapport, or even confidence in court-appointed counsel. Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); Siers v. Ryan, 773 F.2d 37 (3d Cir.1985), cert. denied, 490 U.S. 1025, 109 S.Ct. 1758, 104 L.Ed.2d 194 (1989).”
‘“Snell v. State, 723 So.2d 105, 107 (Ala.Crim.App.1998).’
“ ‘ “ ‘[T]he decision whether to remove an appointed counsel and appoint another counsel for defendant is within the sound discretion of the trial court.’ Crawford v. State, 479 So.2d 1349, 1355 (Ala.Cr.App.1985). See also, Tudhope v. State, 364 So.2d 708 (Ala.Cr.App.1978).... The right to choose counsel may not be subverted to obstruct the orderly procedure in the court or to interfere with the fair administration of justice. United States v. Sexton, 473 F.2d 512 (5th Cir.1973).”
“ ‘Briggs v. State, 549 So.2d 155, 160 (Ala.Crim.App.1989).
“ ‘ “In order to prevail on a motion for substitution of counsel, the accused must show a demonstrated conflict of interest or the existence of an irreconcilable conflict so great that it has resulted in a total lack of communication that will prevent the preparation of an adequate defense.” Snell v. State, supra, at 107.’
“Baker v. State, 906 So.2d 210, 226 (Ala. Crim.App.2001).
[[Image here]]
“... As this Court noted in Cox v. State, 489 So.2d 612 (Ala.Crim.App.1985):
“ ‘ “A defendant is entitled to counsel capable of rendering competent, meaningful assistance in the preparation and trial of the pending charges, including appropriate evaluation and advice with reference to a plea of guilty. A defendant is not entitled to an attorney who agrees with the defendant’s personal view of the prevailing law or the equities of the prosecutor’s case. A defendant is entitled to an attorney who will consider the defendant’s views and seek to accommodate all reasonable requests with respect to trial preparation and trial tactics. A defendant is entitled to an appointment of an attorney with whom he can communicate reasonably, but has no right to an attorney who will docilely do as he is told. Every defendant is entitled to the assis *89 tance of counsel dedicated to the proposition, and capable of assuring that, the prosecution’s case shall be presented in conformity with the Constitution, rules of evidence and all other controlling rules and practices. No defendant has a right to more.” United States v. Moore, 706 F.2d 538, 540 (5th Cir.), cert. denied, 464 U.S. 859, 104 S.Ct. 183, 78 L.Ed.2d 163 (1983).’
“489 So.2d at 622....”
Gavin v. State, 891 So.2d 907, 941-43 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004); 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005)(emphasis deleted).
Although Reynolds had many opportunities to move the court for substitution of lead counsel, he did not do so until after the trial began. Substitution of counsel at that late date would have “obstruct[ed] the orderly procedure in the court [and] ... interfered with the fair administration of justice.” Gavin, 891 So.2d at 941. See also Robinson v. State, 581 So.2d 1197, 1200 (Ala.Crim.App.1990). .Furthermore, Reynolds has not established that his lead “counsel had a conflict of interest or that there was a ‘total lack of communication’ between his counsel and him that would have prevented the preparation of an adequate defense.” Gavin, 891 So.2d at 942. Accordingly, we find no abuse of discretion in the circuit court’s denial of Reynolds’s motion to remove his lead counsel.
V.
Reynolds argues that the circuit court erred by allowing the State to present the deposition testimony of the forensic pathologist who performed the autopsy. (Reynolds’s brief, Issue IV, at 42-51; Reynolds’s reply brief, Issue IV, at 35-40.)
The State introduced the results of the autopsies through the videotaped deposition of Dr. Adam Craig, the forensic pathologist who performed the autopsies. Reynolds claims that at the time of Dr. Craig’s deposition, the State had not yet provided the defense with “crucial discovery information,” namely, the possibility that two different knives may have been used to stab the victims. Reynolds maintains that because he did not have that information at the time of Dr. Craig’s deposition, he was unable to question Dr. Craig about the possibility of two different knives being used in the murders. Thus, Reynolds argues, admission of the autopsy results through Dr. Craig’s deposition testimony in lieu of Dr. Craig’s actual appearance as a witness at trial violated his rights under the Confrontation Clause and the United States Supreme Court’s holding in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
The Confrontation Clause of the Sixth Amendment states that, “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him” U.S. Const. Amend. VI. In Crawford v. Washington, 541 U.S. at 53-54, the United States Supreme Court held that the Confrontation Clause prohibits the “admission of testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant [has] had a prior opportunity for cross-examination.”
Reynolds argues on appeal that although he may have consented to the deposition of Dr. Craig and the use of that deposition testimony at trial, he did not waive his right to confront Dr. Craig about discovery information that he received after the deposition. Reynolds argues that the use of the deposition testimony to introduce the autopsy results violates Crawford because the State did not establish that Dr. Craig was unavailable for trial and because he *90 did not have a prior opportunity to cross-examine Dr. Craig about the discovery materials he received after the deposition.
The State contends that if error did occur in the use of the deposition testimony, it was invited by Reynolds. Under the facts of this case, we agree.
“ “A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.” ’ ” Slaton v. State, 680 So.2d 879, 900 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Crim.App.1990). As we have said in applying the invited-error doctrine, “ ‘It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.’ ” Murrell v. State, 377 So.2d 1102, 1105 (Ala.Crim.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). “The invited error rule has been applied equally in capital eases and noncapital cases.” Rogers v. State, 630 So.2d 78, 84 (Ala.Crim.App.1991), rev’d on other grounds, 630 So.2d 88 (Ala.1992), affd on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Crim.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).’
“ ‘ “Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001). ‘ “An invited error is waived, unless it rises to the level of plain error.” ’ Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), quoting Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001).”
‘“McNabb v. State, 887 So.2d 929, 892-93 [982-83] (Ala.Crim.App.2001).’
“Clark v. State, 896 So.2d 584, 640-41 (Ala.Crim.App.2000) (opinion on return to remand and on application for rehearing).
“ ‘The United States Supreme Court has stated that the plain error doctrine should be used in those situations that “‘seriously affect the fairness, integrity or public reputation of judicial proceedings....’” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).’
“Knight v. State, 675 So.2d 487, 496 (Ala.Crim.App.1995).”
Ex parte Sharp, [Ms. 1080959, December 4, 2009] — So.3d -, - (Ala.2009).
Before trial, the parties agreed to depose Dr. Craig regarding the autopsy results and to use that deposition testimony at trial to introduce the autopsy results instead of presenting Dr. Craig as a wit *91 ness at trial.[7] See, Rule 16.6, Ala. R.Crim. P.; see also § 12-21-264, Ala.Code 1975. The deposition took place as scheduled at the Etowah County courthouse, and Reynolds was permitted to thoroughly examine Dr. Craig.
Nevertheless, at a pretrial hearing when Reynolds informed the court that he had not been able to examine Dr. Craig regarding discovery material he purportedly did not have at the time of Dr. Craig’s deposition, the court offered, at the State’s expense, to allow Reynolds to supplement the deposition and/or to subpoena Dr. Craig for trial in order to address the discovery material. (Vol. 1, C. 139; Vol. IV, R. 57-68.) See § 12-21-288, Ala.Code 1975, “Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceeding.” Despite many subsequent opportunities, Reynolds did not pursue either option offered by the court. (Vol. IV, R. 104; 110-112; Vol. V, R. 441).
When the State sought to introduce the autopsy results through Dr. Craig’s deposition testimony, Reynolds’s only objection was that the State had not demonstrated that Dr. Craig was unavailable for trial. (Vol. IX, R. 1212-1218.)
Assuming, without deciding, that the circuit court erred by allowing into evidence the autopsy results through Dr. Craig’s deposition testimony, any error was the natural consequence of Reynolds’s actions. Moreover, even if allowing the deposition testimony into evidence was error, it does not rise to the level of plain error. “[Vliolations of the Confrontation Clause are subject to harmless-error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).” Smith v. State, 898 So.2d 907, 917 (Ala.Crim.App.2004).
Reynolds argues that he was prejudiced by the circuit court’s allowing the autopsy results in through the deposition of Dr. Craig. In support of this claim, Reynolds alleges that had he been allowed to confront Dr. Craig at trial, he could have challenged Dr. Craig’s conclusion that all the victims were stabbed with the same or a similar weapon and at around the same time, and that this would have enabled him to undermine the State’s theory that there was only one assailant.
However, we believe that it is equally possible if Reynolds had confronted Dr. Craig and Dr. Craig had agreed that two different knives were used to stab the victims, that that testimony could have strengthened the State’s case. As discussed in the facts portion of this opinion, Adrian West testified that Reynolds handed her two different knives after she found him stabbing Melinda Martin. She also testified that she subsequently disposed of the two knives.
Accordingly, if any error occurred, it did not probably injuriously affect Reynolds’s substantial rights. Rule 45A, Ala.R.App.P.
VI.
Reynolds argues that the prosecutor impermissibly presented evidence of offenses not charged in the indictment. (Reynolds’s Brief, Issue XV, at 101-02.) Specifically, Reynolds contends that the State improperly introduced “evidence of sexual assault and rape during the deposition testimony of the medical examiner, Dr. Adam Craig,” even though neither offense was charged in the indictment. Despite Reynolds’s insinuation otherwise, *92 Reynolds did not object on this basis when the deposition testimony was offered at trial. Therefore, we review his argument for plain error only. Rule 45A.
We recognize that “[u]nder the general exclusionary rule, evidence of an offense other than the offense charged in the indictment is not admissible at trial on a specific charged offense.” Krumm v. City of Roberbsdale, 648 So.2d 651, 652 (Ala.Crim.App.1994.) However, in the portion of Dr. Craig’s deposition testimony cited by Reynolds, Dr. Craig was testifying to the standard tests that are performed in an autopsy. Neither the prosecutor, the State’s witness, nor any of the physical evidence suggested that the victims were raped or sexually assaulted. Accordingly, there is simply no merit to this assertion.
VII.
On May 25, 2003, during the hours following the discovery of the crimes, the police interviewed several people of interest — including Charles Martin’s 25-year-old nephew, Chad Martin, and Chad Martin’s friend, John Langley. As addressed below, Chad Martin and John Langley were ultimately ruled out as a suspects. Chad Martin testified for the State at trial and denied any participation in the crimes. John Langley also testified as a witness for the State, and his testimony corroborated Chad Martin’s alibi. Reynolds raises a number of issues related to their testimony. These will be addressed separately below.
A.
Reynolds argues that the circuit court “erred in refusing to allow [him] to present evidence that Chad Martin confessed to the crime[s].” (Reynolds’s brief, Issue II, at 17.)
The inference from the record is that during the May 25, 2003, police questioning, Chad Martin told the investigators two conflicting versions of his whereabouts at the time of the murders. In the first account Chad Martin denied any involvement in the crimes; in the second account Martin purportedly confessed to the crimes. After an investigation, the police excluded Chad Martin as a suspect. Several days later, Chad Martin recanted his confession in a third oral narrative to the police. By that time, Reynolds had already become the target of the investigation.
Chad Martin’s first narrative account to the police, in which he denied any involvement in the crimes, was reduced to a written statement and was signed by Martin. Martin’s confession — the second of the two oral accounts that he gave on the May 25 — was not reduced to an official statement, but was subsequently documented in two police reports. The first police report purportedly documenting Chad Martin’s confession was prepared and signed by Sgt. Dale Fincher, and dated May 25, 2003. Sgt. Fincher’s May 25 police report was not introduced into evidence at trial because Fincher had moved out of state and did not testify at the trial.[8] The second police report purportedly documenting Chad Martin’s confession was dated May 29, 2003, and signed by Capt. Roy Harbin. For reasons that will be addressed below after a hearing at trial the circuit court ruled that the May 29 police report signed by Capt. Harbin could not be used to impeach Chad Martin’s trial testimony.
*93 Reynolds now argues on appeal that the circuit court’s ruling regarding the May 29 report effectively prevented him from presenting evidence showing that Chad Martin confessed to the crimes. (Reynolds’s brief, Issue II, at 17-30; Reynolds’s reply brief, Issue II, at 13-30.) Reynolds contends that the May 29 report purportedly documenting Chad Martin’s confession was admissible for both impeachment purposes and as substantive evidence tending to prove that someone else had committed the crimes. Although the relevant facts are complicated and often confusing, a knowledge of these facts is necessary in order to see that Reynolds has mischarac-terized the circuit court’s ruling.
The State filed a written pretrial motion in limine to prevent the defense from mentioning any “alleged statements” made by Chad Martin regarding the events surrounding the deaths of the victims. (Vol. 1, C. 188.) In support of its motion, the State argued that such “statements” were hearsay and were unreliable. (Vol. 1, C. 188.)
At the beginning of the trial, the circuit court considered arguments regarding the State’s motion in limine. During the hearing, one of Reynolds’s defense counsel stated:
“I would also anticipate — we have the one — we do have one statement signed by Chad Martin. We also have some statements signed by some investigating officers. Two of those three officers are available. And I would anticipate talking about those statement; maybe possibly asking Mr. Martin about them through those officers. They signed them, and he supposedly made these verbal statements to them. They are very pertinent to the crime.”
(Vol. V, R. 434-45.)
The circuit court ruled that until Chad Martin testified at trial, neither party could refer to Martin’s previous oral or written statements. However, the circuit court indicated that at the appropriate time, it would be -willing to consider arguments from counsel regarding the admissibility of the statements for impeachment purposes. (Vol. V, R. 433-36.) Both parties indicated that they were satisfied with the circuit court’s ruling. (Vol. V, R. 436.)
Chad Martin testified for the State. During direct examination, Martin testified that he was very close to his uncle, Charles Martin, and that he considered him to be like a brother. (Vol. IX, R. 1139^40.) Chad Martin said that he also had a good relationship with Martin’s wife and daughter. (Vol. IX, R. 1139-40.) Martin testified that he had nothing to do with the murders and robbery of the Martin family. (Vol. IX, R. 1140-41.)
Chad Martin testified that he spent Saturday afternoon through the following Sunday morning of the murders doing construction work at John Langley’s house, which was located in the same neighborhood as the Martin house.[9] (Vol. IX, R. 1141^43.) Martin testified that he and Langley took drugs during their time together and that at one point they left Langley’s house to get more drugs. (Vol. IX, R. 1141^43.) Martin said that at various times, other people were also at Langley’s house. (Vol. IX, R. 1143.)
Martin testified that the only time that he was out of Langley’s sight was when he went to Langley’s garage to work on Langley’s lawnmower. (Vol. IX, R. 1143-44.) According to Martin, the back door to *94 Langley’s house was open during that time, and Langley knew where he was. (Vol. IX, R. 1144.)
Langley drove Chad Martin home sometime early Sunday morning because Martin thought he had to go to work later that morning. (Vol. IX, R. 1144-45.) Martin testified that his employer telephoned him around 6:00 a.m. and told him that he did not have to work that day because it was going to rain. (Vol. IX, R. 1144.) Martin took a shower, went to a friend’s house, and then returned to John Langley’s house. (Vol. IX, R. 1145.)
Martin testified that as he was on the way to Langley’s house, he saw a fire truck and police vehicles at the Martin’s residence. (Vol. IX, R. 1145-46.) When Chad Martin got to Langley’s house, he told Langley what he had seen at the Martin residence and expressed his concern about Charles Martin. (Vol. IX, R. 1145-46.) Chad Martin testified that Charles Martin had been depressed and that he was concerned that Martin might have committed suicide. (Vol. IX, R. 1145.)
Chad Martin drove back to the Martin residence and parked the car he was driving behind the fence in the Martins’ backyard. (Vol. IX, R. 1146.) Martin testified that a police officer approached him and told him that he could not be there and that he could not be with the family. (Vol. IX, R. 1146.) Martin recognized Sgt. James Mulkey standing nearby and engaged him in a conversation. (Vol. IX, R. 1147)
Martin testified that Sgt. Mulkey told him that Charles Martin was dead and that Mulkey also told him where Charles Martin’s body was found. (Vol. IX, R. 1148-49.) Sgt. Mulkey then asked Chad Martin for the names of Martin’s wife and daughter. (Vol. IX, R. 1148.) Chad Martin testified that when Sgt. Mulkey asked him for Chad’s niece’s name, he became so upset that he collapsed. (Vol. IX, R. 1148)
Although not clear from his testimony, it appears that Chad Martin left the scene for a short time, and during that time he ingested substantial amounts of crystal methamphetamine, Prozac, and cocaine. (Vol. IX, R. 1150-51.) Martin claimed that he was actually trying to kill himself because he was so distraught over the Martins’ deaths. (Vol. IX, R. 1151.)
Chad Martin testified that when he returned to the scene, some of the other family members where there and that is when he heard police officers talking about the details of the crimes. (R. 1148-49.) Martin instigated a conversation with Lt. Faye Gary while he was on the scene. (Vol. IX, R. 1149.) Chad Martin testified that although he did not recall the details of his conversation with Lt. Gary, he did not tell Lt. Gary that he had overheard the other police officers discussing the details of the crimes. (Vol. IX, R. 1149-50.) Chad Martin was taken to the police station for questioning. (Vol. IX, R. 1149.)
Martin testified that while he was at the police station, he was under the influence of the drugs and that he was also suffering from sleep deprivation because of his drug abuse. (Vol. IX, R. 1151.) Martin was questioned for many hours by the police. (Vol. IX, R. 1151-52.) Around 8:40 p.m., Chad Martin signed a written statement that had been prepared by one of the officers in which Martin apparently denied any participation in the crimes.[10] (Vol. IX, R. 1152-58.)
Martin testified that the police nevertheless continued to interrogate him, and af *95 ter 18 or 19 hours of questioning, he decided that he would “tell them anything just to get out of there.” (Vol. IX, R. 1158.) Martin testified that he did not remember what he told the investigators at that point; however, the inference from the record is that at that time Martin apparently confessed to being involved in the crimes. (Vol. IX, R. 1160.)
Although Martin purportedly confessed to the crimes, after further investigation, the police ultimately excluded Chad Martin as a suspect.[11] (Vol. IX, R. 1158-60.) Martin testified that several days later, he contacted a lawyer who accompanied him to the police station, and he gave another narrative in which he recanted his confession. When Martin recanted his confession, he apparently told the police the same version of events he gave in his first statement, and to which he testified at trial. (Vol. IX, R. 1160-61.)
After the prosecutor completed his direct examination of Chad Martin, the prosecutor intimated that he might later offer Chad Martin’s exculpatory statements into evidence. Defense counsel responded that counsel had no objection to the admission of Chad Martin’s exculpatory statement, provided the court also admit Martin’s in-culpatory version of events that he told to the investigators during the questioning. The circuit court indicated that the discussion was premature at that point in the trial. (Vol. IX, R. 1162.)
During cross-examination, defense counsel asked Chad Martin about whether he had made a statement to Lt. Faye Gary. Martin responded that he had but that he did not recall what he had said. Defense counsel then questioned Martin about specific incriminating statements that Chad Martin supposedly made to Lt. Gary by asking a series of questions like, “Did you tell Ms. Gary that Tou knew this sounded crazy but it was like you were seeing this through Chuck’s eyes?’ and “Did you tell Ms. Gary that ... T could see Savannah’s eyes and I could hear her screaming for help?’ ” (Vol. IX, R. 1185-87.) For the most part, Martin could not recall what he told Gary because, he said, he was under the influence of drugs at the time he made the incriminating statement. (Vol. IX, R. 1185.) Martin clarified that the only reason he remembered what he said in his first statement — the exculpatory statement that he signed — was because he had read the statement before trial. (Vol. IX, R. 1185-86.)
Defense counsel then asked Martin whether he remembered making a statement to Capt. Roy Harbin. (Vol. IX, R. 1187.) Martin responded that, although he recalled making a statement, he could not recall to whom he made the statement. At that point, the prosecutor requested a sidebar conference. (Vol. IX, R. 1187.)
Outside the hearing of the jury, the prosecutor asserted that defense counsel should not be allowed to “back-door” the contents of the May 29 report signed by Capt. Harbin by asking Martin line-by-line questions from the report like counsel had done when questioning Martin about his statements to Lt. Gary. (Vol. IX, R. 1187-89.) Defense counsel responded that because the confession was an oral statement made by Martin to the investigators, counsel needed to introduce the contents of statement through Martin’s testimony. (Vol. IX, R. 1189.) The prosecutor replied: “[I]f Chad testifies he doesn’t remember giving the statement to Roy Harbin and doesn’t remember anything in it, the proper method is for him to call Roy Harbin and say ‘Did he do it and what did he *96 say?’ ” (Vol. IX, R. 1189-90.) The Court agreed, and instructed defense counsel that if Martin did not remember what he told the investigator, defense counsel could not elicit the contents of the report by questioning Martin line-by-line regarding the details of the report. (Vol. IX, R. 1187-91.)
When defense counsel resumed cross-examination, Martin reiterated that he did not remember to whom he had made the inculpatory oral statement, so defense counsel ended its cross-examination of Martin. (Vol. IX, R. 1191-93.)
Later in the trial, after the State rested and before the defense’s presentation of its case, the prosecutor informed the Court that he had learned that defense counsel intended to introduce the May 29 police report that was signed by Capt. Roy Harbin, which supposedly documented Martin’s confession. The State moved the Court for an order in limine prohibiting the introduction or mention of the May 29 police report. (Vol. XI, R. 1474.) A hearing was conducted outside the presence of the jury. (Vol. XI, R. 1474-1503.)
During the hearing, the State elicited testimony from Capt. Roy Harbin that in May 2003, he was the head of the detective division and that he supervised several investigators who were involved in the investigation of the Martin murders and robbery. (Vol. XI, R. 1475-76.) When the prosecutor showed Harbin the May 29, 2003, police report, which was labeled Defendant’s Exhibit 10, Capt. Harbin admitted that although he had signed the report, he did not prepare or type the report— that was done by Sgt. Fincher — and he had not even read a completed version of the report until a few days before trial. (Vol. XI, R. 1476-79.) Capt. Harbin testified that he was not present during the entire interview with Chad Martin because he was also monitoring interviews with other suspects. Capt. Harbin stated that the May 29 police report did not contain an accurate version of what he had heard during the interview with Chad Martin.
Defense counsel cross-examined Capt. Harbin at length regarding why he would sign a report purporting to be his rendition of Martin’s confession when he had not read the report, when he was not present for the entire interview with Chad Martin, and when he could not recall what Martin had said during the interview. (Vol. XI, R. 1481-92.) In response to questions propounded by defense counsel, Capt. Harbin conceded, “Detective Fincher put the paper on my desk ... [and] I signed it.” (Vol. XI, R. 1490.)
During the State’s redirect examination, Capt. Harbin confirmed that at the time he signed the May 29 report, Reynolds was the primary suspect in the crimes and was already in custody. (Vol. XI, R. 1493-95.) After the State’s redirect, the following colloquy occurred:
“THE COURT: And this document that I’m looking at, it’s my understanding that you were not aware of the contents of this document until approximately three or four days ago?
“[CAPT. HARBIN]: I may have glanced over it, Your Honor. But the first time I read it thoroughly was three or four days ago.
“THE COURT: You did not read it prior to signing this document.
“[CAPT. HARBIN]: I could have looked over it. I won’t say that I didn’t look over it. But I didn’t read it thoroughly, no, sir.
“THE COURT: And this document is not an accurate statement of the facts as you understood them to be at the time of this interview?
“[CAPT. HARBIN]: No, sir.
“THE COURT: And you did not prepare this document?
*97 “[CAPT. HARBIN]: 1 did not.
[[Image here]]
“THE COURT: The document is out.”[12]
(Vol. XI. R. 1498-99.) (Emphasis added.)
The court was careful to clarify its ruling, stating:
“[Defense counsel], you can call Detective Harbin and you can ask him anything that you think that’s appropriate in regard to this case. I’m not in any way limiting you in your questioning of that particular witness. Just the document itself is not in. You can ask him whatever you think is appropriate, any inconsistencies, just not the document.”
(Vol. XI, R. 1502-08.)
Toward the end of the defense’s case, the court indicated that it was under the impression that the defense was going to call Capt. Roy Harbin as a witness. The following then occurred:
“[DEFENSE COUNSEL]: He’s not any good to me.
[[Image here]]
“THE COURT: Okay.... You do not want to call Captain Harbin. I want you to understand that I am not in any way precluding you from examining him and going into anything you want to about his inconsistencies or whatever.
“[DEFENSE COUNSEL]: I understand. It doesn’t help me at this point.
“[PROSECUTOR]: I think you ruled the other day, anybody that is not here, anybody they have not called — anybody that is not here was trial strategy on their part.
“THE COURT: Yea.
“[THE PROSECUTOR]: It wasn’t anybody we couldn’t get.
“[THE COURT]: Okay. I just want to make sure everybody is aware of that.
“[DEFENSE COUNSEL]: I understand.”
(Vol. XI, R. 1640-41.)
1. Impeachment Evidence
As stated above, Reynolds now argues that the circuit court’s ruling regarding the inadmissibility of the May 29 report precluded him from impeaching Chad Martin’s trial testimony with extrinsic evidence of Martin’s prior inconsistent statement.
“When a witness, on cross-examination, denies having made a statement out of court which is inconsistent with the witness’ testimony on direct examination, the only available move for the impeaching party is to bring on extrinsic proof — either in the form of writing, tape recording or impeaching witness who can testify as to the prior inconsistent statement. Before such extrinsic evidence may be elicited, however, it is the general rule that the impeaching party must lay a proper predicate by asking the witness being impeached whether such a statement was made, specifying with reasonable certainty the time, the place, the person to whom such supposed statement was made and the substance of the statement. The witness likewise must be given an opportunity to admit or deny having made the statement. This foundational requirement is continued under the Alabama Rules of Evidence:

‘“Rule 613. Prior Statements of Witnesses.

*98 [[Image here]]
“ ‘(b) Extrinsic evidence or prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or deny having made it....’”
Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 157.01(l)(b) (6th ed. 2009) (footnotes omitted).
Reynolds maintains that the circuit court’s “restriction on the cross-examination ... prevented [him] from confronting [Chad Martin] with his prior statement, and also denied [Chad Martin] the opportunity to admit or deny the statement.” (Reynolds’s brief, Issue 11(A)(1), at 20-22.)
It is clear from our review of the record that Chad Martin understood which of his prior statements defense counsel was referring to when counsel asked him if he had made a statement to Capt. Harbin. Under the facts of this case, Martin was “confronted with the circumstances of the statement with sufficient particularity to enable the [him] to identify the statement.” Furthermore, Martin’s failure to recall what he said during the conversation with the investigators was tantamount to a denial that he made the statement for purposes of introducing the prior conflicting statement through an impeaching witness. See Walker v. State, 581 So.2d 570 (Ala.Crim.App.1991). Accordingly, contrary to Reynolds’s contention, the circuit court did not prevent Reynolds from establishing the proper predicate to impeach Chad Martin’s trial testimony with extrinsic evidence of a prior inconsistent statement.
Reynolds argues that he should have been allowed to introduce the May 29 police report through the testimony of Capt. Harbin. (Reynolds’s brief, Issue 11(A)(2), at 22-27.) He argues that because Capt. Harbin admitted that he signed the report, the report was sufficiently authenticated. We disagree.
“Nothing in this rule [Rule 613, Ala. R.Crim.P.] abrogates the requirement that if the witness denies having made the statement then any extrinsic evidence of the prior inconsistent statement must be properly authenticated.”
Advisory Committee Notes to Rule 618, Ala. R. Evid.
Furthermore,
“The question of authenticity or proper identification is, in the first instance, for the trial judge as a preliminary matter. See Ala.R.Evid. 104(a). The required foundational showing must consist of evidence ‘sufficient to support a finding that the matter in question is what its proponent claims.”
Advisory Committee Notes to Rule 901, Ala.R.Evid.
Here, although Capt. Harbin admitted that he signed the report, Capt. Harbin testified that he did not prepare the report and that the report did not accurately reflect his recollection of the conversation. Furthermore, the defense did not secure the presence of Sgt. Fincher, the author of the report, to testify at trial in order to authenticate the report. See, § 12-21-283, Ala.Code 1975, “Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceeding.” The evidence simply did not support the conclusion that the report was what it was claimed to be: Capt. Harbin’s written rendition of what he heard Chad Martin say during the police interrogation. Accordingly, we find no abuse of discretion in the circuit court’s ruling.
*99 2. Substantive Evidence of Third-party Guilt
Reynolds also contends that the May 29 report should have been admitted as substantive evidence of the guilt of a third party. (Reynolds’s brief, Issue 11(c), at 27-30.) Reynolds did not move to admit the report on this basis at trial; accordingly, we will review his assertion for plain error only. Rule 45A, Ala.R.App.P.
In the capital-murder case of Dorsey v. State, 881 So.2d 460 (Ala.Crim.App.2001), aff'd in part, rev’d in part on other grounds, 881 So.2d 533 (Ala.2003), Dorsey sought to present evidence that a third party had confessed to the murders that Dorsey was charged with committing. Specifically, Dorsey sought to call a prison inmate, Gary Wayne Henderson, as a defense witness to testify that another inmate, Johnny Likely, had told Henderson that Likely and “two white boys” had committed the murders that Dorsey was accused of committing. 881 So.2d at 491.
During a discussion at trial about presenting Henderson’s testimony, Dorsey’s defense counsel informed the court that Likely had not responded to the defense’s subpoena and was unavailable for trial. Defense counsel argued that Henderson should be allowed to testify at trial regarding what Likely had told him because, counsel maintained, Likely’s statement to Henderson was admissible as an excited-utterance exception to the hearsay rule and as a statement against penal interest. 881 So.2d at 491.
The court immediately issued an attachment for Likely, and, sometime later, Likely was brought to the courthouse to testify. After some investigation, Dorsey’s defense counsel determined that if Likely testified, Likely was going to deny any involvement in the murders, and Likely was going to deny telling Henderson that he committed the crimes. The court ruled that if Likely denied the statements, then Henderson’s “testimony as to what Likely told him would be admissible for impeachment purposes and not as substantive evidence of another person’s guilt.” 881 So.2d at 492-93: After the court made its ruling, defense counsel declined to call either Henderson or Likely as witnesses.
On appeal, Dorsey argued, in essence, that the trial court’s ruling prevented him from presenting evidence in his defense. We disagreed:
“The trial court, when ruling on the admissibility of the hearsay evidence, applied the law as it existed at the time of trial. Traditionally, Alabama courts had held that hearsay evidence concerning a third party’s guilt is not admissible. See C. Gamble, McElroy’s Alabama Evidence, § 48.01(4) (5th ed. 1996). See also Griffin v. State, 790 So.2d 267 (Ala.Crim.App.1999), rev’d, 790 So.2d 351 (Ala.2000).
“After Dorsey was convicted, the Alabama Supreme Court in Ex parte Griffin, supra, recognized that there may be situations when hearsay evidence of a third party’s guilt is admissible against a claim that it violates the hearsay rule. The Supreme Court, relying on the United States Supreme Court’s holding in Chambers v. Mississippi, supra, held that an accused’s ‘constitutional rights [in that case] superseded] the hearsay rule in the Alabama Rules of Evidence.’ 790 So.2d at 355.
“In Ex parte Griffin, the accused sought to introduce evidence that a third party had pleaded guilty to the crime for which Griffin was charged, that the plea was taken in an Alabama court under oath, and that this individual had served four years in prison for the crime for which Griffin was on trial. The Alabama Supreme Court, when holding that this evidence was admissible, stated:
*100 “ ‘The United States Supreme Court has held that a defendant has a right to put on a defense and that that right includes the opportunity to present evidence proving that another person committed the offense for which he has been charged. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, this right is not absolute; instead, the trial court will have to consider the admissibility of such evidence in conjunction with other legitimate interests involved in the trial process. Chambers, 410 U.S. at 295, 93 S.Ct. 1038; see also Guam v. Ignacio, 10 F.3d 608 (9th Cir.1993). As a result, the trial court is presented with a balancing test in order to determine whether the evidence of a third party’s culpability is properly admissible:
“ ‘ “The court must weigh the defendant’s ‘strong interest in presenting exculpatory evidence’ against the state’s interest ‘in promoting reliable trials, particularly in preventing the injection of collateral issues into the trial through unsupported speculation about the guilt of another party.’ ”
“ ‘United, States v. Johnson, 904 F.Supp. 1303, 1311 (M.D.Ala.1995) (citations omitted). In weighing those interests, the federal courts have required the defendant to show that the evidence he is offering is probative and not merely speculation that would confuse the jury:
“ ‘ “To satisfy this balancing test, there must be ‘some showing of a nexus between the other party and the particular crime with which a defendant is charged.’ Of course, this nexus must be substantial— that is, probative — and not tenuous or merely speculative.”
“ ‘Id. (citations omitted).
“ ‘Like the federal courts, Alabama courts have long recognized the right of a defendant to prove his innocence by presenting evidence that another person actually committed the crime. See Ex parte Walker, 623 So.2d 281 (Ala.1992); Thomas v. State, 539 So.2d 375 (Ala.Crim.App.1988); Green v. State, 258 Ala. 471, 64 So.2d 84 (1953); Underwood v. State, 239 Ala. 29, 193 So. 155 (1939); Orr v. State, 225 Ala. 642, 144 So. 867 (1932); Houston v. State, 208 Ala. 660, 95 So. 145 (1923); Tennison v. State, 183 Ala. 1, 62 So. 780 (1913); McGehee v. State, 171 Ala. 19, 55 So. 159 (1911); McDonald v. State, 165 Ala. 85, 51 So. 629 (1910). In addition, Alabama courts have also recognized the danger in confusing the jury with mere speculation concerning the guilt of a third party:
“ ‘ “It generally is agreed that the defense, in disproving the accused’s own guilt, may prove that another person committed the crime for which the accused is being prosecuted.... The problem which arises in the application of this general rule, however, is the degree of strength that must be possessed by the exculpatory evidence to render it admissible. The task of determining the weight that must be possessed by such evidence of another’s guilt is a difficult one.”
“ ‘Charles W. Gamble, McElroy’s Alabama Evidence § 48.01 (5th ed. 1996). To remove this difficulty, this Court has set out a test intended to ensure that any evidence offered for this purpose is admissible only when it is probative and not merely speculative. *101 Three elements must exist before this evidence can be ruled admissible: (1) the evidence “must relate to the ‘res gestae’ of the crime”; (2) the evidence must exclude the accused as a perpetrator of the offense; and (3) the evidence “would have to be admissible if the third party was on trial.” See Ex parte Walker, 623 So.2d at 284, and Thomas, 539 So.2d at 394-96.
[[Image here]]
“ ‘The State makes an additional argument as to Embry’s guilty plea. It apparently argues in its brief that, even if the evidence of the plea passes the three-pronged test, at Griffin’s trial Embry’s plea is still hearsay that does not fall within any exception. Professor Gamble has stated:
“ ‘ “The accused cannot ... prove the guilt of another by the use of hearsay statements. This hearsay ban constitutes the major barrier to exculpatory evidence, particularly in the form of a third party’s confession to the crime with which the accused is charged. Such a statement could surmount a hearsay objection if it qualifies under some hearsay exception.”
“ ‘McElroy’s Alabama Evidence, § 48.01(1). However, Gamble also notes that a situation could arise where “an accused’s constitutional right to present his defense would dictate admission of evidence suggesting another’s guilt,” Id. The United States Supreme Court has encountered such a situation, where the defendant’s due-process rights conflicted with the rules of evidence. In Chambers, the Court stated: “In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.” 410 U.S. at 302, 93 S.Ct. 1038.
[[Image here]]
“ ‘[W]e follow the United States Supreme Court’s holding in Chambers and hold that Griffin’s constitutional rights supersede the hearsay rule in the Alabama Rules of Evidence. However, in doing so, we note that not in every case will the defendant’s right to present his defense supersede the hearsay rule; it will supersede that rule only in those cases that, as indicated by the first two elements of the test stated above, have a probative alternative theory of culpability and not an alternative theory that is merely speculative and meant only to confuse the jury.’
“790 So.2d at 353-55. (Emphasis added.)
“Other courts, like the Alabama Supreme Court in Griffin, have recognized that the main concern when applying the Chambers holding is whether the hearsay evidence has a ‘sufficient indicia of reliability.’ See Card v. Dugger, 911 F.2d 1494 (11th Cir.1990) (noting that the Chambers Court cited four facts that made the hearsay statements reliable: ‘(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the ease; (3) the extent of which the declaration is really against a declarant’s penal interest; and (4) the availability of the declarant as a witness, that is, whether the state could cross-examine him regarding his statements.’ 911 F.2d at 1515); Turner v. State, 267 Ga. 149, 476 S.E.2d 252 (1996) (‘must have “particularized guarantees of trustworthiness,” that is, it must be “coupled with circumstances which attribute verity to it.” ’ 476 S.E.2d at 258); Davis v. State, 194 Ga.App. 482, 391 S.E.2d 124 *102 (1990) (‘In those cases in which the United States Supreme Court has ruled the confession of a third party to be admissible as an exception to hearsay, the Court found strong indicia of reliability of the out-of-court statement. In Chambers, the third-party declarant had made three separate admissions of guilt to three different people, the statements bore persuasive assurances of trustworthiness and the declarant was available for cross-examination by the State so that his demeanor and responses could be weighed by the jury. In Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the Supreme Court held that, pursuant to the Due Process Clause of the Fourteenth Amendment, testimony concerning the confession of a codefendant should have been admitted in the sentencing phase of trial because it was relevant and because of its reliability’); Alderman v. Zant, 22 F.3d 1541 (11th Cir.), cert. denied, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994) (‘It is generally true that a defendant must be permitted to introduce any mitigating evidence at the sentencing phase of a capital case if the evidence relates to the defendant’s character, record or the circumstances of the particular offense .... However, a judge still retains the discretion to exclude otherwise inadmissible evidence which it determines lacks considerable assurances of trustworthiness. Chambers, 410 U.S. at 300, 93 S.Ct. at 1048.’ 22 F.3d at 1557); Jones v. State, 709 So.2d 512 (Fla.1998) (‘[Ujnlike the confessions in Chambers, the alleged confessions in this case lack indicia of trustworthiness.... The confessions were not made prior to the original trial in circumstances indicating trustworthiness, such as spontaneously to a close acquaintance as in Chambers, or to his own counsel or the police shortly after the crime, ... but were made to a variety of inmates with whom [the witness] served prison time.’ 709 So.2d at 525).
[[Image here]]
“Here, we do not have the situation that was presented in Griffin. In Griffin, the evidence that was introduced had a high degree of reliability. There is absolutely no indicia of reliability in a statement made by one inmate to another inmate. The facts of this case are distinguishable from those presented in Griffin; thus, Griffin does not mandate a reversal in this case. There is absolutely no evidence in the record that the statements bore such a degree of reliability that we would depart from the long-standing rule regarding the exclusion of hearsay evidence. In fact, Likely, when questioned about the statement he was said to have made to Henderson, told investigators that he did not make the statement. Likely was prepared to testify, but defense counsel did not want him to testify. Defense counsel knew that if Likely denied the statement then Henderson’s testimony as to what Likely told him was admissible only for impeachment purposes and not as substantive evidence of another person’s guilt. The trial court did not err in excluding this evidence.”
881 So.2d at 493-96.
With the above law in mind, we turn to Reynolds’s assertion. The evidence that Reynolds claims should have been admitted as substantive evidence of a third party’s guilt was a police report supposedly documenting Chad Martin’s confession — a confession subsequently determined to be unreliable — prepared by an officer who did not testify and signed by the officer’s supervisor, who neither heard the confession nor would attest to the accuracy of the statements in the report. Under these unusual facts, the May 29 *103 police report simply did not have “sufficient indicia of reliability” to overcome the prohibition against proving third party’s guilt by use of hearsay evidence.
In any event, the circuit court’s ruling regarding the inadmissibility of the May 29 police report did not prevent Reynolds from effectively presenting his defense. The circuit court emphasized that Reynolds could question Capt. Harbin regarding inconsistencies between Chad Martin’s trial testimony and what he heard Martin say during the interrogation, but Reynolds declined to call Capt. Harbin as a witness. Furthermore, Reynolds did call Lt. Gary to testify to the inculpatory statements that Martin made to her.
Lt. Gary testified that she first spoke with Chad Martin on May 25, 2003, at the scene of the crimes. She said that Chad approached her and began to talk about where the Martins’ bodies were found in the house. (Vol. XI, R. 1506-07.) He also told her that he had lost a pair of his sunglasses. (Vol. XI, R. 1507.) Lt. Gary testified that Martin was very upset. (Vol. XI, R. 1508.) Lt. Gary stated that Martin’s statements made her suspicious, so she told Sgt. Fincher what Martin had told her. (Vol. XI, R. 1508.)
She testified that she later spoke with Chad Martin again when the detectives brought Martin to her office during a break in their interview. (Vol. XI, R. 1510.) Lt. Gary testified that Martin was visibly upset at that time and that he was sobbing. (Vol. XI, R. 1512.) Lt. Gary testified:
“I was telling him everything was going to be okay, just calm down. And then he said Ms. Gary, you know — something to the effect that this may seem or sound crazy to you, but it’s — it’s as if I’m seeing this through — I believe it was Chuck’s eyes. And he said it was like he could smell the gas on his hands and he didn’t know where the cuts came from. And then he said that I know that I couldn’t hurt Savannah. I just — I know I couldn’t hurt Savannah. And he said he told them the truth but they didn’t believe him. Then he went on to say something about a phone call that he had made that was going to probably make him look bad. And I asked him why do you say that, what did you say. And he said something to the effect about the message that [Charles Martin] had on the phone, something about him sounding dead or something, you know, on the message.
[[Image here]]
“[I]t seems like he said he — something about her [Savannah] screaming. Yeah, that was in the conversation. Something about he could hear her screaming don’t hurt me or something to that effect.
[[Image here]]
“... [H]e was talking about a message that he had left Chuck on the phone, that the message that he left— something about he needed to change the message because he sounded dead. And he said I know that is going to look bad for me.”
(Vol. XI, R. 1512-14.)
Under these circumstances, we can find no plain error in the exclusion of the May 29 police report as substantive evidence of a third party’s guilt.
B.
Reynolds argues that his convictions are due to be reversed because, he claims, the prosecutor improperly bolstered the credibility of its witnesses Chad Martin and John Langley by presenting evidence of their prior consistent statements, and by introducing evidence that they either had taken a polygraph test or had offered to *104 take a polygraph test. (Reynolds’s brief, Issue III, pp. 30-42, Reynolds’s reply brief, Issue III, at 30-35.)
1. Reynolds's Bolstering Claim
First, as to Reynolds’s claim regarding Chad Martin, we note that contrary to Reynolds’s assertion, the State did not introduce into evidence any of the content of Chad Martin’s oral or written statements — inculpatory or exculpatory. (See our discussion in part A of this issue.) Thus, Reynolds’s assertion that the State introduced into evidence Chad Martin’s prior consistent statement in order to bolster his trial testimony is without merit.
John Langley, Chad Martin’s friend and a neighbor of the Martins, testified during the State’s case-in-chief. He testified, in essence, that Chad Martin spent Saturday through Sunday morning of the crimes at Langley’s house doing construction work and taking drugs. Langley’s testimony tended to corroborate Chad Martin’s trial testimony.
During direct examination, Langley testified that Chad Martin left Langley’s house and returned on Sunday morning around 8:00 or 8:30, and that Martin was very upset. (Vol. IX, R. 1116-17.) As discussed in the facts portion of this opinion, the crimes were not discovered until approximately 10:00 on that Sunday morning. Defense counsel seized upon this time discrepancy and cross-examined Langley regarding the discrepancy. Langley again testified that Chad Martin came to his house around 8:00 or 8:30 that Sunday morning. He testified that at that time Martin told him that he had seen police and fire officials at the Martin residence and that Martin was upset and concerned that Charles Martin might have killed himself and his wife. (Vol. IX, R. 1122-23.)
During the State’s redirect examination of Langley, the State sought to introduce Langley’s statement that he made to the police during his interrogation, which was marked State’s Exhibit 62. In Langley’s statement he told the police that Chad Martin returned to his house on Sunday morning around 10:30 and that Martin was very upset because had seen fire trucks and police vehicles at the Martins’ house. (IV, R. 1127-28.)
The defense objected to the admission of the statement on the grounds that it was being offered to improperly bolster the witness’s testimony. (Vol. IX, R. 1128-29.) A discussion ensued outside the presence of the jury, during which the following occurred:
“[THE COURT]: [Defense counsel], clearly from the testimony I have heard the bodies weren’t discovered until around 10:00 o’clock, correct?
“[DEFENSE COUNSEL]: Yes, sir, that is correct.
“THE COURT: On the way to church. And you did question him about this statement and you questioned him about the time.
“[DEFENSE COUNSEL]: Sure.
“[THE COURT]: And if what he has testified to is inconsistent with this statement and the statement says otherwise, I think that will be very damaging to the state.
“[DEFENSE COUNSEL]: We won’t object.”
(Vol. IX, R. 1132-33.) (Emphasis added.)
State’s Exhibit 62 was offered and admitted into evidence without further object ion. (Vol. IX, R. 1133-35.) During the State’s redirect examination, Langley confirmed that State’s Exhibit 62 was his statement to the police. Upon the request of the prosecutor, Langley then read the portion of his statement where he wrote that Martin returned to his house at 10:30 *105 on the morning the crimes were discovered. (Vol. IX, R. 1135.) Langley agreed that the time in his police statement was inconsistent with what he testified to during trial. (Vol. IX, R. 1135.)
Although Reynolds did initially object to the introduction of Langley’s statement on the grounds that it was offered to bolster his trial testimony, Reynolds, in essence, withdrew that objection. Thus, we will review Reynolds’s contention that the statement was offered for the purpose of bolstering the testimony for plain error only. Rule 45A, Ala.R.App.P.
“Rule 607, Ala.R.Evid., provides:
“The credibility of a witness may be attacked by any party, including the party calling the witness.”
Further,
“Rule 607 authorizes a party to bring against his own witness all weapons from the arsenal of impeachment that historically were reserved generally for opposing witnesses.... One may, for example, impeach his own witness by showing that the witness made a statement or performed an act that is inconsistent with the witness’ present testimony.... Inconsistencies, whether in the form of statements or acts, likewise could be used to impeach one’s own witness.”
McElroy’s Alabama Evidence § 165.01(6)(a) (footnotes omitted; emphasis added). Even before the implementation of Rule 607, Ala.R.Evid., a party could correct or contradict the testimony of one’s own witness. See Fortenberry v. State, 545 So.2d 129, 137-38 (Ala.Crim.App.1988), aff'd, 545 So.2d 145 (Ala.1989); Bell v. State, 466 So.2d 167, 173 (Ala.Crim.App.1985).
The inference from the record is that the prosecutor introduced Langley’s statement to the police in order to correct Langley’s statement at trial that Chad returned to his house at 8:30 a.m. on the Sunday morning the crimes were discovered. We are not persuaded that the prosecutor introduced this statement in order to improperly bolster Langley’s trial testimony. Thus, we find no plain error in the admission into evidence of State’s Exhibit 62, Langley’s statement to the police.
Likewise, we find no plain error in the prosecutor’s soliciting from John Langley and Chad Martin testimony that they were initially considered to be suspects in the crimes, that they were questioned by the police at length, and that they were then excluded as suspects. (Reynolds’s brief, at 37-38.) At no point during this line of questioning did Reynolds object to the questions on the grounds that the prosecutor was attempting to elicit that testimony in order to bolster the witnesses’ trial testimony.
“There is a general principle that one may not bolster the credibility of his own witness before that credibility has been attacked by the opponent. However, this traditional preclusion has been held inapplicable to preclude a calling party from anticipating such an attack and diffusing bias impeachment by himself bringing out the bias-revealing matter on direct.”
McElroy’s Alabama Evidence § 149.01(15) (footnotes omitted).
Furthermore:
“[A] party may not bolster the credibility of his own witness until it first has been attacked. This principle, however, in no way precludes a party from diffusing the impact of possible impeachment by bringing out the impeaching information on direct. A witness’ inconsistent statement, for example, may be brought out on direct so as to diffuse the prejudi- *106 dal impact such information would have if first brought out by the opponent.”
McElroy’s Alabama Evidence § 116.01(2).
It is apparent from the record that the defense intended to elicit testimony that Chad Martin and John Langley were originally suspects in the crimes and that Chad Martin purportedly confessed to the crimes. By eliciting the fact that both men had been questioned at length by the police and subsequently excluded as suspects, the State was attempting to anticipate and diffuse the matter on direct. Under the facts of this case, we do not agree that the prosecutor was attempting to improperly bolster the credibility of the witnesses by the line of questions referenced by Reynolds. Accordingly, we do not find that the prosecutor’s questions in this regard amounted to plain error. Rule 45A, Ala.R.App.P.
2. Polygraph Evidence
Reynolds also contends that the prosecutor committed reversible error when the prosecutor elicited from John Langley testimony that he took a polygraph test and that Chad Martin offered to take a polygraph test. (Reynolds’s brief, III(B), at 38-42.) Reynolds did not object to the questions that elicited these responses, nor did he move to exclude the witnesses’ answers. (Vbl. IX, R. 1117-18; 1160.) Therefore we review this allegation for plain error only.
Assuming, without deciding, that it was error for the prosecutor to elicit the statements regarding the polygraph test, see A.G. v. State, 989 So.2d 1167, 1177 (Ala.Crim.App.2007), under the facts of this case we do not believe such error would amount to plain error. Rule 45A, Ala. R.App. P. The witnesses each testified without objection that they had told the truth. Each witness was also thoroughly cross-examined by defense counsel regarding his possible bias. It is unlikely that the passing reference to the polygraph tests by each witness in light of their remaining testimony “probably adversely affected” Reynolds’s “substantial rights.” See Daniels v. State, 650 So.2d 544, 556-57 (Ala.Crim.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995); Logue v. State, 529 So.2d 1064, 1067 (Ala.Crim.App.1988).
C.
Reynolds contends that the prosecutor “encouraged the jury to rely on improper evidence in considering Chad Martin’s testimony.” (Reynolds’s brief, Issue XIII(A), at 92-93.) We disagree.
Toward the end of the State’s direct examination of Chad Martin, the following occurred:
“Q. [PROSECUTOR]: Chad, one more time. Did you have anything to do with [Charles Martin’s] death?
“A. No, I did not.
[[Image here]]
“Q. [PROSECUTOR]: Chad, do you know some of these folks sitting out here?
“A. Yes, I do. It’s my family.
“Q. [PROSECUTOR]: The second lady from the left there, who is she?
“A. That would be my mother.
“Q. [PROSECUTOR]: She’s the lady that raised you; isn’t she?
“A. Yes, sir.
“Q. Can you sit right there in that witness stand and look that lady right there in the eye and tell her whether you had anything to do with killing [Charles Martin]?
“[CHAD MARTIN]: Momma, I didn’t kill him.
“[THE PROSECUTOR]: That’s all.
*107 “THE COURT: Your witness.”
(Vol. IX, R. 1161-62.)
Reynolds did not object to the prosecutor’s question on the grounds now asserted on appeal. Thus, his allegation of prosecu-torial misconduct with regard to this incident will be reviewed for plain error only. Rule 45A, AIa.R.App.P.
Reynolds argues that “the prosecutor improperly bolstered the credibility of Chad Martin by asking the jury to rely on Chad Martin’s assurances to his mother as a basis for crediting Chad Martin’s statements.” (Reynolds’s brief at p. 92.)
Although perhaps this distinction is subtle, the prosecutor did not specifically ask Chad Martin to profess his innocence to his mother; rather, it appears that the prosecutor was essentially asking a rhetorical question. At most, the question called for a “yes” or “no” answer, not for Martin to make a direct statement to his mother. We are not convinced that the prosecutor was improperly attempting to encourage the jury to base its verdict on matters not in evidence. Nevertheless, although we do not condone the question, viewing the allegedly improper question in the context of the entire trial, as we are bound to do, see Robitaille v. State, 971 So.2d 43, 61-63 (Ala.Crim.App.2005), cert. denied, 552 U.S. 990, 128 S.Ct. 490, 169 L.Ed.2d 339 (2007),[13] we are not persuaded that the prosecutor’s question that precipitated Chad Martin’s response ‘“so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Robitaille, 971 So.2d at 62 (citations omitted). Martin had already testified several times, without objection, that he did not commit the crimes.
Accordingly, we find no plain error in this assertion of prosecutorial misconduct.
VIII.
Reynolds argues that the circuit court erroneously allowed the State to elicit hearsay testimony from witnesses Adrian West and Chad Martin. (Reynolds’s brief, Issue XVIII, at 104-06.) First, Reynolds alleges that the State, in an effort to bolster West’s testimony and “excuse her involvement in the crime,” was improperly allowed to elicit the following testimony from West:
“And he [Donald Harvey, aka, Dino], asked me if Michael had anything to do with what happened to Chuck [Charles Martin]. And I nodded yes. And he said for me to get the stuff. And I got the stuff, and we went and got rid of it.”
(Vol. VIII, R. 944.)
“And Dino told me that Michael was going to be getting out of jail.”
(Vol. VIII, R. 944.)
Reynolds did not object to the first alleged instance of improper hearsay. When Reynolds objected to the second purportedly improper statement, the State responded that the testimony was not being offered for the truth of the matter asserted but was instead being offered to establish West’s subsequent conduct. (Vol. VIII, R. 945.) The circuit court did not rule on his objection, but simply told the prosecutor to “Go ahead.” (Vol. VIII, R. 945.) Accordingly, we will review these claims under the plain-error standard.
Reynolds contends that “[i]n an effort to exonerate Chad Martin’s confession, the State directly solicited hearsay testimony from the witness [Martin] about what one of the investigating officers told him at the *108 crime scene.” (Reynolds’s brief, at 105.) In the portion of the record cited by Reynolds, Chad Martin testified that when he arrived at the Martins’ residence the morning the crimes were discovered, he saw Sgt. Mulkey and engaged him in a conversation. When the State asked Chad what Sgt. Mulkey told him, the defense objected on the grounds that the question called for hearsay. (Vol. IX, R. 1147.)
The State responded that the testimony was not elicited for the truth of the matter asserted but rather to explain Chad Martin’s subsequent actions. (Vol. IX, R. 1147.) The defense then argued that “[i]f they allege Sgt. Mulkey told him something, the State should have asked Sgt. Mulkey himself.” (Vol. IX, R. 1147-48.) The court stated “Fine,” and then the court instructed the State to ask its next question. (Vol. IX, R. 1148.) The State again asked Chad Martin what Sgt, Mul-key had told him and Chad testified, without objection, that Sgt. Mulkey told him that Charles Martin was dead and that when Sgt. Mulkey asked him for names of Charles Martin’s wife and daughter, he collapsed. (Vol. IX, R. 1148.)
As discussed, Reynolds did not object to the first allegedly improper comment by West and, although he did object to the other supposed hearsay testimony, he did not obtain an adverse ruling. “ ‘In the absence of a ruling, a request for a ruling or an objection to the court’s failure to rule, there is nothing preserved for appellate review.’ ” Johnson v. State, 542 So.2d 341, 345 (Ala.Crim.App.1989) (citations omitted). Nevertheless, we find no error, plain or otherwise, in the admission of the testimony.
“Rule 801(c), Ala.R.Evid., states:
“ ‘ “Hearsay” is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.’
“[The hearsay rule] does not exclude extrajudicial utterances offered merely to prove the fact of the making or delivery thereof, or to explain subsequent conduct of a hearer.” ’ Ashford v. State, 472 So.2d 717, 719 (Ala.Crim.App.1985), quoting 22A C.J.S. Criminal Law § 718 (1961).”
Robitaille v. State, 971 So.2d 43, 57 (Ala.Crim.App.2005), cert. denied, 552 U.S. 990, 128 S.Ct. 490, 169 L.Ed.2d 339 (2007).
Neither statement was offered to prove the truth of the matter asserted; rather, each statement was elicited to explain the declarant’s subsequent conduct. Accordingly, no error occurred.
IX.
Reynolds alleges that the circuit court erroneously prohibited him from impeaching the testimony of two State’s witnesses. (Reynolds’s brief, Issue XI, at 83-87.) First, Reynolds contends that he should have been allowed to question Chad Martin regarding whether Martin had a motive to kill the victims. (Reynolds’s brief, Issue XI (A), at 84-85.) Second, Reynolds asserts that he was incorrectly prohibited from questioning Adrian West regarding her possible bias against Reynolds. (Reynolds’s brief, Issue XI(B), at 85-87.) These allegations will be addressed separately below.
A.
At trial, Reynolds’s counsel cross-examined Chad Martin regarding alleged conflicts Martin had with Charles Martin. During that line of questioning, defense counsel asked whether Chad Martin had ever left a note on Charles Martin’s door threatening to stab him. Defense counsel then stated, “If there were a report somewhere that somebody had done that and *109 you were a suspect in that, you are saying....” (Vol. IX, R. 1179-80.) Before defense counsel could finish the question, the State objected, and a discussion ensued between the court and the respective parties.
In support of its objection, the State argued that the defense was attempting to improperly suggest that Chad Martin had a motive to kill Charles Martin without having any evidence to substantiate the suggestion. Defense counsel conceded that it did not have a “report” naming Chad Martin as a suspect in leaving Martin a threatening note, but defense counsel maintained that its supposition regarding Chad Martin’s leaving the threatening note was based upon discovery material provided by the State, in particular, a statement by one of the Martins’ relatives to a detective. (Vol. IX, R. 1181-82.)
The circuit court instructed the parties to “move along”; thus, by implication, the court sustained the State’s objection to Reynolds’s further questions regarding the note. (Vol. IX, R. 1182.)
Reynolds did not make any offer of proof as to how the extrinsic evidence would have established Chad Martin’s motive for murder. Accordingly, we will review his assertion for plain error only. Rule 45A, Ala.R.App.P; Rule 108(a)(2), Ala.R.Evid.; and Jennings v. State, 513 So.2d 91 (Ala.Crim.App.1987).
We have stated:
“ ‘Alabama courts have long recognized the right of a defendant to prove his innocence by presenting evidence that another person actually committed the crime. See Ex parte Walker, 623 So.2d 281 (Ala.1992); Thomas v. State, 539 So.2d 375 (Ala.Crim.App.1988); Green v. State, 258 Ala. 471, 64 So.2d 84 (1953); Underwood v. State, 239 Ala. 29, 193 So. 155 (1939); Orr v. State, 225 Ala. 642, 144 So. 867 (1932); Houston v. State, 208 Ala. 660, 95 So. 145 (1923); Tennison v. State, 183 Ala. 1, 62 So. 780 (1913); McGehee v. State, 171 Ala. 19, 55 So. 159 (1911); McDonald v. State, 165 Ala. 85, 51 So. 629 (1910). In addition, Alabama courts have also recognized the danger in confusing the jury with mere speculation concerning the guilt of a third party:
“ ‘ “It generally is agreed that the defense, in disproving the accused’s own guilt, may prove that another person committed the crime for which the accused is being prosecuted .... The problem which arises in the application of this general rule, however, is the degree of strength that must be possessed by the exculpatory evidence to render it admissible. The task of determining the weight that must be possessed by such evidence of another’s guilt is a difficult one.”
“ ‘Charles W. Gamble, McElroy’s Alabama Evidence § 48.01(1) (5th ed. 1996). To remove this difficulty, this Court has set out a test intended to ensure that any evidence offered for this purpose is admissible only when it is probative and not merely speculative. Three elements must exist before this evidence can be ruled admissible: (1) the evidence “must relate to the ‘res gestae’ of the crime”; (2) the evidence must exclude the accused as a perpetrator of the offense; and (3) the evidence “would have to be admissible if the third party was on trial.” See Ex parte Walker, 623 So.2d at 284, and Thomas, 539 So.2d at 394-96.’
“Ex parte Griffin, 790 So.2d 351, 354-55 (Ala.2000).”
*110 Gobble v. State, 104 So.3d 920, 963 (Ala.Crim.App.2010). See also Snyder v. State, 893 So.2d 488, 534-37 (Ala.Crim.App.2003), cert. denied, 893 So.2d 563 (Ala.2004), cert. denied, 544 U.S. 1062, 125 S.Ct. 2512, 161 L.Ed.2d 1113 (2005).
Reynolds was allowed wide latitude in cross-examining Chad Martin regarding his prior conflicts with victim Charles Martin. The circuit court did not abuse its discretion in refusing to allow further questioning about a threatening note Chad Martin denied leaving on Charles Martin’s door. Other than a vague reference to a hearsay statement contained within an unspecified report, Reynolds offered no proof that Chad Martin had in fact left such a threatening note. Furthermore, assuming that Reynolds proved that such a report existed, he still did not establish that it would have met the three-pronged requirements set forth in Griffin as addressed in Gobble and Snyder, supra.
Based upon the information provided to the circuit court, “ ‘[T]he tendency of this evidence to mislead the jury substantially outweighed its probative value in the case.”’ Snyder, 893 So.2d at 537. Accordingly, we find no plain error in the circuit court’s ruling.
B.
Reynolds also argues that the circuit court erred in ruling that he could not impeach the testimony of Adrian West with evidence of bias. (Reynolds’s brief, Issue XI(B), at 85-87.) We disagree.
Before trial, a hearing was conducted to determine whether West was Reynolds’s common-law wife and whether the use of information she provided to investigators and her testimony at trial would violate the marital-communication privilege. (Vol. 1, C. 147-48; R. Vol. IV, R. 209-Vol. V, R. 256.) During that hearing, Reynolds’s counsel sought to establish that West was Reynolds’s common-law wife by eliciting testimony from West that she had signed a 2002 tax return and an advance loan application against the tax return as Reynolds’s spouse. However, because the documents had been electronically filed by a commercial tax preparer, there was no signature line, and, at the time of the hearing, West had not yet signed an authorization form permitting the tax preparer to release the paperwork purportedly bearing her signature.
During questioning by defense counsel at the pretrial hearing, West admitted that she had given written authorization for the tax preparer to electronically file the tax return; however, she testified that she did not recall signing either the tax form or the advance loan application as Reynolds’s spouse. For a variety of reasons, the circuit court ultimately ruled that West was not Reynolds’s common-law wife. (Vol. I, C. 165-66.)
During the trial, defense counsel filed a motion in limine seeking the court’s permission to introduce the transcript from the pretrial hearing and the 2002 tax documents, which defense counsel had obtained after the hearing that purportedly bore West’s signature in the capacity as Reynolds’s spouse. (Vol. II, C. 216-17; Second Supplement, Vol. Ill, C. 410-13.) The circuit court addressed Reynolds’s motion in limine before West testified. (Vol. VIII, R. 902-10.) In support of the motion, Reynolds’s counsel argued that the purpose of introducing the transcript from the hearing and the tax documents was to establish that West lied during the hearing when she testified that she had not signed an application for an advance loan as Reynolds’s spouse. Defense counsel alleged that West lied in the hearing because she was biased against Reynolds and because she wanted to ensure that her *111 trial testimony would not be excluded under the marital-communications privilege.
After further discussion, the circuit court denied Reynolds’s motion because, it found, West did not specifically deny that she had signed the papers as Reynolds’s spouse; rather, West testified at the hearing that she could not recall how she signed the paperwork.
Rule 616, Ala.R.Evid, provides:
“A party may attack the credibility of a witness by presenting evidence that the witness has a bias or a prejudice for or against a party to the case or that the witness has an interest in the case.”
In this regard:
“Any acts, statements or relationships offered under Rule 616 must be relevant to bias. It ordinarily lies within the discretionary power to allow or disallow proof of specific facts which tend to show the witness’ bias or the extent thereof. The party alleging error on appeal in this regard must show an abuse of discretion on the part of the trial court.”
McElroy’s Alabama Evidence § 149.01(2)(a) (footnotes omitted).
The proffered documents do not establish bias. As noted, West testified at the pretrial hearing that she could not recall in what capacity she had signed the proffered documents. Furthermore, documents bearing her signature in the capacity of Reynolds’s spouse do not establish that she lied in order to be able testify against him at trial. Reynolds has not established that the circuit court abused its discretion by its ruling.
X.
Reynolds contends that his convictions are due to be reversed because, he claims, the State failed to provide the defense with “critical evidence” in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Alabama caselaw. (Reynolds’s brief, Issue V, at 51-59.)
A.
Reynolds argues that the State improperly failed to provide the defense with notes made by investigators during their interviews with State’s witnesses Adrian West and John Langley and defense witness Donald Harvey. Reynolds maintains that he was entitled to the interview notes because the notes allegedly contain impeachment evidence. (Reynolds’s brief, at 57-59.)
Although Reynolds interchanges the terms “statements” and “interview notes” in various points in his argument, we note that for discovery purposes these terms are different:
“In Cooks v. State, 50 Ala.App. 49, 276 So.2d 634, cert. denied 290 Ala. 363, 276 So.2d 640, it was held:
“ ‘The first requisite necessary to secure for inspection production of a “statement” of a witness for use on cross examination of the witness is that the statement must be one in writing prepared by him or prepared by another at his instance and signed by him or otherwise authenticated by him. In the instant case there was nothing to indicate by query of the witness by the defense or otherwise that the witness had given to any officer a written statement signed or authenticated by her. There was not laid in the evidence any showing that any statement made by the witness to officers before trial differed in any respect from statements made to the jury during trial. See Bellew v. State of Mississippi, 238 Miss. 734, 106 So.2d 146, cited with approval in the Mabry case, supra. Neither was there any such showing of inconsisten *112 cy in testimony given by the witness at a preliminary hearing previously held and the testimony given by her on the trial before the jury. There is no showing that the statement requested, if any, was of such nature that without it the defendant’s trial would be fundamentally unfair. The production for inspection of any such statement as above defined lies within the sound discretion of the court and we find no abuse of that discretion in the ruling here made. See Annotation, Right of Defendant in Criminal Case to Inspection of Statement of Prosecution’s Witness for Purpose of Cross Examination or Impeachment, 7 A.L.R.3d, pp. 181, 217, 219, 213 citing the Mabry case, supra, and the authorities therein noted.’
“After a review of the evidence adduced at the hearing on appellant’s motion for a new trial, we are clear to the conclusion that the unsigned notes in question did not amount to a statement as defined in Cooks, supra, but merely represented the work product of a county investigator’s interview of a prospective witness, and as such were not subject to appellant’s motion to produce. Mabry v. State, 40 Ala.App. 129, 110 So.2d 250; Thigpen v. State, 49 Ala.App. 233, 270 So.2d 666; Fortenberry v. State, 55 Ala.App. 1, 312 So.2d 573; and Cooks, supra.”
Maness v. State, 57 Ala.App. 431, 435, 329 So.2d 120, 123-124 (Ala.Crim.App.1976).
Reynolds does not actually claim that the State failed to provide statements from the three witnesses; rather, Reynolds argues that the State should have also produced the investigators’ interview notes with West, Langley, and Harvey because, he asserts, those notes purportedly contain impeachment evidence. We disagree.
As discussed in Maness, supra, the investigators’ notes from the interviews are considered privileged work product and are not necessarily discoverable by Reynolds. See Rule 16.1(c)(l)-(3) and 16.1(e), Ala.R.Crim.P. See also Rogers v. State, 417 So.2d 241, 247 (Ala.Crim.App.1982.) (“[0]riginal notes [of investigator] are considered work product and as such a defendant has no right to their production.”).
However, Rule 16.1(f), Ala. R.Crim.P., provides that “[n]othing in this Rule 16.1 shall be construed to limit the discovery of exculpatory material or other material to which a defendant is entitled under constitutional provisions or other provisions of law.”
“ ‘In Brady [v. Maryland], 373 U.S. [83,] 87, 83 S.Ct. [1194] 1196-97 [ (1963) ], the Supreme Court held that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” A Brady violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant and (3) material to the issues at trial. Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990); Delap v. Dugger, 890 F.2d 285 (11th Cir.1989); United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983); Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The Supreme Court of the United States in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion by Blackmun, J.), defined the standard of materiality required to show a *113 Brady violation as follows: “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” See also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Stano v. Dugger, 901 F.2d at 899; Delap v. Dugger, 890 F.2d at 299; Coral v. State, 628 So.2d 954 (Ala.Cr.App.1992); Thompson v. State, 581 So.2d 1216 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
“ ‘The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. United States v. Bagley; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Ex parte Womack[, 435 So.2d 766 (Ala.1983) ]. “When the ‘reliability of a given witness may well be determinative of guilt or innocence,’ nondisclosure of evidence affecting credibility falls within the general rule.” Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state’s witness.’
“Williams v. State, 710 So.2d 1276, 1296-97 (Ala.Crim.App.1996).”
Giles v. State, 906 So.2d 963, 973-974 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005).
Reynolds claims that,
“[h]ad these statements [investigators notes] been turned over to defense counsel, it is clear that counsel would have not only been able to effectively cross-examine two key State witnesses, but that it would have been able to discredit the State’s theory of the crime in a way that would render [him] not guilty of capital murder.”
(Reynolds’s brief, at 58.) Reynolds does not specify how the notes in question were exculpatory or what portion of the notes were inconsistent with the witnesses’ trial testimony.
The record on appeal has been supplemented with the portion of the State’s file that was placed under seal at trial for purposes of appellate review. (First Supplemental Record, C. 87-182.) This supplemental record includes the notes from the interviews conducted with West, Langley, and Harvey. (First Supplemental Record, C. 156-64, 167-71, 172-73, 178.) This Court has reviewed the notes from the investigators’ interviews with the three witnesses.
Despite Reynolds’s contention to the contrary, it is not clear how these additional notes could have been used to impeach the three witnesses’ trial testimony. Although these notes may contain more or less detail than the witnesses’ trial statements, the notes do not appear to contain either any conflicting information that could have been useful for impeachment purposes or any exculpatory information as that term is contemplated by Brady and its progeny. Accordingly, Reynolds is due no relief on this claim.
B.
Likewise, Reynolds is due no relief on his assertion that the State withheld field *114 notes prepared by Mark Hopwood, a forensic scientist who participated in the investigation of the crimes. (Reynolds’s brief, at 53-56.) During defense counsel’s cross-examination of Hopwood, Hopwood testified that he had performed a chemical-screening test for the presence of blood in various places of the interior of the automobile that Reynolds and West used on the night of the murders, but that the test did not detect the presence of blood. (Vol. X, R. 1329-30.)
Defense counsel requested a sidebar conference and informed the court that although the defense had requested certified copies of the Department of Forensic Sciences’ reports, the defense did not receive a copy of Hopwood’s report regarding the testing of the vehicle. The defense maintained that it was not previously aware of the test performed by Hopwood on the interior of the vehicle. (Vol. X, R. 1331-32.) A discussion ensued during which the State indicated that it did not have any such report, but that if possible it would obtain a copy and provide it the defense to determine if further action was necessary. (Vol. X., R. 1333.)
Later, during the defense counsel’s recross-examination of Hopwood, the following occurred:
“Q. [DEFENSE COUNSEL]: Did you bring a specific report with you today that has the fact that you tested the car that they have stipulated was Sandra Roberts, or is that just in notes.
“A. I have my notes, and then you have — you should have DNA reports on the results for the towel that I sent down.[14]
“Q. [DEFENSE COUNSEL]: But you don’t have—
“A. I mean, I have field notes.
“Q. [DEFENSE COUNSEL]: You don’t have an individual report for that car?
“A. No.”
(Vol. X., R. 1346-47.)
As evidenced from the above excerpt, Hopwood apparently did not reduce his field notes regarding the testing of the vehicle to an official report, and, as discussed previously, Reynolds was not necessarily entitled to Hopwood’s field/investigative notes. In this case, Reynolds has not overcome the privilege against disclosure of the State’s work product.
Reynolds has not shown that the State suppressed the evidence. The State apparently did not have the notes, and the notes are not part of the record placed under seal for appellate review. See Vanpelt v. State, 74 So.3d 32, 56 (Ala.Crim.App.2009) (“Although Rule 16.1 and the circuit court’s order required the State to disclose reports of tests made, there is no indication that [the investigator] made a report of his comparison. Nothing in the circuit court’s discovery order or in Rule 16.1, Ala. R.Crim. P., required the State to create a report of comparisons made during an investigation.”).
Furthermore, even assuming, for the sake of argument, that Reynolds was entitled to Hopwood’s field notes regarding the test on the interior of the vehicle, Reynolds has not demonstrated that had he been provided the notes “there is a reasonable probability that ... the result of the proceeding would have been different.” Giles, 906 So.2d at 973.
As we have stated:
*115 “We find no error in the admission of this testimony. There is no evidence that the prosecutor deliberately withheld any evidence from the appellant. There is no indication that the belated discovery of this oral statement prejudiced the appellant. Prejudice caused by the late disclosure is a ‘prerequisite for a reversal on this issue.’ Pettway, 607 So.2d at 382. See Stewart v. State, 601 So.2d 491, 499 (Ala.Cr.App.1992); Robinson v. State, 577 So.2d 928, 930 (Ala.Cr.App.1990); Brown v. State, 545 So.2d 106, 114-15 (Ala.Cr.App.1988), affirmed, 545 So.2d 122 (Ala.), cert. denied, 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 206 (1989). See also DeBruce v. State, 651 So.2d 599, 622 (Ala.Cr.App. 1993) (‘ “Tardy disclosure of Brady material is generally not reversible error unless the defendant can show that he was denied a fair trial.” ... A delay in disclosing Brady material requires reversal only if the “lateness of the disclosure so prejudiced appellant’s preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial.” ’). There is no probability that the jury would have resolved the appellant’s case differently had the State disclosed the oral statement on a timely basis.”
Taylor v. State, 666 So.2d 36, 54 (Ala.Crim.App.1994). See also Smith v. State, 79 So.3d 671 (Ala.Crim.App.2010.)
Adrian West had already testified to this same fact when Hopwood testified that no blood was detected in the vehicle, and defense counsel was able to argue to Reynolds’s advantage in its closing statement to the jury the fact that no blood was detected in the vehicle. (Vol. XI, R. 1644, 1650.) Accordingly, Reynolds has not established the requisite prejudice to justify a reversal of his convictions.
XI.
Reynolds argues that his convictions are due to be reversed because, he alleges, the State was improperly allowed to introduce DNA test results and the results of a footprint analysis without establishing a proper chain of custody. (Reynolds’s brief, Issue VI, at 59-69.) Specifically, Reynolds contends that the State’s DNA expert witness should not have been allowed to testify regarding the results of DNA tests because, he alleges, the State did not establish a sufficient chain of custody for either the known samples that were used for comparison purposes or for the swabs of blood obtained from the scene of the crime that were compared to the known samples. (Reynolds’s brief, at 59-65.) Reynolds also argues that the State was improperly allowed to introduce the results of a footprint analysis because, he claims, the State did not establish a sufficient chain of custody for the known samples. (Reynolds’s brief, at 65-69.)
An understanding of what transpired at trial is helpful to the resolution of this issue.
Mark Hopwood, a forensic scientist with the Alabama Department of Forensic Sciences, helped investigate and process the crime scene. Hopwood photographed a blood drop located on the top step outside the carport door as well as a bloody, partial footprint on the steps. (Vol. IX, R. 1246-50; Vol. X, R. 1280-81.) Hopwood subsequently swabbed the blood drop (State’s Exhibit 26) and footprint. (Vol. X, R. 1278-1280.) Hopwood also swabbed the blood on the handle of the gasoline can found beside Charles Martin’s body (State’s Exhibit 27) and blood droplets on the wall opposite the entrance to the bedroom where the bodies of Melinda and Savannah Martin were discovered. (State’s Exhibit 24.) (Vol. X, R. 1285,1287-88.)
*116 Hopwood testified that the swabs were packaged individually, labeled, and then sealed with his initials. (Vol. X, R. 1280, 1297, 1301-03.) Hopwood testified that he personally delivered the samples to the Birmingham division of the Alabama Department of Forensic Sciences for DNA testing. (Vol. X, R. 1297.) Hopwood testified that the Birmingham division would have records to verify that he delivered the samples. (Vol. X, R. 1297.)
State’s Exhibit 24 (the swab of the blood droplets on the hallway wall), State’s Exhibit 26 (a swab of the blood drop on the doorstep), and State’s Exhibits 27 (the blood swab from the handle of the gasoline can) were all admitted into evidence without objection. (Vol. X, R. 1301-03.)
Hopwood identified State’s Exhibit 185 as the known inked footprints of seven original suspects: Chad Martin, John Langley, Michael Reynolds, Donald Harvey, Adrian West, and two other suspects. (Vol. X, R. 1304-06.) He testified that he received these known prints from the Gadsden Police Department. (Vol. X, R. 1304-06.) Hopwood also identified State’s Exhibits 186, 187, and 188 as the known inked footprints of the three victims that he received from the forensic pathologist who performed the autopsy. (Vol. X, R. 1304-05.) State’s Exhibits 185-188 were admitted into evidence without objection. (Vol. X, R. 1305-06.)
Hopwood retained the photographs of the unknown bloody footprint, as well as the known inked footprints depicted in State’s Exhibits 185-188, until he was requested to send them to Shannon Fitzgerald, the latent print examiner with the Alabama Bureau of Investigation. (Vol. X, R. 1282,1304-05.)
Chris Crow, a crime-scene technician with the Gadsden Police Department, testified that during the course of his investigation, he and his “unit” were required to collect various biological samples from persons of interest for comparison purposes. (Vol. X, R. 1363.) Specifically, he testified that he or someone in his unit collected the following samples:
1. Two oral swabs from Adrian West (State’s Exhibit 21);
2. Two oral swabs from John Langley (State’s Exhibit 7);
3. Multiple head hairs from John Langley (State’s Exhibit 4);
4. Fingernail scrapings from Chad Martin (State’s Exhibit 12);
5. Two oral swabs from Chad Martin (State’s Exhibit 5);
6. Multiple head hairs from Chad Martin (State’s Exhibit 6);
7. Multiple head hairs from Adrian West (State’s Exhibit 20);
8. Oral swabs from Donald Harvey (State’s Exhibit 17).
(Vol. 10, R. 1364-65.)
Crow testified in some detail about the procedures used to collect and secure the various samples. (Vol. X, R. 1366-67.) Crow stated that each of the exhibits bore his or the collecting officer’s initials and that the exhibits appeared to have been secured and packaged in the customary manner for transportation to the Department of Forensic Sciences for comparison to items obtained from the scene of the crimes. (Vol. X, R. 1365-66.) He testified that the samples were sent to the State laboratory for testing and returned to the Gadsden Police Department after testing and that packaging on the various exhibits documented the chain of custody. (Vol. X, R. 1367-71.) All eight exhibits were admitted into evidence without objection. (Vol. X, R. 1367-71.)
Crow testified that he also collected two oral swabs from Reynolds (State’s Exhibit 189) and some hairs from Reynolds’s head *117 (State’s Exhibit 190). (Vol. X, R. 1371-74.) Crow verified that these samples were secured and packaged in the same manner as the other previously discussed exhibits and that Reynolds’s samples were also sent to the State laboratory for analysis. (Vol. X, R. 1371-74.) Reynolds’s samples were also admitted without objection. (Vol. X, R. 1373-74.)
Forensic biologist, Carl Mauterer, of the Alabama Department of Forensic Sciences, testified as the State’s DNA expert.[15] He identified State’s Exhibit 24 as the swab of a red/brown stain obtained from the hallway wall in the Martins’ residence, State’s Exhibit 26 as a swab of a red/brown stain from the outside steps of the Martins’ residence, and State’s Exhibit 27 as a red/ brown stain obtained from the handle of the gasoline can.[16] (Vol. X, R. 1407-10.) He also identified several known biological samples that were obtained from the five original suspects: Reynolds, Adrian West, Chad Martin, John Langley, and Donald Harvey.[17] Mauterer also received for comparison purposes, blood-standard cards from the autopsies of the three victims. (Vol. X, R. 1412.) Mauterer testified that each exhibit had been labeled with a case number assigned from the Alabama Department of Forensic Sciences, and that the exhibits had been initialed by him. (Vol. X, R. 1407-11.)
Mauterer testified that the DNA profile extracted from the blood swabs from the doorstep and hallway matched the DNA profile from the known sample obtained from Adrian West. (Vol. X, R. 1420-21.) Mauterer testified that the swab obtained from the gasoline can handle tested positive for the presence of blood and that it contained a mixture of DNA traits. (Vol. X, R. 1421-22.) He testified that the primary contributor to the DNA on the handle was victim Savannah Martin but that Michael Reynolds and Melinda Martin could not be excluded as contributors of the DNA. (Vol. X, R. 1421-22, 1430.) However, Charles Martin, Chad Martin, Adrian West, John Langley, and Donald Harvey were excluded as contributors to the DNA extracted from the swab of the handle of the gasoline can. (Vol. X, R. 1443^44.) Mauterer also testified regarding the results of the DNA population-frequency statics with regard to the above matches. (Vol. X, R. 1420-1424.)
Shannon Fitzgerald, a latent print examiner with the Alabama Bureau of Investigation, identified State’s Exhibit 191 as two photographs of the same bloody footprint. (Vol. X, R. 1452.) State’s Exhibit 191 was admitted into evidence without objection. (Vol. X, R. 1453.) Fitzgerald testified that he received State’s Exhibit 191 — the inked footprints from the three victims, and the inked footprints from the seven original suspects — packaged in a sealed envelope, from Mark Hopwood on *118 July 11, 2007. (Vol. X, R. 1452-53.) Fitzgerald testified that after performing a comparison of the unidentified footprint to the known inked footprints he had received from Hopwood, he concluded that the unknown footprint from the crime scene matched the known inked footprint of Michael Reynolds’s left foot. (Vol. X, R. 1458-55.)
Reynolds now challenges the admissibility of the testimony regarding the DNA test results and footprint analysis on the ground that various samples used to perform the tests were not properly authenticated based on the State’s failure to establish an adequate chain of custody as to the test samples. We have stated:
“In Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), the Alabama Supreme Court discussed the requirements for establishing the chain of custody:
“ ‘Ex parte Holton, 590 So.2d 918 (Ala.1991), sets forth the legal analysis to be applied in determining if a proper chain of custody has been established:
“ ‘ “The chain of custody is composed of ‘links.’ A ‘link’ is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link’s possession of the item: ‘(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.’ Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145,159 (1973).
“ ‘ “If the State or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a ‘missing’ link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the ‘link,’ as to one or more criteria or as to one or more links, the result is a ‘weak’ link. When the link is ‘weak,’ question of credibility and weight is presented, not one of admissibility.”
“ ‘590 So.2d at 920. While each link in the chain of custody must be identified, it is not necessary that each link testify in order to prove a complete chain of custody. Harrison v. State, 650 So.2d 603 (Ala.Crim.App.1994).’
“680 So.2d at 918. ‘ “In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ ” ’ Ingram v. State, 779 So.2d 1225, 1254 (Ala.Crim.App.1999) (quoting Ex parte Holton, 590 So.2d at 919-20 (citation omitted in Holton)), aff'd, 779 So.2d 1283 (Ala.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). ‘[E]vidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item.’ Lane v. State, 644 So.2d 1318, 1321 (Ala.Crim.App.1994); see also Ingram v. State, 779 So.2d at 1254. Additionally, ‘ “[c]hain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves.’” Ex parte Scott, 728 So.2d 172, 182 (Ala.1998) (quoting Magwood v. State, 494 So.2d *119 124, 144 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)), cert. denied, 528 U.S. 881, 120 S.Ct. 87 (1999).
[[Image here]]
“ ‘Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.’
“§ 12-21-13, Ala.Code 1975. Therefore, any question as to the adequacy of the safeguarding and handling of the evidence did not go to its admissibility. Rather, it went to the weight the jury would assign to the evidence.”
Martin v. State, 931 So.2d 736, 748-49 (Ala.Crim.App.2003), aff'd in part, rev’d in part on unrelated ground, 931 So.2d 759 (Ala.2004.)
“Additionally,
“ ““ “The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.” Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Cr.App.1992); Smith v. State, 583 So.2d 990 (Ala.Cr.App.1991), cert. denied, 583 So.2d 993 (Ala.1991). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Cr.App.1990), rev’d, 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Cr.App.), appeal after remand, 591 So.2d 149 (Ala.Cr.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Cr.App.1984).’ ” ’ ”
Broadnax v. State, 825 So.2d 134, 170 (Ala.Crim.App.2000).
With these principles in mind, we turn to Reynolds’s specific allegations.
Reynolds cites Brooks v. State, 33 So.3d 1262 (Ala.Crim.App.2007), and Ex parte Phillips, 962 So.2d 159 (Ala.2006), which is addressed in Brooks, in support of his allegation that the circuit court erroneously allowed into evidence testimony regarding the DNA and footprint analysis.
In Brooks, the defendant was convicted of two counts of first-degree sodomy and one count of first-degree sexual abuse involving his eight-year-old stepdaughter, H.F. On appeal to this Court, Brooks argued that the circuit court abused its discretion in allowing the State to introduce, over his objection, test results that indicated that H.F. had Type 1 herpes— the same type herpes Brooks had. On appeal, Brooks argued that the State failed to establish a sufficient chain of custody regarding the vaginal swabs and blood drawn from H.F. and the blood drawn from him.
We agreed that the chain of custody with regard to the samples was insufficient. We found:
*120 “In this case the chain of custody for the vaginal swab and the blood sample taken from H.F. is totally lacking. In regard to the vaginal swab, the record shows that Dr. Burchfield took a sample, put it in a tube, and sent it to Quest Diagnostics. There is no testimony concerning the method used to safeguard the sample after it was collected and sent to the lab. Neither is there any testimony as to how the samples were transported from Dr. Burchfield’s office to the lab for testing. Indeed, no individuals in the chain of custody, other than Dr. Burchfield, are identified. We do not know the individual who accepted the sample at the lab or the individual who conducted the tests on the samples. We do not know whether the samples were received at the lab in the same condition as when they were sealed and transported. The record is totally devoid of the requisite chain of custody for these samples. We have no means of determining whether the integrity of the samples was protected from the time they were collected until they were tested at the lab. There is even less testimony on the chain of custody for the blood sample. There are many missing links in the chain of custody for both the vaginal swab and the blood sample.”
33 So.3d at 1272.
We then determined that the error in the admission of the testimony regarding the test results on the samples was not harmless under the facts of the case. We reasoned:
“[T]he Alabama Supreme Court in Ex parte Phillips, 962 So.2d 159 (Ala.2006), addressed whether the erroneous admission of test results based on missing links in the chain of custody for the samples used for the test was harmless error, given the victim’s testimony that the defendant had sexually abused her. The Phillips Court; reversing this Court’s holding that the error was harmless, noted that ‘overwhelming evidence of guilt does not render prejudicial error harmless.’ 962 So.2d at 165. The Supreme Court then wrote:
“ ‘Had the evidence of the chlamy-dial infections been excluded, the jury would have been provided essentially with the opposing versions of D.M. and Phillips, and if it had found his version to be more credible, or even if it found itself unable in the final analysis to determine who was telling the truth, it might have found itself unable to agree that Phillips was guilty beyond a reasonable doubt; it then could have returned a verdict of not guilty or perhaps have been deadlocked, necessitating a mistrial. Accordingly, we cannot ignore the probable effect on the jury of the inadmissible evidence of the chlamydial infections of both D.M. and her mother.’
“962 So.2d at 165.
“As the Alabama Supreme Court cautioned in Phillips, we cannot ‘ignore the probable effect’ on the jury of the erroneous admission of the extremely prejudicial test results. This is especially true in this case given that Brooks’s first trial ended in a mistrial, after this same evidence was admitted, because the jurors were unable to reach a unanimous verdict on the sodomy charges.”
33 So.3d at 1276-77.
Unlike the defendant in Brooks, Reynolds did not object to the admission of the testimony regarding the DNA test results or the footprint analysis.[18] We have re *121 viewed the evidence in light of the law set forth above, and we find that in contrast to the situation in Brooks, the State did present sufficient evidence that “the integrity of the samples was protected from the time they were collected until they were tested at the lab.” Brooks, supra. See also, Ex parte Mills, 62 So.Bd 574, 587 (Ala.2010) (finding no plain error in the admission of several tangible items of evidence as well as forensic-testing results regarding those items because there was no indication that the items had been tampered with or altered and Mills made no ‘ “showing of ill will, bad faith, evil motivation, or some evidence of tampering,” ’ quoting Lee v. State, 898 So.2d 790, 847-48 (Ala.Crim.App.2001)). As set forth above, there was testimony elicited regarding how the various test samples were collected, sealed, and maintained. “Even if the State failed to provide a textbook chain of custody,” Floyd v. State, [Ms. CR-05-0935, September 28, 2007] — So.3d -,(Ala.Crim.App.2007), we find there was sufficient evidence that the items were properly authenticated by proof of an adequate chain of custody.
XII.
Reynolds argues that the evidence was insufficient to sustain his convictions for robbery-murderer under counts II, III, and V, because, he contends, Adrian West was an accomplice to the robbery and her testimony implicating him in the robbery was not sufficiently corroborated as required by § 12-21-222, Ala.Code 1975. (Reynolds’s brief, Issue X, at 79-83.) Specifically, Reynolds maintains that “without Ms. West’s testimony, there was no connection between [him] and the items alleged to have been stolen.” (Reynolds’s brief, at 80.) In a related vein, Reynolds also alleges that the circuit court erred in refusing to give his requested jury charge addressing the necessity of corroborating an accomplice’s testimony. (Reynolds’s brief, at pp. 82-83.)
Although Reynolds did object to the circuit court’s refusal to give his requested jury charge on accomplice corroboration, he did not move for a judgment of acquittal on the ground that the accomplice’s testimony had not been sufficiently corroborated.[19] Accordingly, we will review his challenge to the sufficiency of the evidence on this ground for plain error only. Rule 45A, Ala. R.App. P. See Marks v. State, 20 So.3d 166, 172 (Ala.Crim.App.2008).
Section 12-21-222, Ala.Code 1975, provides:
“A conviction of a felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.”
We have held:
“For this section [12-21-222, Ala.Code 1975,] to apply, it must clearly appear that the witness in question is an accomplice. Steele v. State, 512 So.2d 142 (Ala.Cr.App.), cert. denied, 512 So.2d 142 (Ala.1987). The defendant bears the burden of showing that the witness was an accomplice before § 12-22-222 can be invoked. Miller v. State, 518 So.2d 801 (Ala.Cr.App.1987), cert. denied, 518 So.2d 801 (Ala.1988).
“An accomplice is defined as ‘an associate in crime; a partner or partaker in guilt.’ Darden v. State, 12 Ala.App. 165, *122 167, 68 So. 550, 551 (1915). ‘The test for determining whether a witness is an accomplice is whether he or she could have been indicted and convicted for the offense charged, either as principal or accessory.’ Russell v. State, 365 So.2d 343, 346 (Ala.Cr.App.1978). Where a person’s participation in a crime or cooperation with the defendant is motivated by fear, he is not an accomplice. Curry v. State, 502 So.2d 836, 842 (Ala.Cr.App.1986), cert. denied, 502 So.2d 836 (Ala.1987).”
Gordon v. State, 611 So.2d 453, 455 (Ala.Crim.App.1992). (Emphasis added.)
The State maintains that Adrian West was not an accomplice and that, therefore, there was no requirement that her testimony be corroborated.[20] Under the facts of this case, we agree. As addressed in detail in the facts portion of this opinion, Adrian West testified that she took Melinda Martin’s pursue and the Martin’s telephone because she was in fear for her life. Although West’s testimony was conflicting as to whether she knew that Reynolds planned to rob the Martins when she drove him to their house, she did not “aid or abet” Reynolds in the commission of the robbery. Indeed, West testified that Reynolds stabbed her in the arm when she tried to intervene. See § 13A-2-23 Ala. Code 1975.
Even assuming, without deciding, that West was an accomplice, we find no plain error in the circuit court’s denial of Reynolds’s motion for a judgment of acquittal because West’s testimony regarding Reynolds’s commission of the robbery was sufficiently corroborated. See Green v. State, 61 So.3d 386, 395 (Ala.Crim.App.2010), for a thorough discussion of the applicable law regarding the sufficiency of corroborating evidence.
As discussed, West said that Reynolds ordered her to take Melinda Martin’s purse and the Martins’ cordless telephone, and then to “get out.” Fearing for her life, West complied. She put the telephone and the purse in Sandra Roberts’s automobile, which she and Reynolds had borrowed earlier that night. Neither the telephone nor the purse were found in the Martins’ house during the investigation. West told the police that when they arrived back at Reynolds’s father’s house, Reynolds got money out of Melinda Martins’s purse to purchase drugs. Sandra Roberts confirmed that after Reynolds and West returned to the Reynolds’s residence, Reynolds gave her money to purchase drugs. Sandra Roberts also testified that she later discovered the cordless telephone in her automobile.
West testified that she and Donald Harvey disposed of the base for the telephone in a wooded area near where they burned the clothes and Martin’s purse. The investigators found the burn pile and recovered the telephone base in the area described by West. Both the telephone base and the cordless receiver were the same brand as the telephone cord found lying across the bedroom floor where the bodies of Melinda and Savannah Martin were discovered.
Accordingly, we find that there was sufficient corroborating evidence to connect Reynolds to the stolen items and to corroborate West’s testimony that Reynolds murdered the victims during a robbery. Accordingly, we find no plain error in the circuit court’s denial of the motion for a judgment of acquittal on the ground that the purported accomplice’s testimony regarding the robbery was not sufficiently corroborated. Furthermore, because West’s testimony was sufficiently corroborated, any error that occurred in *123 the circuit court’s refusal to give Reynolds’s requested jury charge regarding the necessity of corroborating accomplice testimony was harmless. Gavin v. State, 891 So.2d 907, 975 n. 80 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004), cert. denied, 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005).
XIII.
Reynolds asserts that the circuit court failed to conduct a reasonable inquiry into two instances of possible juror misconduct. (Reynolds’s brief, Issue IX, at 75-79.) The first alleged instance of juror misconduct involved purported improper contact between one or more jurors and members of the victims’ family during the trial. The second alleged instance of improper contact occurred when defense witness Lt. Faye Gary supposedly winked at a juror as Lt. Gary was leaving the witness stand.
Before addressing each allegation separately below, we will set forth the applicable law.
“ ‘ “Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion.” ’ Burgess v. State, 827 So.2d 134, 157 (Ala.Cr.App.1998), quoting Gaffney v. State, 342 So.2d 403, 404 (Ala.Cr.App.1976), cert. denied, 342 So.2d 404 (Ala.1977). In discussing claims involving alleged juror misconduct, we said the following in Sis-trunk v. State, 596 So.2d 644 (Ala.Cr.App.1992):
“ ‘ “In the absence of any showing to the contrary, we must assume that the trial judge was satisfied as to the nature of the conversation which passed between the witness and the juror, and upon this basis decided that the appellant was not prejudiced thereby. Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion. Gaffney v. State, Ala. Cr. App., 342 So.2d 403, [1976], cert. denied, Ala., 342 So.2d 404 (197[7]). This ruling will not be disturbed in the absence of a showing of abuse of discretion.”
“ ‘Cox v. State, 394 So.2d 103, 105-06 (Ala.Cr.App.1981).
“ ‘In Holland v. State, 588 So.2d 543 (Ala.Cr.App.1991), a case involving alleged juror contamination, this court reversed because the trial court undertook no inquiry into the circumstances of the alleged improper communication. We observed that
“ ‘ . In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion ‘where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark.’ Bascom v. State, 344 So.2d 218, 222 (Ala.Cr.App.1977). However, the trial judge has a duty to conduct a ‘reasonable investigation of irregularities claimed to have been committed’ before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala.Cr.App.1984).”
“ ‘Holland [v. State], 588 So.2d [543,] 546 [ (Ala.Cr.App.1991) ]. What constitutes a “reasonable investigation of irregularities claimed to have been committed” will necessarily differ in each case. A significant part of the discretion enjoyed by the trial court in this area lies in determining the scope of the investigation that should be conducted.
*124 . A full evidentiary hearing at which witnesses and jurors can be examined and cross examined is not required. Tillman [v. United States], 406 F.2d [930][at] 938 [ (5th Cir.1969), vacated on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969)]. The trial judge need not examine the juror to determine if that juror admits to being prejudiced before granting a mistrial.”
“ ‘Woods v. State, 367 So.2d 974, 980 (Ala.Cr.App.), reversed on other grounds, 367 So.2d 982 (Ala.1978), partially quoted in Cox v. State, 394 So.2d 103, 105 (Ala.Cr.App.1981). As long as the court makes an inquiry that is reasonable under the circumstances, an appellate court should not reverse simply because it might have conducted a different or a more extensive inquiry. Generally, where the judge polls the jury and each juror indicates that there has been no improper communication, that is sufficient. See Ham v. State, 540 So.2d 805, 810 (Ala.Cr.App.1988); Ex parte Weeks, 456 So.2d 404, 407 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985). There is no absolute requirement that a juror alleged to have received an improper communication be examined apart from the other jurors. See Smith v. State, 432 So.2d 550 (Ala.Cr.App.1983), and Hopkins v. State, 429 So.2d 1146, 1152 (Ala.Cr.App.1983) (wherein the jury was questioned together as a group).
“ ‘ “[W]hen the trial judge acts promptly to investigate the circumstances surrounding the making of an inherently prejudicial remark [to] a veniremember, determining specifically whether the remark was made and whether the remark had a prejudicial effect on those who, ultimately selected to serve as jurors, heard it, there is no error in the denial of a motion for mistrial based on jury contamination.” Holland v. State, 588 So.2d at 548.’
“596 So.2d at 648-49.”
Gamble v. State, 791 So.2d 409, 432-33 (Ala.Crim.App.2000). See also, Taylor v. State, 808 So.2d 1148, 1173-74 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), cert. denied, Taylor v. Alabama, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002).
A.
On October 25, 2007, three days after the penalty phase of the jury trial concluded, defense counsel filed a written motion with the circuit court requesting the court to conduct a “reasonable inquiry” into allegations that one or more of the jurors might have had improper contact with the victims’ family members on the first and the last day of the trial. (Vol. III, C. 198-213.) Defense counsel attached affidavits from three of Reynolds’s family members, who stated that they had witnessed the improper contact, as well as affidavits from two of his defense counsel who had spoken with his relatives regarding the improper contact.
On October 31, 2007, the circuit court conducted a hearing to investigate the allegations in Reynolds’s motion. (Vol. XIII, R. 2009-47.) The 2 jurors who were the subject of Reynolds’s motion were present at the hearing, as well as the other 10 jurors — the court had requested the remaining jurors to attend the hearing out of an abundance of caution.
During the hearing, the circuit court individually questioned the two jurors who allegedly had contact with the victims’ family. Defense counsel also questioned *125 the two jurors. (Vol. XIII, R. 2013-17; 2021-23.) Both jurors testified that they had not had contact with the victims’ family members.
After the 2 jurors were examined, the court individually questioned each of the remaining 10 jurors to ensure that the jurors had in fact followed the court’s instructions and that there had been no inappropriate contact between the jurors and victims’ family members. (Vol. XIII, R. 2026-2047.) All 10 jurors indicated that they had followed the court’s instructions and that they did not engage in any improper contact with the victims’ family members. The court did not allow Reynolds’s counsel to question the 10 jurors because those jurors were not the subject of Reynolds’s motion.
At the conclusion of the hearing, the following occurred:
“[DEFENSE COUNSEL]: I think Your Honor has conducted a reasonable investigation and asked the jurors. And at this point I cannot point to anything from these jurors that would support juror misconduct at this point.
“THE COURT: Based on the testimony of these various parties, the Court makes a finding that no improper communication has occurred.”
(Vol. XIII, R. 2047.)
As evidenced from the above, Reynolds agreed that the circuit court had conducted a reasonable investigation and that there was no evidence of juror misconduct. Thus, his allegation of error is subject to plain-error review only. Rule 45A, Ala. RApp.P. We have reviewed the record in light of the principles addressed in Gamble, supra, and we find no error, plain or otherwise, in the extent of the court’s inquiry into the alleged juror misconduct or in the court’s conclusion that the evidence did not support a finding of juror misconduct. Thus, Reynolds is due no relief on this allegation.
B.
During the defense’s case at the guilt phase of the trial, one of Reynolds’s defense counsel informed the circuit court that an attorney, who practiced before the court and who was in the audience, had told defense counsel that he had observed Lt. Faye Gary wink at a juror as Lt. Gary left the witness stand following her testimony in the defense’s case.[21] (Vol. XI, R. 1541.) When the court asked the attorney what he had seen, the attorney stated that he saw Lt. Gary wink at either “the juror on the end right there” or “PJ,” who was the court’s investigator.[22] (XI, R. 1541-42.) The State countered that the person Lt. Gary gestured to was Roger Dale, a Gadsden police investigator. (Vol. XI, R. 1543; R. 1472.) The court then conducted a hearing on the matter.
During the hearing, the attorney testified that as Lt. Gary left the witness stand, Gary “winked over in the direction of the last juror, and the juror — she gave her the heads up like she saw her and said ‘Hey.’ ” (Vol. XI, R. 1546.) In response to questions propounded by the State, the attorney admitted that it was possible that Lt. Gary was gesturing to her co-worker Detective Roger Dale who, from the inference *126 in the record, was sitting near that end of the jury box. (Vol. XI, R. 1546-47.)
The Court then conducted an examination of the juror Lt. Gary supposedly winked at. (Vol. XI, R. 1548-1449.) The juror testified that she did not know Lt. Faye Gary and that Lt. Gary did not wink at her. (Vol. XI, R. 1548-49.) The juror stated that she thought Lt. Gary might have winked at “somebody over there behind” her. (Vol. XI, R. 1548^9.)
After the examinations of the attorney and pertinent juror, the court found no evidence of inappropriate conduct between Gary and the juror. (Vol. XI, R. 1549.) Reynolds did not object to the manner of the court’s inquiry into the matter, nor did he object to the court’s findings.
Applying the principles discussed in Gamble, supra, to the facts pertaining to this issue, we find no error, plain or otherwise, in the extent of the court’s inquiry into the alleged juror misconduct or in the court’s conclusion that the evidence did not support a finding of juror misconduct. Reynolds is due no relief on this allegation.
XIV.
Reynolds contends that his capital-murder convictions must be reversed because, he claims, the prosecutor improperly impeached his trial testimony with his post-Miranda [23] silence, in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and its progeny. (Reynolds’s brief, Issue I, at 7-17, Reynolds’s reply brief, Issue I, at pp. 1-12.)
The prosecutor’s questions and comments cannot be considered in the abstract but must be considered in the context in which they occurred. Brown v. State, 11 So.3d 866, 909 (Ala.Crim.App.2007), aff'd, 11 So.3d 933 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009). Accordingly, before addressing Reynolds’s contention, we will address the context in which the questions/comments occurred.
During the State’s case, Gadsden Police Investigator Scott Lumpkin testified regarding his involvement in the investigation. During defense counsel’s cross-examination of Lumpkin, the following occurred:
“Q. [DEFENSE COUNSEL]: And you picked up Michael Reynolds [on] Sunday, is that right, May 25th [the day the murders were discovered]?
“A. [LUMPKIN]: He was picked up Sunday. I wasn’t present.
“Q: [DEFENSE COUNSEL]: Oh, you didn’t pick him up?
“A. [LUMPKIN]: No sir.
“Q. [DEFENSE COUNSEL]: Did you talk to him Sunday?
“A. [LUMPKIN]: No, Sir.”
(Vol. IX, R. 1230.)
There was no other testimony in the State’s case regarding the circumstances of Reynolds’s arrest.
As addressed in detail in the facts portion of this opinion, Reynolds claimed on direct examination that he had nothing to do with the robbery and murders of the victims. Although Reynolds did not deny being at the Martin residence after the crimes, he testified that he went there only to cover up any evidence indicating that his girlfriend was present when the crimes took place.
On direct examination, defense counsel asked Reynolds whether he contacted the police after he found his friend Charles Martin lying in a pool of blood on the floor. (Vol. XI, R. 1572.) Reynolds admitted that he did not call the police; instead, he *127 went inside the house, stepped over the bloody body of Charles Martin and walked to the back of the house, where he discovered Melinda Martin lying in a bloody heap in the bedroom. Reynolds testified that after he determined that he could not thoroughly wipe down all the surfaces in the house, he decided to douse Charles and Melinda Martin’s bodies and the interior of their house with gasoline, light the gasoline, and then leave the scene.
During the State’s cross-examination of Reynolds, the prosecutor probed Reynolds’s version of what happened in the hours before the murder. Specifically, the prosecutor questioned Reynolds about his claim that Adrian West and Sandra Roberts had left the Reynolds’s house together to go get more drugs. During this line of questioning, the following exchange occurred:
“Q. [PROSECUTOR]: So you put Marcie [Adrian West] in it and you put Sandra [Roberts] in it together; is that right?
“A. [REYNOLDS]: Yes.
“Q. [PROSECUTOR]: And you also put Dino [Donald Harvey] in your story; is that right?
“A. [REYNOLDS]: That’s where I told them to go get the drugs.
“Q. [PROSECUTOR]: So Dino [Donald Harvey] is in the picture and Sandra is in the picture. Right after this happened, you were interviewed by the police, weren’t you?
“A. [REYNOLDS]: That morning, the next morning.
“Q. [PROSECUTOR]: And you made a statement to them, did you not?
“A. [REYNOLDS]: Yes. I don’t know about a statement. They talked to me and asked me some questions, and I answered a few.
“Q. [PROSECUTOR]: You ' answered those questions, right?
“A. [REYNOLDS]: I answered some, yes.
“Q. [PROSECUTOR]: And you told them that Marcie [Adrian West] had left and come back and said that [Charles Martin] was dead?
“A. [REYNOLDS]: No, I didn’t tell them that.
“Q. [PROSECUTOR]: Oh, you didn’t tell them that. And you told them that you saw Melinda’s body on the floor and you fell across it?
“A. [REYNOLDS]: No.
“Q. [PROSECUTOR]: Well, you told them that you took some gasoline and doused these folks’ bodies and tried to set them on fire that night, didn’t you?
“A. [REYNOLDS]: No. But I wish I did.
“Q. [PROSECUTOR]: You wish you had. You wish you had made up this story then, right?
“A. [REYNOLDS]: No.
“Q. [PROSECUTOR]: No. You had to wait until you had all the pieces of your puzzle to make your story up, didn’t you?
“A. [REYNOLDS]: No.
“Q. [PROSECUTOR]: You waited— have you ever told anybody — has anybody, your lawyers or you or anybody else—
“[DEFENSE COUNSEL]: I object Your Honor.
“Q. [PROSECUTOR]: — ever told this story—
“[DEFENSE COUNSEL]: I object.
“THE COURT: One at a time.
“[DEFENSE COUNSEL]: He cannot reveal the attorney-client privilege.
*128 “Q. [PROSECUTOR]: I’m not talking about privilege. I wasn’t asking about privileged information.
“THE COURT: Sustained as to the issue of what he told his lawyer. Rephrase your question.
“Q. [PROSECUTOR]: I wasn’t asking you what you told your lawyer. I was asking you what you told the police or anybody else about what happened that night. You had to have all the pieces of your puzzle together first, didn’t you?
“A. [REYNOLDS]: I don’t understand.
“Q. [PROSECUTOR]: Have you ever directed anybody or have you personally ever told that story that we heard in this courtroom Tuesday, for the first time, to anybody else any time—
[DEFENSE COUNSEL]: Your Hon- or, I object to that question. He has got the right to remain silent.
[PROSECUTOR]: Not to your lawyer.
“A. [REYNOLDS]: After I was incarcerated.
“[DEFENSE COUNSEL]: Excuse me, Michael. Your Honor, I ask for a ruling on my objection. I think that question he asked is objectionable, because Mr. Reynolds has a right to remain silent. He doesn’t have to tell this Court or anybody—
“[PROSECUTOR]: He doesn’t have a right to remain silent. He is on the stand.
“THE COURT: Ask your next question.
“Q. [PROSECUTOR]: You could have solved this whole crime, couldn’t you?
“A. [REYNOLDS]: I should have told them at the beginning of this what happened.”
(Vbl. XI, 1589-92.)(Emphasis added.)
The cross-examination continued, and the following occurred:
“Q. [PROSECUTOR]: The gas can that you picked up and used that night that’s got Savannah’s blood mixed on that handle—
“A. [REYNOLDS]: I did fall on the bed that she was on, they said.
“Q. [PROSECUTOR]: Another piece of the puzzle that you filled in for us, sir. We appreciate that.
“A. [REYNOLDS]: You’re welcome.
“Q. [PROSECUTOR]: And you didn’t have that piece until all the evidence came in, did you? Did you?
“A. [REYNOLDS]: It’s the truth.
“Q. [PROSECUTOR]: Let me ask you something. The first time the police talked to you about this, you didn’t know anything about it; is that right?
“A. [REYNOLDS]: That’s right.
“Q. [PROSECUTOR]: Then you find out, well, [Adrian West] has told what happened. So didn’t you conclude then that I have got to put [West] in it some kind of way, right? That’s what you thought, didn’t you?
“A. [REYNOLDS]: No.
“Q. [PROSECUTOR]: I have got to bring [Adrian West] in the picture because her blood is over there?
“A. [REYNOLDS]: No
“Q. [PROSECUTOR]: And the district attorney has already told my lawyers that they have got her blood on the scene. So you know [Adrian West] is there, right, right? You knew that, didn’t you?
“A. [REYNOLDS]: I knew she was saying this and telling me this to begin *129 with, what they told me after I asked for an attorney. They never come back and talked to me again about it.
“Q. [PROSECUTOR]: I’m not asking about your lawyer. Listen to me.
“A. [REYNOLDS]: Okay.
“Q. [PROSECUTOR]: You knew that [Adrian West] could have been proven to be on that scene; am I right about that?
“A. [REYNOLDS]: Yes, that’s correct.
“Q. [PROSECUTOR]: And you knew, didn’t you — once you found out about what Sandra [Roberts] had to say, you knew you had to put her in the picture some kind of way to try to dirty her up too, didn’t you?
“A. [REYNOLDS]: She was at my dad’s house. She was my dad’s girlfriend.
“Q. [PROSECUTOR]: And you know what she was saying about what happened that night. So she had to be in the picture. She had to be guilty of something. So she leaves with [Adrian West]; isn’t that right? That’s the other part of your lie, right. Your story. I’m sorry.”
(R. Vol. XI, R. 1595-97.)(Emphasis added.)
The prosecutor continued to cross-examine Reynolds as to how his version of what happened dovetailed with the State’s evidence, during which the following transpired:
“Q. [PROSECUTOR]: Don’t you have any pity, any sense of loss for this so called good friend of yours, Chuck, lying on the floor bleeding out his life when you walked through there?
“A. [REYNOLDS]: Yes. That’s why I don’t understand why I’m on trial here and not the people who did it.
“Q. [PROSECUTOR]: And who was that again?
“A. [REYNOLDS]: I don’t believe I can say nothing about that.
“Q. [PROSECUTOR]: You don’t know — you said that [Adrian West] came back and told you she was trying to help somebody when she got stabbed, according to you.
“A. [REYNOLDS]: Yes.
“Q. [PROSECUTOR]: So she hadn’t even committed a crime, right? All she did was try to help somebody.
“A. [REYNOLDS]: That’s what she said.
“Q. [PROSECUTOR]: And all she has told you is she was trying to help somebody and you’re going over there trying to burn up a house?
“A. [REYNOLDS]: I was going to protect her.
“Q. [PROSECUTOR]: Protect her from what?
“A. [REYNOLDS]: She was in the house.
“Q. [PROSECUTOR]: She hadn’t done anything according to you.”
(Vol. XI, R. 1597-98.)(Emphasis added.)
A short time later in the cross-examination, the prosecutor showed Reynolds a picture of Charles Martin’s body and the following exchange took place:
“Q. [PROSECUTOR]: Is that the way he looked the last time you saw him?
“A. [REYNOLDS]: I believe so.
“Q. [PROSECUTOR]: And you did that to him too, didn’t you.
“A. [REYNOLDS]: No, I didn’t.
“Q. [PROSECUTOR]: Why don’t you feel sorry?
“A. [REYNOLDS]: I do. I have been in jail four and a half years, sitting in jail cell. And it’s been — it’s weighed heavy. I shouldn’t have nev *130 er — he was my friend, and I tried to cover it up. I done lost my son and my family and them.”
(Vol. XI, R. 1603.)
The following colloquy occurred toward the end of the cross-examination:
“Q. [PROSECUTOR]: Mr. Reynolds, you are asking this jury to believe this story today; is that right?
“A. [REYNOLDS]: It’s the truth.
“Q. [PROSECUTOR]: You are a truthful person, right? You tell the truth?
“A. [REYNOLDS]: I do.
[[Image here]]
“Q. [PROSECUTOR]: ... You are saying that [Adrian West] told you that somebody else did it but she never did tell you who, right?
“A. [REYNOLDS]: She said she was trying to stop them.
“Q. [PROSECUTOR]: Trying to stop them, whoever they are?
“A. [REYNOLDS]: Yes.
“Q. [PROSECUTOR]: And you never got her to tell you who it was?
“A. [REYNOLDS]: No. She was distraught out there. She told me she didn’t even want to think about it.
“Q. [PROSECUTOR]: Uh-huh. And you didn’t feel any need to tell the police that in your interview?
“A. [REYNOLDS]: I was protecting her. I went as far as trying to burn it down. I mean—
[[Image here]]
“Q. [PROSECUTOR]: That’s what you thought; I would just burn the house down?
“A. [REYNOLDS]: Yes.
“Q. [PROSECUTOR]: Rather than trying to find the ones that really did it.
“A. [REYNOLDS]: Instead of trying to wipe it down.
[[Image here]]
“Q. [PROSECUTOR]: You say you just wish you had told the truth?
“A. [REYNOLDS]: I should have.
“Q. [PROSECUTOR]: You’ve thought about that more than once, right?
“A. [REYNOLDS]: A lot.
“Q. [PROSECUTOR]: How many times over the last four years have you thought about that?
“A. [REYNOLDS]: A whole lot.
“Q. [PROSECUTOR]: The first time you have done it is in this courtroom; is that right?
“A. [REYNOLDS]: I have talked to my attorney about it.
“Q. [PROSECUTOR]: I don’t mean with your attorneys. The first time you have come to any authorities since—
“A. [REYNOLDS]: Yes. This is the first time since this happened, since I asked for an attorney that the district attorney or the police or anybody has ever asked me.
“[PROSECUTOR]: That’s all.”
(Vol. XI, 1605-09.)(Emphasis added.)
Defense counsel argued during a portion of the closing argument that the jury’s decision turned solely on a credibility question as between Adrian West and Reynolds. Specifically, defense counsel argued:
“[N]one of the other testimony or the evidence they put on disputes what Mr. Reynolds has told you. None of it. None of it points to him and says that can’t be true. You’re a liar because of this and this and this, because of this doctor or this DNA expert or because of this fingerprint guy. None of it. None *131 of it. You would think a day and a half of that evidence would show something.”
(Vol. XII, R. 1665-66.)
During the State’s rebuttal, the prosecutor argued:
“[Adrian West] told you what happened out there. And what that man did: He sat over there in jail. He came up with a story that you and I heard for the first time Tuesday.
“The evidence dribbles in as it always does in an investigation like this. You know you have got a killing. He is questioned for the first time about these killings. He didn’t know nothing about it. He is questioned a second time. Didn’t know nothing about it. Well, of course, he is not questioned again. He is charged. But all they would have had to do was somebody had to call [Investigator] Roger Dale there or call us up, ‘[H]ey, listen, we have got all the facts. We can tell you exactly what happened. Just like [Adrian West] did. A couple of days after the killing she came in and told us what happened.’ We didn’t hear from this man except for him to say ‘[N]o, I wasn’t theref] I don’t know nothing about it.’ ”
(Vol. XII, R. 1674.) (Emphasis added.)
After closing arguments, the circuit court charged the jury on the applicable law and submitted the case to the jury for deliberation. During deliberations, the jury submitted a written question to the court, and the following discussion occurred:
“THE COURT: All right, gentlemen. ... Question: ‘Did Michael Reynolds make a statement to the police after being questioned and was it submitted as evidence and available for our review?’
“I have no idea.
“[PROSECUTOR]: Judge, that was a — he made a statement, and I questioned him about it, and he responded that he made a statement is my understanding.”
(Vol. 12, R. 1806-07.) The discussion continued, and the court and the respective parties ultimately decided to answer the jurors’ question as follows: “No written statement made by the defendant was offered into evidence; you have to remember the testimony.” (Vol. 12, R. 1807-12.) This answer was provided to the jury.[24]
The “statement” to which the parties referred was actually a set of handwritten interview notes made by the investigators during their questioning of Reynolds. The first notes are dated May 26, 2008, and indicate that Reynolds was advised of his rights. (First Supplemental Record, C. 174-76.) During that interview Reynolds apparently told investigators that he was not at the Martins’ residence on the night of the crimes and that he did not kill the Martins or know who did. Reynolds said that he did not know where the Uniden brand telephone found in Sandra Roberts’s car came from. He also said that Chad Martin stole drugs from Charles Martin on previous occasions and that Charles Martin knew about it. Reynolds told the investigators that when Charles Martin used drugs, he was slow and could be “taken.” In this same conversation, Reynolds described the black bag where Charles Martin kept his prescription drugs, and Reynolds described in some detail how Charles Martin “cooked” his drugs on the stove. In other interview notes, Reynolds admitted that he had used drugs with Charles Martin, and he again denied committing the crimes or being at the Martin residence on the night of the crimes. (First *132 Supplemental Record, C. 179, 155, respectively.)
Reynolds argues on appeal that “on twenty-one different occasions during cross-examination and closing arguments, the prosecutor ... commented on [his] post-Miranda silence by drawing attention to the fact that [he] did not disclose his subsequent exculpatory [trial] explanation to the State before trial,” in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and its progeny. (Reynolds’s reply brief, at 2.) The State contends that there was no Doyle violation because, it argues, the prosecutor permissibly impeached Reynolds’s trial testimony with his prior existing inconsistent statements.
First, we note that despite Reynolds’s claims that the prosecutor improperly commented 21 times on Reynolds’s post-Miranda silence, defense counsel objected only once on this particular ground during the purportedly improper line of questioning. Although Reynolds’s failure to object at trial will not preclude this Court from reviewing the issue, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
In Doyle, the United States Supreme Court granted certiorari to address the question:
“[Wjhether a state prosecutor may seek to impeach a defendant’s exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda [v. Arizona, 384 U.S. 436 (1966) ] warnings at the time of his aorest? ”
426 U.S at 611 (footnote omitted; emphasis added). The Court held that “the use for impeachment purposes of petitioners’ silence, at the time of amst and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment.” Doyle, 426 U.S. at 619-20 (footnote omitted; emphasis added).
Although the Supreme Court found that the prosecutor’s use of the defendant’s post-Miranda silence for impeachment purposes violated due process, the Court acknowledged the importance of impeachment cross-examination to the prosecution:
“We recognize, of course, that unless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defense insulated from effective challenge. See generally Fitzpatrick v. United States, 178 U.S. 304, 315, 20 S.Ct. 944, 948, 44 L.Ed. 1078 (1900).
[[Image here]]
“It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant’s testimony as to his behavior following arrest. Cf. United States v. Fairchild, 505 F.2d 1378, 1383 (C.A.5 1975).”
426 U.S. at 619, 620, n. 7 and n. 11.
In the post-Doyle case of Anderson v. Charles, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), Anderson was arrested while driving a stolen car that belonged to a murder victim. Anderson was apprised of his Miranda rights and was interviewed *133 shortly after his arrest. In the interview, Anderson told the detective how he came to possess the murder victim’s car. At trial, Anderson testified in his defense and told a different version of how he come to possess the car. During cross-examination, the prosecutor asked Anderson a series of questions challenging Anderson’s credibility based on his failure to tell the detective the same story that he told at trial.
The Court found that no Doyle violation occurred. The Court reasoned:
“Doyle bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. See United States v. Agee, 597 F.2d 850, 354-356(CA3) (en banc), cert. denied, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); United States v. Mireles, 570 F.2d 1287, 1291-1293 (C.A.5 1978); United States v. Goldman, 563 F.2d 501, 503-504 (C.A.1 1977), cert. denied, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978).
“In this case, the Court of Appeals recognized that the respondent could be questioned about prior statements inconsistent with his trial testimony. The court therefore approved the ‘latter portion of the above quoted cross-examination....’ 610 F.2d, at 421. But the Court of Appeals found that ‘the earlier portion of the exchange’ concerned the ‘separate issu[e]’ of the respondent’s ‘failure to tell arresting officers the same story he told the jury.’ Ibid. In the court’s view, these questions were unconstitutional inquiries about post arrest silence. Thus, the Court of Appeals divided the cross-examination into two parts. It then applied Doyle to bar questions that concerned the respondent’s failure to tell the police the story he recounted at trial.
“We do not believe that the cross-examination in this case can be bifurcated so neatly. The quoted colloquy, taken as a whole, does ‘not refe[r] to the [respondent’s] exercise of his right to remain silent; rather [it asks] the [respondent] why, if [his trial testimony] were true, he didn’t tell the officer that he stole the decedent’s car from the tire store parking lot instead of telling him that he took it from the street.’ 58 Mich.App., at 381, 227 N.W.2d, at 354. Any ambiguity in the prosecutor’s initial questioning was quickly resolved by explicit reference to Detective LeVanseler’s testimony, which the jury had heard only a few hours before. The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement.
“We conclude that Doyle does not apply to the facts of this case. Each of two inconsistent descriptions of events may be said to involve ‘silence’ insofar as it omits facts included in the other version. But Doyle does not require any such formalistic understanding of ‘silence,’ and we find no reason to adopt such a view in this case.”
447 U.S. at 408-09 (emphasis added).
With the above principles in mind, we turn to the present case. It is clear from the our review of the record that when the prosecutor questioned Reynolds regarding what Reynolds told the police after his arrest, the prosecutor’s intent was to impeach the credibility of Reyn *134 olds’s trial testimony by contrasting his trial testimony -with his prior inconsistent statements to the investigators. Reynolds contends that because he admitted to making only a “few statements” and that because those statements are not in the record, the prosecutor’s questions were akin to commenting on his post-Mmmcto silence and thus do not fall under Anderson, supra. He relies on Doyle, supra, and Edwards v. State, 502 So.2d 846 (Ala.Crim.App.1986), in support of his assertion.
We disagree. This case is factually distinguishable from both Doyle and Edwards. In Doyle, one defendant remained silent after arrest and the other defendant, Doyle, responded to a question by saying, “What’s this all about?” and when told why he was arrested, he responded, “[Y]ou got to be crazy” or “I don’t know what you are talking about.” 426 U.S. at 623-24. That response was construed to be silence for the purposes of analysis, presumably because it did not actually contradict Doyle’s trial testimony. See Anderson, 447 U.S. at 408 n. 2.
In Edwards, after evidence was introduced that Edwards had invoked his right to silence following his arrest and Miranda warnings, the prosecutor cross-examined Edwards regarding a statement Edwards had purportedly made to the authorities. Edwards denied making such a statement. On appeal, Edwards argued that the trial court erred in allowing the State to question him regarding the invocation of his right to remain silent. This Court held that the prosecutor’s comments constituted reversible error. We reasoned:
“In the present case, there is an indication in the record that the prosecutor may have been attempting to use a prior inconsistent statement made by the appellant to the arresting officer after he had claimed his right to remain silent; those facts would have brought this case under the holding of Anderson v. Charles, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). .
[[Image here]]
“Any indication ... that the prosecutor intended to impeach the appellant by the introduction of a prior inconsistent statement, is not upheld by the record. Such a statement was never introduced into evidence, nor was there any testimony regarding such a statement by Sergeant Boone, the appellant, or any other witness. . Thus, the Anderson holding is inapplicable to this case. See also Bradley v. State, 494 So.2d 750 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986).”
Edwards, 502 So.2d at 851-52.
In this case, although the statements themselves were not admitted into evidence, there was direct evidence from Reynolds that he made two statements, and that those statements were inconsistent with Reynolds’s trial testimony, unlike the fact situation in Edwards and Doyle. Further, although the written statements were not admitted into evidence, we fail to see how this harmed Reynolds. The Alabama Rules of Evidence do not require the admission into evidence of written prior inconsistent statements:
“The historic rule was that the witness must be alerted as to the particulars (time, place and person) of an inconsistent statement before being asked on cross about the statement itself. Much criticism arose as to this predicate requirement’s constituting a needless impediment to effective cross-examination. This resulted in its abandonment under the following provision of the Alabama Rules of Evidence:
“ ‘Rule 613. Prior Statement of Witnesses
*135 “ ‘(a) Examining witness concerning prior statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.’
“The party who called the witness shall, of course, be made privy to the contents of the statement upon request for the purpose of rehabilitating the witness on redirect.”
McElroy’s Alabama Evidence § 157.01(a) (footnotes omitted).
Here, the defense did not request to be shown the statements. Furthermore, the prosecutor did elicit, without objection, testimony that Reynolds was arrested the day the murders were discovered, that upon his arrest he answered questions propounded by the investigators, and that those answers were inconsistent with his exculpatory trial testimony. Moreover, defense counsel did not assert that this evidentiary foundation was insufficient.
Perhaps most significantly, the introduction into evidence of the actual statements to the investigators in which Reynolds denied any knowledge of the crimes would have only solidified for the jury the disparity between Reynolds’s trial testimony and his previous statements. Accordingly, we find no error, plain or otherwise, in the prosecutor’s use of Reynolds’s prior inconsistent statements to impeach his exculpatory trial testimony. The prosecution’s questions do not constitute a Doyle violation because “[sjuch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.” Anderson, 447 U.S. 404, 408. See also Gobble v. State, 104 So.2d 920, 945 (Ala.Crim.App.2010).
Likewise, we find no error in the prosecutor’s line of questions regarding why Reynolds did not come forward with his exculpatory story at any time before trial. In Doyle, supra, although the Court did find that a prosecutor’s use of post-Miranda silence to impeach a defendant’s trial testimony violated the defendant’s due-process rights, the Court specifically declined to address the constitutionality of the prosecutor’s inquiry as to why neither defendant had told his exculpatory story at any time before trial. See, 426 U.S. at 616 n. 6.
In the post-Doyle case of Jenkins v. Anderson, 447 U.S. 281, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the United States Supreme Court held that a prosecutor’s use of defendant’s pre-arrest silence to impeach the defendant’s trial testimony did not violate the Fifth or Fourteenth Amendment to the Constitution. The Supreme Court’s reasoning in reaching that result is particularly relevant to the facts of this case:
“During the cross-examination, the prosecutor questioned the petitioner about his actions after the stabbing:
“‘Q. And I suppose you waited for the Police to tell them what happened?
“‘A. No, I didn’t.
“ ‘Q. You didn’t?
“ ‘A. No.
“‘Q. I see.
“ ‘And how long was it after this day that you were arrested, or that you were taken into custody?’ Id., at 38.
“After some discussion of the date on which petitioner surrendered, the prosecutor continued:
*136 “ ‘Q. When was the first time that you reported the things that you have told us in Court today to anybody?
“ A. Two days after it happened.
“ ‘Q. And who did you report it to? “ A. To my probation officer.
“ ‘Q. Well, apart from him?
“ A. No one.
‘“Q. Who?
“A. No one but my—
‘“Q. (Interposing) Did you ever go to a Police Officer or to anyone else? “A. No, I didn’t.
“ ‘Q. As a matter of fact, it was two weeks later, wasn’t it?
“ A. Yes.’ Id., at 34.
“In closing argument to the jury, the prosecutor again referred to the petitioner’s prearrest silence. The prosecutor noted that petitioner had ‘waited two weeks, according to the testimony — at least two weeks before he did anything about surrendering himself or reporting [the stabbing] to anybody.’ Id., at 43. The prosecutor contended that the petitioner had committed murder in retaliation for the robbery the night before.
[[Image here]]
“At trial the prosecutor attempted to impeach the petitioner’s credibility by suggesting that the petitioner would have spoken out if he had killed in self-defense. The petitioner contends that the prosecutor’s actions violated the Fifth Amendment as applied to the States through the Fourteenth Amendment. The Fifth Amendment guarantees an accused the right to remain silent during his criminal trial and prevents the prosecution for commenting on the silence of a defendant who asserts the right. Griffin v. California, 380 U.S. 609, 614 [85 S.Ct. 1229, 14 L.Ed.2d 106] (1965). In this case, of course, the petitioner did not remain silent throughout the criminal proceedings. Instead, he voluntarily took the witness stand in his own defense.
“This Court’s decision in Raffel v. United States, 271 U.S. 494 (1926), recognized that the Fifth Amendment is not violated when a defendant who testifies in his own defense is impeached with his prior silence. The defendant in Raffel was tried twice. At the first trial, a Government agent testified that Raffel earlier had made an inculpatory statement. The defendant did not testify. After the first trial ended in deadlock the agent repeated his testimony at the second trial, and Raffel took the stand to deny making such a statement. Cross-examination revealed that Raffel had not testified at the first trial. Id., at 495, n. [1]. The Court held that inquiry into prior silence was proper because ‘[t]he immunity from giving testimony is one which the defendant may waive by offering himself as a witness.... When he takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined.... ’ Id., at 496-497. Thus, the Raffel Court concluded that the defendant was ‘subject to cross-examination impeaching his credibility just like any other witness.’ Grunewald v. United States, 353 U.S. 391, 420 (1957).
“It can be argued that a person facing arrest will not remain silent if his failure to speak later can be used to impeach him. But the Constitution does not forbid ‘every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.’ Chaffin v. Stynchcombe, 412 U.S. 17, 30 (1973). See Corbitt v. *137 New Jersey, 489 U.S. 212, 218, and n. 8 (1978). The ‘ “threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.” ’ Chaf-fin v. Stynchcombe, supra, 412 U.S., at 82 quoting Crampton v. Ohio, decided with McGautha v. California, 402 U.S. 183, 213 (1971). The Raffel Court explicitly rejected the contention that the possibility of impeachment by prior silence is an impermissible burden upon the exercise of Fifth Amendment rights. ‘We are unable to see that the rule that [an accused who] testified ... must testify fully, adds in any substantial manner to the inescapable embarrassment which the accused must experience in determining whether he shall testify or not.’ 271 U.S., at 499.
“This Court similarly defined the scope of the Fifth Amendment protection in Harris v. New York, 401 U.S. 222 (1971). There the Court held that a statement taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966), may be used to impeach a defendant’s credibility. Rejecting the contention that such impeachment violates the Fifth Amendment, the Court said:
“ ‘Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.... Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.’ 401 U.S., at 225.
“See also Oregon v. Hass, 420 U.S. 714, 721-723 (1975); Walder v. United States, 347 U.S. 62, 65 (1954).
“In determining whether a constitutional right has been burdened imper-missibly, it also is appropriate to consider the legitimacy of the challenged governmental practice. See Chaffin v. Stynchcombe, supra, 412 U.S., at 32, and n. 20. Attempted impeachment on cross-examination of a defendant, the practice at issue here, may enhance the reliability of the criminal process. Use of such impeachment on cross-examination allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts. A defendant may decide not to take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics. Once a defendant decides to testify, ‘[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.’ Brown v. United States, 356 U.S. 148 (1958).
“Thus, impeachment follows the defendant’s own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial. We conclude that the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant’s credibility.”
447 U.S. at 233-38.
In a footnote in Jenkins, the Court noted:
“In Crampton v. Ohio, [402 U.S. 183 (1971),] the Court considered a claim that a murder defendant’s right to remain silent was burdened unconstitu *138 tionally because he could not argue for mitigation of punishment without risking incrimination on the question of guilt. The Court recognized that a defendant who speaks in his own defense cannot avoid testifying fully.
“ ‘It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. See, e.g., Brown v. Walker, 161 U.S. 591, 597-598 (1896); Fitzpatrick v. United States, 178 U.S. 304, 314-316 (1900); Brown v. United States, 356 U.S. 148 (1958). It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like. See Spencer v. Texas, 385 U.S. [554, 561,] (1967); cf. Michelson v. United States, 335 U.S. 469 (1948); but cf. Luck v. United States, 121 U.S.App.D.C. 151 348 F.2d 763 (1965); United States v. Palumbo, 401 F.2d 270 (CA2 1968).’ 402 U.S. at 215.
447 U.S. at 237 n. 3.
In Jenkins, the Supreme Court concluded by noting:
“Our decision today does not force any state court to allow impeachment through the use of prearrest silence. Each jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative then prejudicial. We merely conclude that the use of pre arrest silence to impeach a defendant’s credibility does not violate the Constitution.”
447 U.S. at 240-41,
In Alabama, Rule 611(b), Ala.R.Evid., provides:
“The right to cross-examine a witness extends to any matter relevant to any issue and to matters affecting the credibility of the witness.... ”
Accordingly,
“Pursuant to Rule 611(b) cross-examination generally is not limited in scope to the matters brought out on the witness’ direct examination. Rather, the cross-examiner may ask questions that are relevant to: (1) any material issue in the case, and (2) the witness’s credibility. In addition, even if the cross-examiner propounds a question that is not otherwise relevant to either a material issue in the case or the witness’ credibility, the question may be permissible if it is relevant to a matter brought out by the adverse party during direct examination of the witness.”
McElroy’s Alabama Evidence § 136.01(1) (footnotes omitted).
Furthermore,
“Adverse parties in both civil and criminal cases are entitled to conduct a thorough and sifting cross-examination which includes wide latitude for testing a witness’ credibility. It is equally well established, however, that this entitlement is not absolute, and that the latitude and extent of such cross-examination rests largely within the sound discretion of the trial court which is reversible only if abused to the prejudice of the complaining party. On appeal the party claiming that the trial judge has abused discretion in this regard bears the burden of persuasion.”
*139 McElroy’s Alabama Evidence § 136.01(2) (footnotes omitted).
“ ‘As the United States Supreme Court stated in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974):
“ ‘ “Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.”
“‘415 U.S. at 316, 94 S.Ct. 1105. “‘The latitude and extent of cross-examination, of necessity, is a matter within the sound discretion of the trial court, and, in the absence of prejudicial abuse, it is not reviewable on appeal.’ Turner v. State, 289 Ala. 97, 100, 265 So.2d 883 (1972).” Ashurst v. State, 462 So.2d 999, 1008-09 (Ala.Crim.App.1984).’
“Marshall v. State, 20 So.3d 830, 835 (Ala.Crim.App.2008). ‘Where a witness’ testimony is of major importance and is strongly adverse to the party against whom he has testified, the usual discretion of a trial court has a narrow range, and it generally is required to allow proof of any important fact indicating bias of the witness.’ Proctor v. State, 331 So.2d 828, 830 (Ala.Crim.App.1976).
“ ‘In the discharge of its fact finding functions the jury’s search for the truth includes the paramount right to consider a witness’s motivation, and any evidence testing “his interest, bias or prejudice” so as to “illustrate or impeach the accuracy of his testimony” is a competent, material and relevant subject of cross-examination, and the jury’s right to be given such evidence is, of itself, part of the fact finding process. Green v. State, [258 Ala. 471, 64 So.2d 84 (1953) ].’
“Ex parte Brooks, 393 So.2d 486, 487-88 (Ala.1980).
“ ‘ “[Wjhen the accused takes the stand to testify in his own behalf, he does so in a dual capacity — (1) as the accused and (2) as a witness. In his capacity as a witness his credibility may be impeached in the same way or ways in which the credibility of any other witness may be impeached. Stone v. State, 208 Ala. 50, 93 So. 706 [ (1922) ]; Pitts v. State, 261 Ala. 314, 74 So.2d 232 [ (1954) ]. ‘A defendant, who testifies for himself as a witness, may be impeached in the same manner as other witnesses, by showing that he has been convicted of a crime involving moral turpitude, or that he has made contradictory statements, or that he is a person of bad character.’ ” ’
“Fisher v. State, 57 Ala.App. 310, 328 So.2d 311, 317 (Ala.Crim.App.1976), quoting Chambers v. State, 264 Ala. 8, 10, 84 So.2d 342, 343-44 (1955).”
Gobble, 104 So.3d at 953.
As discussed above, Reynolds testified during direct examination that he was not present when the crimes occurred and that he had nothing to do with the crimes. He testified that he went to the scene only to protect his girlfriend who, he claimed, although present, did not participate in the crimes. Reynolds further testified on direct that rather than calling the police after discovering that the Martins had been murdered, he tried to burn the bodies and the house in order to cover *140 crimes that some other undisclosed persons supposedly committed.
On cross-examination, Reynolds admitted that after his arrest he told the police that he had no knowledge of the crimes but that he wished that he had told the truth when he first talked to the police. He expressed confusion as to why he was being prosecuted for the crimes instead of the people who supposedly committed the crimes. Reynolds intimated that he even knew who committed the robbery and murders, but he declined to reveal their identity when asked to do so by the prosecutor during cross-examination. Finally, Reynolds testified that he had been incarcerated for over four years before trial and that during that time he regretted not telling his version of what had happened.
Given the particular facts of this case, together with Reynolds’s admission that he regretted not coming forward much earlier with his exculpatory version of the facts, we find no basis for reversal in either the prosecutor’s cross-examination questions or his comments during closing argument.
XV.
Reynolds argues that alleged prosecuto-rial misconduct undermined the reliability of jury’s verdicts finding him guilty of capital murder and the resulting death sentence. (Reynolds’s brief, Issue XIII, at 92-98).[25]
Before addressing his individual claims, we set forth the applicable law regarding appellate review of prosecutorial comments.
“In Belisle v. State, 11 So.3d 256 (Ala.Crim.App.2007), this court reiterated the principles applied when reviewing a prosecutor’s alleged improper comment as follows:
“ ‘ “ ‘In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.’ Smith v. State, 698 So.2d 189, 202-03 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (citations omitted); Bush v. State, 695 So.2d 70, 131 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citations omitted). ‘The relevant question is whether the prosecutor’s comments “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990.), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). ‘Prosecutorial misconduct is subject to a harmless error analysis.’ Bush v. State, 695 So.2d at 131 (citations omitted); Smith v. State, 698 So.2d at 203 (citations omitted).”
*141 “ ‘Simmons v. State, 797 So.2d 1134, 1161-62 (Ala.Crim.App.1999) (opinion on return to remand). We must view the challenged arguments in the context of the entire trial and not in the abstract. See Duren v. State, 590 So.2d 360 (Ala.Crim.App.1990); Whitlow v. State, 509 So.2d 252 (Ala.Crim.App.1987). It is proper for a prosecutor to argue any legitimate inference that may be drawn from the evidence. See Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003).’
“11 So.3d at 302.
“ ‘ “ “While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ] (emphasis in original). ‘This court has concluded that the failure to object to improper prose-cutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).” ’
“Ex parte Windsor, 683 So.2d 1042, 1061 (Ala.1996) (quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990)).”
Vanpelt v. State, 74 So.3d 32, 81 (Ala.Crim.App.2009).
With the aforementioned principles in mind, we turn to Reynolds’s specific allegations.
A.
Reynolds contends that the “prosecutor encouraged the jury to rely on improper evidence in considering Chad Martin’s testimony.” (Reynolds’s brief, at 92-93.) This assertion was addressed in Part VII of this Court’s opinion and found to lack merit.
B.
Reynolds claims that the prosecutor improperly vouched for the strength of the State’s case in the prosecutor’s closing argument during the guilt phase of the trial. (Reynolds’s brief, at 93-94.) In a footnote to his argument, Reynolds quotes three allegedly improper comments from the record.
1.
First, Reynolds argues that the prosecutor improperly vouched for the strength of the State’s case during the State’s rebuttal closing argument when the prosecutor stated: “We feel very strongly, and we feel that you all — we also conclude beyond a reasonable doubt that based on clear, undisputed — reasonably undisputed evidence in this case — this is clearly a case of capital murder and nothing else.” (Vol. 12, R. 1670.)
Reynolds did not object to this purportedly improper comment, and we find no plain error in the comment. Rule 45A, Ala.R.App.P.
“ ‘ “ ‘[I]t is not improper for [the prosecuting attorney] to argue or to express his opinion that [the] accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence.’ 23A C.J.S. Criminal Law § 1104, pp. 194-95 (1961).” Galloway v. State, 484 So.2d 1199, 1201 (Ala.Cr.App.1986). In Galloway, a number of cases are cited in which the prosecuting attorney made comments stating his opinion that the appellant was guilty.’
“Henderson v. State, 584 So.2d 841, 857 (Ala.Cr.App.1988), remanded on other grounds, 584 So.2d 862 (Ala.1991).”
*142 Broadnax v. State, 825 So.2d 134, 183 (Ala.Crim.App.2000).
2.
Second, Reynolds argues that the prosecutor improperly vouched for the strength of the State’s case when the prosecutor argued in his rebuttal argument, “because anybody with any kind of sense would know that you’re not going to buy that cock and bull story the guy got on the witness stand and tried to sell to you.’” (Vol. XII, R. 1670-71.)
 Reynolds did not object to this comment, and we find no plain error. Rule 45A, Ala.R.App.P.
“The prosecution is entitled to ‘spotlight the defense’s strategy,’ and a prosecutor’s remarks during closing argument pointing out the flaws in the defense’s theory of the case do not constitute improper argument. ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987) (citation omitted), rev’d on other grounds, 523 So.2d 1118 (Ala.1988). The remarks complained of by the appellant were part of the prosecutor’s legitimate argument that the evidence did not support the defense’s theory that the robbery of Johnson was a ‘mere afterthought.’ We find no error here, plain or otherwise.”
Reeves v. State, 807 So.2d 18, 45-46 (Ala.Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001).
We have carefully reviewed the comment in the context in which it occurred. Contrary to Reynolds’s allegation, we do not believe that the prosecutor was vouching for the strength of the State’s case by the comment. Rather, it appears that the prosecutor was merely replying to defense counsel’s closing argument that the evidence established only that Reynolds was at the scene of the crimes to help cover up his girlfriend’s presence at the scene of the triple-murder/robbery.
3.
Likewise, we find no plain error in the prosecutor’s comment: “The only appropriate verdict is guilty of capital murder. Not anything less. If you are not going to convict him of capital murder, just let him go.” (Vol. XII, R. 1685.)
“ ‘ “Generally, the prosecutor is in error by exhorting the jury to ‘do what’s right,’ or to ‘do its job,’ if that exhortation ‘implies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court’s instructions on the law.’ ” McNair v. State, 653 So.2d 320, 339-40 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), quoting Arthur v. State, 575 So.2d 1165, 1185 (Ala.Crim.App.1990). However, it is not improper for a prosecutor to argue to the jury that a defendant is guilty or to urge the jury to find the defendant guilty of the crime charged so long as that argument is based on the evidence; in fact that is exactly what a prosecutor is supposed to do during closing argument. See Galloway v. State, 484 So.2d 1199 (Ala.Crim.App.1986), and the authorities cited therein. See also Broadnax v. State, 825 So.2d 134, 183 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), and Melson v. State, 775 So.2d 857, 889-90 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000).”
Morris v. State, 60 So.3d 326, 368 (Ala.Crim.App.2010), quoting Minor v. State, 914 So.2d 372, 420 (Ala.Crim.App.2004).
*143 The prosecutor’s exhortation to the jury was based upon the evidence presented during the trial.
4.
In a fourth allegation of improper vouching, Reynolds refers this Court to three pages of the prosecutor’s opening argument. (Reynolds’s brief at 94, citing Vol. VII, R. 841 — 43.) We have reviewed the alleged improper comments in the context of the opening argument, and we find no plain error. Rule 45A, Ala. R.App. P. Contrary to Reynolds’s interpretation, the prosecutor was not improperly vouching for the credibility of State’s witness, Adrian West. Instead, the prosecutor was simply outlining what he expected the evidence to prove. See Baker v. State, 906 So.2d 210, 266-67 (Ala.Crim.App.2001), rev’d on other grounds, Ex parte Baker, 906 So.2d 277 (Ala.2004).
C.
Reynolds cites several portions of the prosecutor’s opening and closing arguments at the guilt phase of the trial as support for his allegation that “throughout the trial the prosecutor sought to inflame the jury’s passions.” (Reynolds’s brief, at 94-95.)[26]
‘We have carefully reviewed the prosecutor’s entire closing argument during the penalty phase of Floyd’s trial, paying particular attention to the context of the prosecutor’s remarks quoted in Floyd’s brief. Based on that review, it is clear that the prosecutor’s remarks at the penalty phase of Floyd’s trial were made in the heat of debate, were proper comments on facts in evidence, were in reply to various remarks made during defense counsel’s closing argument, and were not improperly designed to inflame the passions of the jury. Therefore, no basis for reversal exists.”
Floyd v. State, [Ms. CR-05-0935, September 28, 2007] — So.3d -, - (Ala. Crim.App.2007). Based upon the rationale in Floyd, we find no plain error in the prosecutor’s comments.
D.
Reynolds contends that the prosecutor improperly belittled him during cross-examination of him at the guilt phase of the trial. (Reynolds’s brief, at 95.) The prosecutor’s cross-examination of Reynolds was addressed in part XIV of this opinion and found to lack merit.
E.
Reynolds argues that the prosecutor misstated the law at various points in the trial. (Reynolds’s brief, at 95-97.)
1.
First, Reynolds alleges that the prosecutor incorrectly defined reasonable doubt to the prospective jurors during voir dire of the venire panels when the prosecutor defined reasonable doubt, in part, as follows: “ ‘[A] doubt to which you have a reason, is a fair doubt, a substantial doubt.’ ” (Reynolds’s brief, at 95-96, citing R. 495, 496, 564, 656, and 747.)
Reynolds did not object on this basis at trial, and we find no plain error. The use of the terms “substantial doubt,” “fair doubt,” and “doubt for which you have a reason,” to explain the concept of reasonable doubt is not improper. See Greenhill v. State, 746 So.2d 1064, 1069-71 (Ala.Crim.App.1999); Lee v. State, 898 So.2d 790, 841-42 (Ala.Crim.App.2003), cert. de *144 nied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004). Furthermore:
“Our review of the state’s voir dire examination leads us to conclude that the prosecutor provided his ‘definition’ of reasonable doubt to assist him in learning the veniremembers’ opinions on the state’s burden of proof. We do not find any plain error in this situation. Moreover, the trial court repeatedly instructed the jury that the comments and arguments of counsel were not the law and that they should follow only his instructions on the law. Thus, we find no plain error.”
Broadnax v. State, 825 So.2d at 180.
2.
Second, Reynolds maintains that the prosecutor “improperly directed the jury that in order to vote for life [imprisonment], the mitigating factors would have to outweigh the aggravating factors.” (Reynolds’s brief, at 96.) In support of this allegation, Reynolds cites two statements made by the prosecutor during the voir dire of the individual venire panels at the guilt phase of the trial and a comment made during the prosecutor’s closing argument at the penalty phase of the trial. (Vol. VI, R. 490, VII, R. 742; Vol. XIII, R. 1969.)
Reynolds did not object to these allegedly improper comments; thus, we review them for plain error only. Rule 45A, Ala.R.App.P. Whatever misstatements the prosecutor made regarding the weighing of aggravating and mitigating circumstances did not “ ‘so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.’ ” Vanpelt, 74 So.3d at 90. The circuit court charged the jury at the penalty phase that what the attorneys said was not evidence, (Vol. XIII, R. 1984-85, 88-92.) Further, the circuit court correctly charged the jury on the weighing of the aggravating circumstances and the mitigating circumstances. (Vol. XIII, R. 1998-99.) Jurors are presumed to follow the trial court’s instructions. See Irvin v. State, 940 So.2d 331, 352 (Ala.Crim.App.2005) (citing Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.), on return to remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)). No plain error occurred, and no basis for reversal exists regarding this claim.
3.
Reynolds avers that during the prosecutor’s rebuttal closing argument at the guilt phase of the trial, the prosecutor misstated the law on the concept of “voluntary intoxication” when the prosecutor stated that, “ ‘voluntary intoxication is never a defense.’ ” (Reynolds’s brief, at 96, citing Vol. XII, R. 1672.) Reynolds did not object to this comment; thus, we review the comment for plain error only. Rule 45A, Ala.R.App.P.
As stated above, the circuit court charged the jury that what the attorneys stated was not evidence. Furthermore, the circuit court correctly charged the jury that “[w]hile voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent that is essential to an intentional killing and reduce it to other charges.” (Vol. XII, R. 1716.) See § 13A-3-2, Ala.Code 1975. See also Flowers v. State, 922 So.2d 938, 953-54 (Ala.Crim.App.2005.), cert. denied, 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006). Again, jurors are presumed to follow the trial court’s instructions.
After reviewing the prosecutor’s comment in the context of the entire trial, we are not persuaded that the comment “ ‘so infected the trial with unfairness as to *145 make the resulting conviction a denial of due process.’ ” Vanpelt, 74 So.3d at 81. No plain error occurred, and no basis for reversal exists.
4.
Reynolds alleges that during the cross-examination of a defense witness in the penalty phase of the trial, the “prosecutor incorrectly and improperly insinuated that [Reynolds’s] upbringing was not mitigating because it did not directly cause him to commit the crime.” (Reynolds’s brief, at p. 96, citing Vol. XIII, R. 1862.)
During the prosecutor’s cross-examination of Michael Reynolds’s father, Harold Reynolds, at the penalty phase of the trial, the following exchange occurred:
“Q. [PROSECUTOR]: As far as you having to tell this jury this morning that if this crime got committed by him, that it was because of the way you raised him, you don’t feel that way, do you?
“[DEFENSE COUNSEL]: Your Honor, I object to that question. Excuse me, Mr. Reynolds. We are not saying because of the way he was raised he committed this crime. We are offering it for mitigation to weigh the punishment. There is a distinction.
“THE COURT: Sustained. Move along.
“THE PROSECUTOR: That’s all.”
(Vol. XIII, R. 1862-63.)
As evidenced by the above excerpt, defense counsel objected before the question was answered, and the circuit court sustained defense counsel’s objection. Even so, as addressed above, the circuit court correctly charged the jury on the concept of aggravating and mitigating circumstances. In the context of the entire argument, we do not believe that the prosecutor’s question “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Vanpelt, 74 So.3d at 47.
F.
In a one-paragraph argument, Reynolds suggests that his convictions are due to be reversed because the “prosecutor imposed leading questions throughout the trial.” (Reynolds’s brief, at 97.) He then refers this Court to 21 places in the record where this “egregious” conduct supposedly occurred.[27]
Reynolds objected to only 3 of the 21 cited instances of the prosecutor’s purportedly leading questions. On two of those three instances, the circuit court instructed the prosecutor not to lead the witness. (R. 915, 951.) Defense counsel did not move to strike the answers. On the third instance, the Court did not rule on the defense counsel’s objection; thus, there was no adverse ruling from the Court to appeal. (R. 1078.)
As to the remaining 18 allegedly improper questions, as we said in Broadnax, “[b]eeause of the way this issue is presented in his brief to this Court, we seriously question [Reynolds’s] sincerity in making this argument.” 825 So.2d at 170. His string citation to numerous pages from the record does not meet the requirements of Rule 28(a)(10), Ala.R.App.P. Likewise, Reynolds does not specify which questions were allegedly improper, or how he was prejudiced by the improper questions. We will not create Reynolds’s argument for him. Egbuonu v. State, 993 So.2d 35, 38-39 (Ala.Crim.App.2007). Nevertheless, our plain-error review necessarily encompassed the pages referenced by Reynolds, *146 and we find no plain error in the prosecutor’s questions. Lee v. State, 898 So.2d 790, 827 (Ala.Crim.App.2001)
G.
Reynolds alleges that “the prosecutor implied to the jury that [he] was guilty of capital murder by telling it that the trial would require two phases.” (Reynolds’s brief, at 97, citing Vol. VI, R. 570-71, Vol. VII, R. 662.)
There is no merit to this contention. In the portion of the record cited by Reynolds, the prosecutor was simply explaining the bifurcated nature of Alabama capital-murder proceedings as codified in § 13A-5-48, Ala.Code 1975. Reynolds did not object to the prosecutor’s comments, and we find no plain error. Rule 45A, Ala. R.App.P. The prosecutor’s “explanation was relevant to the ... questions regarding the veniremember’s beliefs about the death penalty and whether or not they could follow the law as it was explained to them in determining whether to impose the death penalty” and the comments “did not destroy [Reynolds’s] presumption of innocence.” Lee, 898 So.2d at 834.
XVI.
Reynolds argues that the State improperly introduced victim-impact evidence to the jury during the guilt phase of the trial. (Reynolds’s brief, Issue XIV, at 98-101.)
In Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), the Alabama Supreme Court addressed a claim that the prosecution had improperly injected victim-impact evidence during the guilt phase of the trial. In rejecting this claim, the Supreme Court reasoned:
“We agree with Rieber that Mr. Craig’s testimony concerning Ms. Craig’s children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, supra; Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, supra, applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber’s attorneys did not object to Mr. Craig’s brief references to Ms. Craig’s children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its *147 verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig’s testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).”
663 So.2d at 1005-06.
Mindful of the above and the previously discussed law applicable to allegedly improper prosecutorial comments discussed in issue XV, we turn to Reynolds’s specific allegations.
A.
In a two-sentence argument, Reynolds asserts that the “prosecution falsely indicated to the jury that the victims’ families were parties to this case and that the prosecution was representing them against [him].” (Reynolds’s brief, at 98.) In support of his argument, he refers this Court to 10 instances in the record where this supposedly occurred.[28]
We have reviewed the portions of the record cited by Reynolds. One statement occurred during opening argument; the remaining comments occurred during the prosecutor’s voir dire of the individual jury panels. Reynolds did not object to any of the allegedly improper comments, and we find no plain error. Rule 45A, Ala. R.App.P. In the cited portions of the record, the prosecutor was explaining to the veniremembers the importance of the trial proceedings to Reynolds, the victims’ family, and the State. See Henderson v. State, 583 So.2d 276, 287 (AIa.Crim.App.1990), aff'd, Ex parte Henderson, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)(finding no plain error in the prosecutor’s mentioning at the guilt phase “the importance of the case to the victim’s family, the suffering of the family, [and] that he represented the family....”).
B.
Likewise, we find no plain error in Reynolds’s allegation that during voir dire, opening statement, and a question propounded to a State’s witness “the prosecutor errantly focused the jury’s attention in the guilt phase on how the crime affected the victims’ families.” (Reynolds’s brief, at 99, citing Vol. VI, R. 647; Vol. VII, 830; Vol. IX, R. 901, respectively.)
Reynolds did not object to any of the allegedly improper comments. We have reviewed the comments in the context in *148 which they occurred, and we do not find that the comments “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Vanpelt, 74 So.3d at 81.
C.
Reynolds argues that the prosecutor’s references in voir dire and closing argument regarding how old the victim Savannah Martin would have been at the time of the trial were improper. (Reynolds’s brief at 99, citing Vol. VII, R. 732; Vol. XI, R. 1619; Vol. XII, R. 1669, respectively.) Reynolds did not object to these alleged references on this basis at trial, and we find no plain error. The fact that Savannah would have been a teenager at the time of trial was an obvious fact to the jury. “We cannot reasonably conclude that the prosecutor’s comments in this particular case, when considered in the context of the entire trial, were so prejudicial as to call into question the correctness of the verdict.” Ex parte Rieber, 663 So.2d at 1014.
D.
In a one-paragraph argument, Reynolds contends that portions of the prosecutor’s closing argument were improper because the argument solicited a guilty verdict based upon sympathy, not the evidence. (Reynolds’s brief, at 99, citing Vol. XI, R. 1615, 1616, 1619, 1625.) As he has done with so many other issues, Reynolds merely refers this Court to various portions of the closing argument. He does not even specify which comments were egregious. We have reviewed the comments in the context of the entire closing argument and do not find that the argument was “improperly designed to inflame the passions of the jury.” Floyd v. State, — So.3d at
E.
Reynolds also argues that the prosecutor improperly introduced autopsy photographs of the victims, a video of the crime scene, and a fitted sheet from the victims’ bed that contained dried blood. (Reynolds’s brief, at 100-01.) He maintains that the evidence was inadmissible because it was cumulative and because it constituted improper victim-impact evidence.
We find no abuse of discretion in the circuit court’s admission of the evidence. Contrary to Reynolds’s claim, the aforementioned evidence did not constitute victim-impact evidence, as that term is normally interpreted. Further, the evidence was “relevant to depict the nature and extent of the injuries the victims suffered and the crime scene[]” and was “neither unduly prejudicial nor inflammatory.” Billups v. State, 86 So.3d 1032 (Ala.Crim.App.2009). See also Stallworth v. State, 868 So.2d 1128, 1151-1152 (Ala.Crim.App.2001.)
XVII.
Reynolds contends that the circuit court committed several errors in its jury instructions in the guilt phase of the trial.[29] (Reynolds’s brief, Issue XII.) Reynolds did not object to any of the alleged errors at trial. Accordingly, we will review his assertions for plain error only. Rule 45A, Ala. R.App. P.
“ ‘When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted *149 them.’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).
“ ‘A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, “ ‘the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’ ” Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).’
“Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999).”
Vanpelt, 74 So.3d at 92.
With these principles in mind, we turn to Reynolds’s specific allegations of error.
A.
Reynolds contends that the circuit court erred to reversal when it charged the jury during the guilt phase of the trial that the jury “ ‘did not have to go through each and every element’ for each count because the results would be the same for counts two, three and five.” (Reynolds’s brief, Issue XII(A), at 87-88.) Reynolds argues that these instructions improperly reduced the State’s burden of proof with regard to the elements of the robbery/murder charges.
Contrary to Reynolds’s contention, when the instructions are reviewed in the context of the entire charge, it is clear that the circuit court’s instructions did not relieve the State of its burden of proving each element of the capital offenses charged in counts II, III, and V of the indictment. Those counts charged Reynolds with the capital offense of murder committed during the course of a robbery. See § 13A-5-40(a)(2), Ala.Code 1975. During the portion of the charge cited by Reynolds, the circuit court was simply explaining that the robbery component of the charge was the same for each count; the difference between the three counts was the victim of the murder. The Court was not instructing the jury that the State did not have to prove the robbery component of the robbery/homicide charged in counts II, III, and V of the indictment.
B.
Reynolds maintains that the circuit court “improperly told the jury that a reasonable doubt that would entitle the defendant to an acquittal is a ‘doubt to which you can assign a reason.’ ” (Reynolds’s brief, Issue XII(B), at 88-89.) Reynolds asserts that this instruction improperly permitted a conviction based upon insufficient proof. As we held in Lee v. State, 898 So.2d 790, 842 (Ala.Crim.App.2001), cert. denied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004):
“Taken as a whole, the trial court’s instructions in this case properly conveyed the concept of reasonable doubt to the jury and did not lessen the State’s burden of proof. There is not a reasonable likelihood that the jury applied the instructions in a manner that would violate the appellant’s constitutional rights. Therefore, we do not find that there was any plain error in this regard.”
C.
Reynolds argues that the circuit court’s instructions during the guilt phase “unduly emphasized the defendant’s interest in the outcome of the case ... and as such improperly invaded the province of *150 the jury.” (Reynolds’s brief, Issue XII(C), at 89.) Reynolds is due no relief on this claim.
The circuit court appropriately charged the jury, in pertinent part:
“Ladies and gentlemen, the defendant may testify as a witness on his own behalf, which he did in this case. And when he does so, you may consider the testimony of the defendant along with all the other evidence in light of the facts that he is the defendant and the interest he has in your verdict. This is to be taken into consideration together with all of the other evidence or lack of evidence.”
(Vol. XII, R. 1793-94.) (Emphasis added.) The circuit court’s instructions did not mandate that the jury consider Reynolds’s interest in the outcome of the case; thus, the Court’s instructions did not invade the province of the jury. Phillips v. State, 606 So.2d 170, 170-71 (Ala.Crim.App.1991).
D.
Reynolds alleges that the circuit court incorrectly failed to charge the jury on the offense of manslaughter as a lesser-included offense. (Reynolds’s brief, Issue XII(D), at 89-90.) Reynolds argues that “although the trial court gave the jury an intoxication instruction, it failed to instruct the jury on the corresponding lesser-included offense of manslaughter.” (Reynolds’s brief, at 89.)
“A defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the evidence to support the charge. Ex parte Smith, 756 So.2d 957, 963 (Ala.2000). ‘Constructions on intoxication and manslaughter are not required when they would be inconsistent with the defense strategy.’ Maples v. State, 758 So.2d at 23.”
Pilley v. State, 930 So.2d 550, 562 (Ala.Crim.App.2005).
Reynolds’s defense was that he was not present during the murders or the robbery and that he only went to the scene of the crimes to attempt to help hide any evidence indicating that his girlfriend may have been involved in the crimes. There was simply no evidence indicating that Reynolds recklessly caused the death of the victims or that he killed the victims while acting in a “sudden heat of passion caused by provocation recognized by law and, before a reasonable time for the passion to cool and for reason to reassert itself.” § 13A-6-3(a)(l) and (2), Ala.Code 1975. Thus, we find no plain error in the circuit court’s not charging the jury on the offense of manslaughter as a lesser-included offense.

Penalty-Phase Issues

XVIII.
Reynolds contends that the circuit court improperly instructed the jury during the penalty phase of the trial. Because Reynolds did not object to any of the alleged improper instructions, we review his allegations for plain error only. Rule 45A, Ala.R.App.P. Mindful of the applicable law set forth in Vanpelt, 74 So.3d 64 at, in Part XVII, we will now review each of Reynolds’s purported instances of error.
A.
Reynolds alleges that the circuit court improperly instructed the jury during the penalty phase that it did not have to determine whether the aggravating circumstances existed because the court had already made that determination. (Reynolds’s Brief, Issue XII(A), at p. 88.)
The record indicates that at the beginning of the penalty phase of the trial, the parties agreed that by virtue of the jury’s guilty verdicts, the following two aggravating factors had been proven beyond a *151 reasonable doubt: (1) that the capital offense was committed while Reynolds was engaged in a robbery, see § 18A-5-49(4), Ala.Code 1975; and (2) that Reynolds intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-49(9), Ala.Code 1975. See also, § 13A-5-45(e), Ala.Code 1975. It further appears that for strategic reasons, the defense stipulated that a third aggravating factor was proven beyond a reasonable doubt by the evidence presented at trial: that “[t]he capital offense was especially heinous, atrocious, or cruel compared other capital offenses,” see § 13A-5-49(8), Ala.Code 1975. The State agreed to the existence of the statutory mitigating circumstance that Reynolds had no significant prior criminal history, see § 13A-5-51, Ala.Code 1975. (Vol. XII, R. 1820-24, 1830-31.)
The State introduced into evidence at the penalty phase of the trial all the evidence presented during the guilt phase of the trial. The circuit court adopted the jury’s five guilty verdicts for purposes of the penalty phase. (Vol. XII, R. 1841-44.)
During its charge, the circuit court instructed the jury that the aggravating circumstance that the murder was committed during a robbery and that two or more persons were murdered by one act or pursuant to one scheme or course of conduct had been proven beyond a reasonable doubt by the jury’s guilty verdicts for those offenses during the guilt phase of the trial. Section § 13A-5-45(e), Ala.Code 1975, provides: “[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.” The circuit court’s instructions in this regard were a correct statement of law. See Calhoun v. State, 932 So.2d 923, 973-74 (Ala.Crim.App.2005).
As previously noted, for strategic reasons, the defense also stipulated to the existence of the statutory aggravating factor that the offense was especially heinous, atrocious or cruel when compared to other capital offenses. Pursuant to defense counsel’s suggestion, the circuit court did not specifically inform the jury that the defense had “stipulated” to the existence of this aggravating circumstance; rather, the Court instructed the jury that by virtue of “the verdict, the testimony and the evidence that in this case an evidentiary and factual basis exists for that aggravating circumstance.” (Vol. XIII, R. 1960-61; 1989-91.) The court’s instruction was consistent with the parties’ agreement. The practice of instructing the jury on a stipulation by the parties as to the existence of an aggravating circumstance has been approved by this Court. See Stewart v. State, 730 So.2d 1203, 1227-29 (Ala.Crim.App.1996).
Accordingly, in light of these facts, we find no plain error. Rule 45A, Ala. R.App.P.
B.
Reynolds contends that the circuit court’s use of the words “you” and “your” during its jury charge in the penalty phase of the trial implied to the jury that the jury’s findings as to the existence of any mitigating evidence had to be unanimous before the mitigating evidence could be considered. (Reynolds’s brief, Issue XII(E), at 90-91.) This Court addressed and rejected an identical argument in Hall v. State, 979 So.2d 125, 165-67 (Ala.Crim.App.2007). Further we have reviewed the Court’s entire charge in light of the principles addressed Hall and find “ ‘ “nothing in the instructions that would have suggested to the jurors, or given them the *152 impression, that their findings concerning the existence of mitigating circumstances had to be unanimous” ’ ” before those mitigating circumstances could be considered. Hall, 979 So.2d ,at 165 (quoting other cases). Accordingly, we find no error, plain or otherwise, in this regard.
C.
Last, Reynolds argues that the circuit court’s charge to the jury in the penalty phase was incorrect because, he asserts, the charge “allowed the jury to believe that it could not consider mercy.” (Reynolds’s brief, Issue XII(F), at 91.) The Court charged the jury, in relevant part:
“Now, in your deliberation, ... do not let personal opinions outweigh the law. Weigh the aggravating and mitigating circumstances carefully and dispassionately. Do not be swayed by anger, sympathy or prejudice or any type of passion or emotion. The weighing and comparing of aggravating and mitigating circumstances requires the exercise of sound judgment on your part. It is not a matter of unbridled discretion. A human life hangs in the [balance]. It is a matter of calm reflection, not for the indulgence of emotion.”
(Vol. XIII, R. 2000-01.)
In Brown v. State, 11 So.3d 866, 921 (Ala.Crim.App.2007), aff'd, 11 So.3d 933 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009), the appellant also argued that “the circuit court’s instruction allowed the jury to believe that it could not consider mercy in determining its penalty-phase verdict.” We held:
“ ‘Contrary to Perkins’s contention, it is well settled in Alabama that “[a] capital defendant is not automatically entitled to a mercy instruction.” Boyd v. State, 715 So.2d 825, 846 (Ala. Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). See also, Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994) aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). In Kuenzel v. State, 577 So.2d 474, 495 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), this court stated that “[t]he Alabama provisions for the imposition of capital punishment nowhere mention mercy.” Here, the trial court instructed the jury that its verdict should be based only on the evidence presented and the law as instructed by the court. The jury was instructed that it “must avoid any influence of passion, prejudice or any other arbitrary factor.” (R. 3007-08.) In California v. Brown, 479 U.S. 538, 539, 107 S.Ct. 837, 838, 93 L.Ed.2d 934 (1987), the United States Supreme Court held that “an instruction informing jurors that they ‘must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling1 during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.’
“Perkins v. State, 808 So.2d 1041, 1134—35 (Ala.Crim.App.1999), vacated on other grounds, Perkins v. Alabama, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). For the above reasons, we find no plain error.”
11 So.3d at 921. See also, Vanpelt, 74 So.3d at 93.
*153 Accordingly, for the reasons set forth above, we find no plain error with regard to the court’s instruction.
XIX.
Reynolds argues that the circuit court and the prosecutor improperly diminished the jurors’ “sense of responsibility for their sentencing determination” by stating that the jury’s verdict in the penalty phase was an advisory verdict. (Reynolds’s brief, Issue XVII, at 104.) Reynolds did not object to these allegedly improper comments at trial. Thus, we review his argument for plain error only. Rule 45A, Ala.R.App.P.
“ ‘We have repeatedly stated that a trial court does not diminish the jury’s role by stating that its verdict in the penalty phase is a recommendation or an advisory verdict. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), on remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979,117 L.Ed.2d 142 (1992).’
“Smith v. State, 795 So.2d 788, 837 (Ala.Crim.App.2000).”
Doster v. State, 72 So.3d 50, 104 (Ala.Crim.App.2010). Reynolds is due no relief on this claim.
XX.
Reynolds argues that because of the evidence of his drug use on the day of the murders, the circuit court erroneously refused, without any explanation, to consider and find the following statutory mitigating circumstances: that “[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance” and that “[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.” See § 13A-5-51(2) and (6), Ala.Code 1975, respectively. (Reynolds’s brief, Issue XVI(B), at 102-04).
The circuit court’s sentencing order provided, in relevant part:
“The Court in determining, considering and weighing mitigating circumstances in this case reviewed all statutory mitigating circumstances and also considered all of the mitigating factors charged to the jury in the penalty phase of the trial, and the additional mitigating circumstances offered by the Defendant on October 22, 2007 and December 6, 2007, and those offered at trial. The Court also considered the contents of the ‘Defendant’s Motion for Court to Consider Attached Exhibits As Additional Mitigation Evidence-at -the Sentencing Docket on December 6, 2007’ and all exhibits attached thereto as substantive submissions in support of the mitigating circumstances presented by the Defendant.
“The Court finds no evidence that the Defendant was acting under the influence of extreme mental or emotional disturbance or that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.”
(Vol. II, C. 324, 331, 338, 345, 352.)[30]
Pursuant to § 13A-5-47(d), the circuit court considered all the mitigating evi *154 dence presented, but the Court did not find the existence of the statutory mitigating circumstances set forth in § 13A-5-51(2) and (6), Ala.Code 1975. Section 13A-5-47(d), Ala.Code, does not require the court to enter an “explanation” as to why it did not find the existence of a particular statutory mitigating circumstance.
Furthermore, as we wrote in Beckworth v. State, 946 So.2d 490 (Ala.Crim.App.2005), cert. denied, 549 U.S. 1120, 127 S.Ct. 936, 166 L.Ed.2d 717 (2007):
“In Simmons [v. State, 797 So.2d 1134 (Ala.Crim.App.2000) ], we addressed whether the trial court had erred when it found that the defendant’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired and that the § 13A-5-51(6) mitigating circumstance did not exist. We stated:
“ ‘Conflicting evidence was presented on Simmons’s mental health and his ability to appreciate the criminality of his conduct. Consequently, the determination of the existence of this mitigating factor was within the discretion of the trial court. Based on the record before us, we cannot conclude that the trial court erred in not finding the existence of this mitigating circumstance.’
“797 So.2d at 1183.
“We further noted in Simmons the well-established principle that a trial court is required to consider all evidence offered in mitigation, but that whether the evidence is found to be mitigating is within the trial judge’s discretion. 797 So.2d at 1181-82. See also Waldrop v. State, 859 So.2d 1138, 1149 (Ala.Crim. App.2000), aff'd, 859 So.2d 1181 (Ala.2002).
946 So.2d at 529.
We find no abuse of discretion in the circuit court’s finding that neither of the mitigating circumstances set forth in § 13A-5-51(2) and (6), Ala.Code 1975, existed.
XXI.
Reynolds argues that the circuit court improperly weighed the aggravating circumstances and the mitigating circumstances; therefore, he contends, his sentence of death should be reversed. (Reynolds’s brief, Issue XVI(A) at 102.) In support of his assertion, he cites the portion of the circuit court’s sentencing order in which the court wrote: “It is the opinion of this Court that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstances.” (Vol. II, C. 325, 333, 340, 347, 354.)
Section 13A-5-47(e), Ala.Code 1975, provides, in relevant part:
“In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist....”
In Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 141 (2001), this Court addressed and rejected a claim that the circuit court committed reversible error when it used similar language in its sentencing order. We wrote:
“Melson argues that the trial court’s statement ‘improperly created and applied a presumption of death’ to his case. *155 (Melson’s brief, p. 10.) Initially we note that Melson is presenting this claim for the first time on appeal; thus, our review is for plain error. Rule 45A, Ala. R.App. P.
“Melson’s claim has been addressed and rejected by this court in Weaver v. State, 678 So.2d 260 (Ala.Cr.App.1995), rev’d on other grounds, 678 So.2d 284 (Ala.1996); Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); and Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). As we stated in Weaver:
“ ‘The appellant contends that a statement made in the trial court’s sentencing order was error. In the order, the trial court stated, “It is the opinion of the Court that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstances.” (R. 121.) While this portion of the trial court’s order is technically defective, this court in Fortenberry v. State, 545 So.2d 129 (Ala.Crim.App.1988), aff'd, 545 So.2d 145 (1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990), held that this error was “not so egregious or substantial as to require a new sentencing order.” “ ‘As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are “so clear and convincing that virtually no reasonable person could differ,” a harmless error analysis can be used.’ Baldwin v. State, 456 So.2d 117, 126 (Ala.Cr.App.1983), affirmed, Ex parte Baldwin, 456 So.2d 129, 140 (Ala.1984), cert. denied, 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985).” Fortenberry.
“‘Here, the trial court considered two aggravating circumstances and found that they were sufficient to support the sentence of death.' It is clear that the trial court did not fail to consider any statutory or nonstatuto-ry mitigating circumstances and properly engaged in a weighing and balancing process of the aggravating and mitigating circumstances in this case. We find that the facts indicating the death penalty in this case are clear and convincing and that no reasonable person would differ in their opinion. The error in the trial court’s sentencing order was correct without injury. Fortenberry, Taylor v. State, 666 So.2d 36[, 70-71] (Ala.Crim.App. 1994).’
“678 So.2d at 283.
“In this case, the trial court considered only one aggravating circumstance, that the murder was committed during the course of a robbery, and found that this aggravating circumstance was sufficient to support a death sentence. It is clear in this case, as in Weaver, supra, that the trial court ‘did not fail to consider any statutory or nonstatutory mitigating circumstances and properly engaged in a weighing and balancing process of the aggravating and mitigating circumstances in this case.’ Id. at 283. We have no difficulty concluding that ‘the facts indicating the death penalty in this case are clear and convincing and that no reasonable person would differ in their opinion.’ Id. Thus, the ‘technical’ error in the trial court’s sentencing order was error without injury.
“We point out that during the penalty phase of the trial before the jury, the trial court correctly instructed the jury *156 on the proper method of weighing the aggravating and mitigating circumstances. Throughout its instructions, the trial court repeatedly informed the jury that the aggravating circumstance must outweigh the mitigating circumstances in order for the jury to recommend the death penalty. (R. 2134, 2140, 2141.) ‘Trial judges are presumed to follow their instructions, and they are presumed to know the law and to follow it in making their decisions. Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (citing Ex parte Harrell, 470 So.2d 1309, 1318 (Ala.1985)).’ Stewart v. State, 730 So.2d 1203, 1212 (Ala.Cr.App.1997), aff'd, 730 So.2d 1246 (Ala.1999). We find that the trial court properly considered and weighed the aggravating and mitigating circumstances in sentencing Melson to death.”
775 So.2d at 901-02.
We have carefully reviewed the sentencing proceedings, and, based upon the rationale in Melson, we reject Reynolds’s claim that the circuit court improperly weighed the aggravating and mitigating circumstances in determining that the appropriate sentence was death.
XXII.
Reynolds also argues that his “death sentence must be vacated in light of Ring v. Arizona [536 U.S. 584 (2002).]” (Reynolds’s brief, Issue XXI, at 110-12.) In Ring, the United States Supreme Court held that its earlier decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applied to death-penalty cases; thus, any fact that could increase the maximum penalty to death must be presented to a jury and must be found by the jury to exist beyond a reasonable doubt.
First, Reynolds maintains that his death sentence cannot be imposed because the jury did not make the specific finding that it unanimously found the existence of the aggravating circumstances beyond a reasonable doubt, nor did the jury make finding that the aggravating circumstances outweighed the mitigating circumstances. Second, in a related vein, Reynolds contends that because Alabama law does not require juries to make findings regarding the existence of aggravating and mitigating circumstances, there is no way to verify whether the jury actually unanimously found the existence of an aggravating circumstance beyond a reasonable doubt. Third, Reynolds alleges that his death sentence cannot be imposed because the jury was informed that its sentence was a recommendation. (Reynolds’s brief, Issue XXI, at 110-12.)
Initially, we note that two of the three aggravating circumstances — i.e., that the murders were committed during a first-degree robbery, and that two or more people were killed pursuant to a common scheme or plan — were found to exist beyond a reasonable doubt based on the jury’s unanimous verdicts in the guilt phase finding Reynolds guilty of five counts of capital murder. The third aggravating circumstance — that the murders were especially heinous, atrocious, or cruel when compared to other capital offenses— was stipulated to by the parties. Moreover, Reynolds did not object to the imposition of his sentence on these grounds. Accordingly, we review his allegations for plain error only. These same arguments have been addressed and decided adversely to Reynolds. See Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010); Sharifi v. State, 993 So.2d 907, 940-41 (Ala.Crim.App.2008), cert. denied, 555 U.S. 1010, 129 S.Ct. 491, 172 L.Ed.2d 386 (2008); Lewis v. State, 24 So.3d 480, 533-36 (Ala.Crim.App.2006), aff'd, 24 So.3d 540 (Ala.2009), *157 cert. denied, 558 U.S. 1078, 130 S.Ct. 796, 175 L.Ed.2d 562 (2009). Because the existence of the aggravating circumstances was found either by the jury’s guilt-phase verdicts or by stipulation of the parties, Reynolds is due no relief on these claims.[31]
XXIII.
Reynolds argues that the circuit court “erred in double-counting aggravating circumstances in the penalty phase” of the trial. (Reynolds’s brief, Issue XXII, at 112-13.) Specifically, he argues:
“[T]he use of these charges both as aggravation in the first phase and as ag-gravators in the penalty phase failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty ... and subjected [him] to two punishments as a result of being convicted of a single criminal charge.”
(Reynolds’s brief, Issue XXII, at 112-13.)
Reynolds did not object the proceeding on this basis at trial, and we find no plain error. Rule 45A, Ala.R.App.P. These same assertions have been previously considered and rejected by this Court. See Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010).
XXIV.
In a one-paragraph argument, Reynolds maintains that “evolving standards of decency have rendered lethal injection unconstitutional” as cruel and unusual punishment. (Reynolds’s Brief, Issue XXIII, at 113-14.)
In Vanpelt v. State, 74 So.3d at 89, we wrote:
“Vanpelt next argues that evolving standards of decency have rendered Alabama’s method of execution — lethal injection — unconstitutional. (Vanpelt’s Brief at 119.)
“This court notes that Vanpelt’s entire argument consists of one paragraph and completely fails to offer any argument regarding current standards of decency. In fact, the only sentence contained in Vanpelt’s argument that appears to relate to lethal injection is his conclusory allegation that ‘[e]volving standards of decency have rendered lethal injection unconstitutional.’ (Vanpelt’s Brief at 119.) Additionally, this court, in Saunders v. State, [10 So.3d 53 (Ala.Crim.App.2007) ] held that ‘lethal injection does not constitute per se cruel and unusual punishment. See e.g., McNabb v. State, 991 So.2d 313 (Ala.Crim.App. 2007), and cases cited therein.’ 10 So.3d 53, 111 (Ala.Crim.App.2007); see also Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (holding that lethal injection does not violate the Eighth Amendment); Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008) (holding that lethal injection is not unconstitutional).
“Because Vanpelt has failed to offer this court any basis upon which to hold that lethal injection is unconstitutional *158 and because Vanpelt’s claim has been rejected by the United States Supreme Court, the Alabama Supreme Court, and this court, he is not entitled to any relief.”
For the reasons set forth above, Reynolds is due no relief on this allegation.
XXV.
Reynolds contends that the cumulative effect of the errors affected his substantial rights and warrants a new trial. (Reynolds’s brief, Issue XIII, at 97-98; Issue XXIV, at 114.)
“ ‘The Alabama Supreme Court has set forth the cumulative-error rule as follows: “[WJhile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.” Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App.P.). Applying this standard to Lewis’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected Lewis’s substantial rights at trial.’
“Lewis v. State, [24 So.3d 480, 538 (Ala.Crim.App.2006) ].”
Sharifi v. State, 993 So.2d 907, 946-47 (Ala.Crim.App.2008). We find that the cumulative effect of the individually nonrev-ersible errors did not affect Reynolds’s substantial rights.
XXVI.
As required by § 13A-5-53, Ala.Code 1975, we will now address the propriety of Reynolds’s death sentence.
Reynolds was convicted of five counts of capital murder: (1) the murder of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-6-40(a)(10), Ala.Code 1975; (2) the murder of Charles Martin III, during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975; (3) the murder of Melinda Martin during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975; (4) the murder of Savannah Martin, who was less than 14 years old when she was murdered, see § 13A-5-40(a)(15), Ala.Code 1975; and (5) the murder of Savannah Martin during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 12-0, recommended that Reynolds be sentenced to death.
Pursuant to § 13A-5-53(a), Ala.Code 1975, we have reviewed the sentencing proceedings, and we find no error adversely affecting Reynolds’s substantial rights occurred during the sentencing proceedings. In its sentencing order, the circuit court found the existence of three aggravating circumstances: (1) that the capital offense was committed while Reynolds was engaged in a robbery in the first degree, see § 13A-5-49(4), Ala.Code 1975; (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offense, see § 13A-5-49(8), Ala. Code 1975;[32] and (3) that Reynolds inten *159 tionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-49(9), Ala.Code 1975. The circuit court found the existence of one statutory mitigating circumstance: that Reynolds had no significant history of prior criminal activity, see § 13A-5-51(l), Ala.Code 1975.
We note that § 13A-5-47(d), Ala.Code 1975, provides, in pertinent part, that “the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52.”
We have carefully reviewed the circuit court’s sentencing order. The court’s order does not contain specific written findings concerning the existence or nonexistence of each aggravating circumstance and each mitigating circumstance. Instead, the court’s order sets out only the three aggravating circumstances it found to apply to Reynolds’s case: the two aggravating circumstances established by the jury’s guilt-phase verdicts and the aggravating circumstance stipulated to by the parties. Further, although the circuit court made specific findings regarding the nonexistence of the statutory mitigating circumstances set forth in § 13A-5-51(2), (3), (5), and (6), Ala.Code 1975, the circuit court neglected to address the existence or nonexistence of the statutory mitigating factors set forth in § 13A-5-51(4) and (7),[33] Ala.Code 1975.
Although the circuit court’s findings with regard to the aggravating circumstances and the mitigating circumstances are technically deficient, remand is not necessary in this case. Indeed, in several cases where the circuit court’s sentencing order made specific written findings only as to the aggravating circumstances it found to exist, we held that the court’s failure to make specific findings as to the aggravating circumstances enumerated in § 13A-5-49, Ala.Code 1975, it did not find to exist constituted harmless error. See, e.g., Pilley v. State, 930 So.2d 550, 568 (Ala.Crim.App.2005); Gavin v. State, 891 So.2d 907, 995 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004); Stewart v. State, 730 So.2d 1203, 1219 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999); Fortenberry v. State, 545 So.2d 129 (Ala.Crim.App.1988), aff’d, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).
Nothing in the record indicates that the circuit court refused or failed to consider any aggravating circumstances. Indeed, as noted above, the aggravating circumstances found to apply in this case were the two aggravating circumstances established by the jury’s verdicts in the guilt phase of Reynolds’s trial and the heinous, atrocious, or cruel aggravating circumstance to which the parties stipulated. Because the circuit court’s findings regarding the aggravating circumstances it found to exist in this case are sufficient for this *160 Court to carry out its appellate review, a remand for the entry of a new sentencing order is unnecessary. See Slaton v. State, 680 So.2d 879, 907 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).
Likewise, a remand is not warranted based on the technical deficiency with regard to the trial court’s lack of specific findings as to the existence or nonexistence of two statutory mitigating circumstances. As we stated in Beckworth v. State, 946 So.2d 490 (Ala.Crim.App.2005), cert. denied, 549 U.S. 1120, 127 S.Ct. 936, 166 L.Ed.2d 717 (2007):
“In a recent case presenting similar circumstances, we held that, although technically deficient, the sentencing order did not require a remand. Pilley v. State, 930 So.2d 550 (Ala.Crim.App.2005). The trial court in Pilley failed to mention two statutory mitigating circumstances. Although this Court determined that a remand was not possible because the circuit judge who tried the case was no longer on the bench, we further stated:
“ ‘Given these unique circumstances, we do not find it to be in the interests of judicial economy to remand this case for a new sentencing order, in light of the fact that the trial judge found the existence of no mitigating circumstances at Pilley’s first trial and because Pilley presented no evidence in support of any of the statutory mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975. Moreover, given that no evidence in the record supports the existence of the two mitigating circumstances the circuit court failed to address, we find the court’s omission of these two mitigating circumstances to be harmless.’
“930 So.2d at 569.
“In this case, although the trial judge has not retired from the bench, we find the trial court’s technical defect in failing to mention the § 13A-5-51(l) mitigating circumstance constitutes harmless error and does not rise to the level of plain error requiring a remand. Plain error is error that ‘has or probably has adversely affected the substantial right of the appellant.’ Rule 45A, Ala.R.App. P. Because the trial court considered all of the proffered mitigation, because it found as an aggravating circumstance that Beckworth was under a sentence of imprisonment when he committed this crime, and because there was no support in the record for this mitigating circumstance, it cannot reasonably be argued that the trial court’s failure to state that it did not find this mitigating circumstance to exist has or probably has adversely affected his substantial rights. While we do not wish to be understood as condoning a trial court’s failure to comply strictly with the requirements of § 13A-5-47, Ala.Code 1975, we hold here that the failure to do so does not rise to the level of plain error.”
946 So.2d at 534.
Here, the circuit court stated that it had considered all the mitigating evidence presented at the various stages of the proceedings. Furthermore, Reynolds did not assert the existence of the two mitigating circumstances, and the evidence in the record does not support a finding of the existence of either of the two omitted mitigating circumstances. Accordingly, the circuit court’s omission of these two mitigating circumstances from its order does not rise to the level of plain error. Rule 45A, Ala.R.App.P.
The circuit court found the following regarding the existence of nonstatutory mitigating circumstances:
*161 “[T]he Court finds and considers as mitigating circumstances in the Defendant’s behalf evidence presented of the Defendant’s environment, education, life, background, family, and school history; the love of the Defendant’s family for the Defendant, the love of the Defendant’s friends for the Defendant and the Defendant’s love for his family and friends. The Court also finds and considers as a mitigating circumstances that the Defendant experienced neglect and abuse as a child and had a history of drug abuse and addiction. The Court has considered as a mitigating circumstances the poverty experienced by the Defendant as a child; the fact that his father was at times a brutal abusive alcoholic; the fact that the Defendant’s mother was not ‘maternal,’ apparently did not bond with or nurture her children, and had health problems; the fact that the Defendant was reared in a filthy home with hygiene and health issues; the fact that the Defendant was homeless for a significant period of time during his childhood and has essentially been ‘on his own’ since about age thirteen (13); the fact that the Defendant was physically abused by his father as a small child and had little, if any, structure in his home; the fact that the Defendant dropped out of school when he was in the 7th grade and has received little, if any, formal education since that time; the fact that the Defendant apparently witnessed his father physically abusing his mother and possibly other family members when he was a child; as well as the fact that the Defendant allegedly began abusing drugs and alcohol at age thirteen (13) and later developed a serious drug dependency to crystal methamphetamine and cocaine and that these addictions led to the loss of custody of his child, the loss of jobs and inevitable emotional issues that result from drug addictions and the consequences of drug addictions. The Court has also seriously considered, as mitigating factors, the fact that the Defendant does have a child and family members who love him, that he has been described as ‘the glue’ that holds his disjoined family together and that the imposition of the death penalty in this case would have a devastating effect on many members of this family. The Court has also considered the fact that the Defendant was a good father and stepfather at points in his life.”
(Vol. II, R. 324-25.)
Pursuant to § 13A-5-53(a), this Court has reviewed the record, and we determine that the circuit court’s findings regarding the aggravating and mitigating circumstances are supported by the evidence.
Because we find no error adversely affecting Reynolds’s rights was made in the sentence proceedings and that the circuit court’s findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, we shall now proceed to review the propriety of the decision that death was the proper sentence.
In determining whether death is the appropriate sentence, this Court will specifically address each of the factors enumerated in § 13A-5-53(b), Ala.Code 1975:
The record reflects that Reynolds’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
After an independent weighing of the aggravating and mitigating circumstances, we agree that death is the proper sentence. See § 13A-5-53(b)(2), Ala.Code 1975.
*162 Section 13A-5-53(b)(3), Ala.Code 1975, requires this Court to determine whether Reynolds’s death sentence is disproportionate or excessive when compared to the penalties imposed in similar cases. Reynolds was convicted of three counts of murder during the course of a robbery, one count of the murdering two or more persons by one act or pursuant to one scheme or course of conduct, and the murder of a person who was less than 14 years of age. See §§ 13A-5-40(a)(2), (10), and (15), Ala. Code 1975.
Considering the crime committed and Reynolds, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. “ ‘ “In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.” ’ ” Stallworth v. State, 868 So.2d 1128, 1188 (Ala.Crim.App.2001); Fortenberry v. State, 545 So.2d at 145 (murder of two or more persons); Minor v. State, 914 So.2d 372, 446 (Ala.Crim.App.2004), cert. denied, 548 U.S. 925, 126 S.Ct. 2977, 165 L.Ed.2d 987 (2006)(murder of a child less than 14 years of age).
Finally, as required by Rule 45A, Ala. R.App., we have thoroughly examined the record for any error that may have adversely affected Reynolds’s substantial rights with respect to Reynolds’s capital-murder convictions and his sentence of death, whether or not brought to our attention or to the attention of the circuit court. We find no plain error or defect in the proceedings.
Based upon the foregoing, Reynolds’s capital-murder convictions and his sentence of death are affirmed.
AFFIRMED.
WISE, P.J., and WELCH, WINDOM, and MAIN, JJ., concur.

. Reynolds was sentenced on December 6, 2007. Appellate counsel filed a timely motion for a new trial on December 21, 2007. On February 11, 2008, appellate counsel filed an amendment to the motion for a new trial. On February 15, 2008, the circuit court conducted a hearing on the motion for a new trial and subsequently denied the motion by written order on February 19, 2008. However, the record contains no indication that the motion was continued in conformity with Rule 24.4, Ala. R.Crim. P.; thus, the motion for new trial was deemed denied by operation of law on February 4, 2008 (60 days from the date Reynolds was sentenced). Therefore, all proceedings in the circuit court relating to the motion for a new trial subsequent to February 4, 2008, are moot.

. The facts surrounding the interrogation of those suspects and the resulting statements given by the suspects is addressed in Part VII of this opinion.

. The record indicates that Reynolds had been convicted of a number of felony offenses that he had committed before the crimes in this case; however, because Reynolds was not convicted for those crimes until after the offenses in the present case had been committed, the State agreed not to dispute the presence of the statutory mitigating factor that Reynolds had no significant history of prior criminal activity.

. In an effort to protect the anonymity of the challenged jurors, we have used their initials.

. The circuit court entered a written sentencing order for each conviction; however, only one death sentence was imposed.

. The record indicates that each of the venire-members completed a juror questionnaire that was used in the voir dire of the prospective jurors. (Vol. V, R. 399.) As in Walker, supra, those questionnaires were not included in the appellate record. However, when this Court requested the questionnaires, pursuant to Rule 18.2(b), Ala. R.Crim. P., we were informed by the Etowah circuit clerk that the questionnaires had not been retained. Accordingly, the questionnaires are not available for this Court’s consideration in evaluating this issue. Cf. Ex parte Sharp, [Ms. 1080959, December 4, 2009]-So.3d-(Ala.2009) (The Alabama Supreme Court requested and received questionnaires that were not in the record, and after reviewing questionnaires and record, found that the record raised an inference of discrimination and reversed the judgment of this Court and remanded the case to this Court for it to order further proceedings consistent with its opinion).

. The parties agreed to depose Dr. Craig and to use that deposition testimony in lieu of his live testimony because Dr. Craig was no longer employed by the State of Alabama and no longer resided in Alabama. (Vol. 1, C. 104-OS.)

. Before trial, the prosecutor offered to assist in securing Fincher’s presence at trial; however, the defense indicated that Fincher was not a critical witness to its case. (Vol. V, R. 442-43.)

. John Langley’s testimony corroborated Chad Martin's testimony with regard to what transpired while Chad Martin was at his residence.

. The statement, which was referred to as both State’s Exhibit 63 and Defense's Exhibit 2, was not introduced into evidence by either party. (Vol. IX, R. 1152-56.)

. The police determined that Chad Martin knew details of the crime because of what he had overheard while at the scene of the crimes. (Vol. XI, R. 1519-1521.)

. Although the circuit court ruled that the May 29 police report (Defendant’s Exhibit 10) could not be used as extrinsic evidence to impeach Chad Martin's trial testimony, the circuit court made the report part of the record on appeal. (Vol. XI, R. 1499-1502; Second Supplemental Record on Appeal, Vol. 3, C. 407-10.)

. The applicable law regarding prosecutorial misconduct is addressed in more detail in Part XV of this opinion.

. The DNA profile from the bloodstain on a towel found in the car matched a DNA profile from an Alabama prisoner in the Department of Forensic Sciences’ DNA data base. (Vol. X, R. 1439-41.) The towel apparently had no relation to this case.

. As best we can determine, Reynolds did not object to the general admissibility of the DNA evidence; nevertheless, the circuit court conducted a hearing outside the presence of the jury to determine the admissibility of the DNA evidence. (Vol. X, R. 1387-1401.) See § 36-18-30, Ala.Code 1975.

. During the State’s questioning of Mauterer, the State incorrectly referred to State's Exhibit 27 as State’s Exhibit 29. There does not appear to be any question that the both the State and Mauterer were referring to State’s Exhibit 27 in this exchange. (Vol. X, R. 1410.)

.Mauterer testified that he received fingernail scrapings (State's Exhibit 12) and oral swabs (State’s Exhibit 5) obtained from Chad Martin, oral swabs obtained from John Langley (State’s Exhibit 7), Marcie West (State’s Exhibit 21), and Donald Harvey (State's Exhibit 17.) Mauterer also received oral swabs (State’s Exhibit 189), and head hairs obtained from Reynolds (State's Exhibit 190). (Vol. X, R. 1408-11.)

. Brooks's insufficient “chain of predicate” objection was determined to be sufficient to preserve his challenge to the chain of custody, 33 So.3dat 1271 n. 2.

. At the close of the State’s case, Reynolds moved for a judgment of acquittal on the ground that the State failed to prove a prima facie case because, he alleged, the State’s evidence did not establish the offense of intentional murder. (Vol. XI, R. 1470, 1473.)

. Adrian West was charged with hindering the prosecution. (Vol. VIII, R. 1010-11.)

. Reynolds's counsel initially told the court that two attorneys who were in the audience told him that they had witnessed the occurrence; however, the remainder of the discussion focused on only one of the attorneys. There was no further mention of the other attorney or any other audience member who might have witnessed the occurrence.

. The person referred to as "PJ” was subsequently referred to as Mr. Pruitt, who was introduced as the court’s investigator at the beginning of the trial. (Vol. 5, R. 443.)

. Miranda v. Arizona, 384 U.S, 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Second Supplemental Record, Vol. 3, C. 414.

. For the sake of clarity, this Court has grouped all the guilt-phase issues together and all the penalty-phase issues together; however, because of the manner in which Reynolds intertwined the two phases in this argument, this portion of the opinion does include some discussion of penalty-phase matters.

. In support of his contention, Reynolds cites portions of the prosecutor’s argument from pages 830, 831, 838, and 1219-20 of the record on appeal; however, our review of the record indicates that the last purportedly improper quote was found on pages 1619-20, not on pages 1219-20 as set out in Reynolds’s brief.

. Reynolds cites the following pages from the record on appeal: 915, 951, 1078, 1493-94, 1256, 1260, 1262, 1266, 1270, 1273, 1275, 1281-84, 1289, 1304, 1352, 1354, 1357-58, 1367, 1384-85, 1394, 1412.

. Reynolds cites the following pages from the record: 483, 556, 557-58, 575-76, 585, 648, 665, 673, 732, 829.

. Reynolds also alleges that the circuit court committed several errors in its penalty-phase instructions. These allegations are addressed in the portion of this opinion addressing the penalty-phase issues.

. As previously noted, the circuit court prepared written sentencing orders for each of *154 the five convictions. Reynolds received only one sentence of death for the five convictions.

. Reynolds also challenges the constitutionality of the Alabama Supreme Court's decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002). He claims that the decision "im-permissibly eased the State's burden of proving that the death penalty is appropriate by ensuring that the jury was unaware that its guilt-innocence phase finding authorized the trial judge to impose the death penalty without additional process,” and that the Waldrop decision "undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty.” (Reynolds’s brief, at 111-12.) "However, this Court is bound by the decisions of the Alabama Supreme Court and has no authority to reverse or modify those decisions. See § 12-3-16, Ala.Code 1975.” Doster, supra, 72 So.3d at 101 n. 13.

. Although the parties stipulated to the existence of the heinous, atrocious, or cruel aggravating circumstance, the circuit court nevertheless made specific findings of fact explaining why this aggravating circumstance was applicable, as required by Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). This Court has approved the application of this aggravating circumstance when the testimony established that the victims were *159 stabbed multiple times and that they had suffered before their deaths. See Price v. State, 725 So.2d at 1062; Barbour v. State, 673 So.2d 461, 471 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); Hallford v. State, 548 So.2d 526, 546 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).

. 13A-5-51(4) provides: "The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.” Section 13A-5-51(7) provides: "The age of the defendant at the time of the crime.”